THOMAS E. WHEELER (CA Bar #304191)
ENVIRONMENTAL PROTECTION INFORMATION CENTER
145 G Street, Suite A
Arcata, California 95521
Ph: (707) 822-7711
tom@wildcalifornia.org

SANGYE INCE-JOHANNSEN
*Appearing pro hac vice*
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, OR 97401
Ph: (541) 778-6626
sangyeij@westernlaw.org

MARLYN J. TWITCHELL
*Appearing pro hac vice*
WESTERN ENVIRONMENTAL LAW CENTER
2400 NW 80th Street, #338
Seattle, WA 98117
Ph: (206) 487-7230 ext. 144
twitchell@westernlaw.org

*Attorneys for Plaintiff*
*Environmental Protection Information Center*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**EUREKA DIVISION**

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER, <br><br> Plaintiff, <br><br> vs. <br><br> PAUL SOUZA, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; and U.S. FISH AND WILDLIFE SERVICE, <br><br> Defendants. | Case No. 4:25-cv-03049 <br><br> **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1. Environmental Protection Information Center (EPIC) challenges the United States Fish and Wildlife Service's (FWS) Biological Opinion (BiOp) and Incidental Take Statement (ITS) concerning its 2019 decisions to approve the Green Diamond Resource Company's Forest Habitat Conservation Plan (HCP) and to issue a 50-year Incidental Take Permit (ITP) under the Endangered Species Act (ESA). The permit exempts Green Diamond from liability for causing the "take" of up to 238 northern spotted owls through logging operations on approximately 365,000 acres of private timberland in Del Norte and Humboldt Counties in northern California (Plan Area). The conservation measures the BiOp and HCP rely on are speculative, uncertain, and insufficient to avoid jeopardy to listed species, and fail to minimize and mitigate impacts to northern spotted owls to the maximum extent practicable. The BiOp fails to apply the best available science concerning the habitat requirements of the northern spotted owl and the ecological changes occurring and projected to occur in northern California. The BiOp relies on a model for predicting incidental take that is neither complete nor approved by FWS. FWS fails entirely to analyze or address harm to marbled murrelet and their habitat, despite its earlier designation of 1,400 acres of Plan Area lands as murrelet critical habitat. Plaintiff seeks declaratory and injunctive relief to remedy these violations of the ESA and the Administrative Procedure Act (APA).

# JURISDICTION

2. This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the Endangered Species Act, 16 U.S.C. § 1540(g). This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 16 U.S.C. § 1540(g) (ESA). Pursuant to 16 U.S.C. § 1540(g), on September 17, 2020, Plaintiff provided 60 days' notice of its intent to sue FWS over violations of the ESA. An updated notice of intent, with identical claims but covering fewer species and updated to reflect final action on a barred owl removal program, was sent on February 12, 2025, and received by the FWS on February 14, 2025.

3. Plaintiff has suffered legal wrongs and is adversely affected and aggrieved within the meaning of the ESA. 5 U.S.C. § 702. An actual, justiciable controversy exists between Plaintiff

and Defendant. The relief Plaintiff seeks is authorized by 28 U.S.C. §§ 2201 (Declaratory Judgment), 2202 (Injunctive Relief), 5 U.S.C. § 706 (APA), and 16 U.S.C. § 1540 (ESA).

## VENUE

4. Venue is proper in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A) because all, or a substantial portion, of the events or omissions giving rise to this litigation occurred within the Northern District of California. The offices of the officials that authorized the decisions at issue in this litigation are located within the Northern District. The decisions at issue in this litigation pertain to privately-owned lands within the Northern District. Plaintiff maintains its office within the Northern District.

## DIVISIONAL ASSIGNMENT

5. Assignment to the Eureka Division is appropriate under Civil L.R. 3-2(c) because Green Diamond's landholdings covered by the HCP are in Humboldt and Del Norte Counties, Plaintiff's main office is in Arcata, and the FWS decisions challenged in this litigation were made or signed by the FWS field office in Arcata, all of which are in the Eureka Division.

## PARTIES

6. Plaintiff ENVIRONMENTAL PROTECTION INFORMATION CENTER (EPIC) is a non-profit organization based in Arcata, California. EPIC's mission is to defend the wildlife and wild places of the Klamath Mountains and North Coast Range through science-based protection and restoration of northwest California's forests, and safeguarding connected landscapes for species survival, recovery, and climate adaptation. Since its founding in 1977, EPIC has been at the forefront of forest protection, ensuring that state and federal agencies uphold environmental laws and protect threatened and endangered species. Most of EPIC's 15,000 members and supporters live in northern California. EPIC's staff and members are dedicated to ensuring the long-term survival of northern spotted owls and marbled murrelets, and that FWS complies with applicable law regarding habitat conservation plans and incidental take of these species.

7. The habitat conservation plan and incidental take permit at issue in this litigation frustrate EPIC's mission and harm the interests its members and staff hold in northern spotted owls, marbled murrelets, and their forest habitats. EPIC's members and staff regularly recreate in and

near the Plan Area, including by hiking, attempting to observe and photograph wildlife, and otherwise enjoying the aesthetic and scientific values of forest habitats in and surrounding the Plan Area. The Plan Area is adjacent to public lands that EPIC's staff and members recreate on. EPIC's staff and members intend to return to the vicinity in the future, but are unlikely to do so if FWS continues to allow Green Diamond to diminish the area's natural and scenic values through its commercial logging activities.

8. Defendant PAUL SOUZA is sued in his official capacity as Acting Director of the U.S. Fish and Wildlife Service. As Acting Director, Paul Souza holds the authority and responsibilities of the Director, including for the actions and inactions of the U.S. Fish and Wildlife Service asserted in this complaint.

9. Defendant U.S. FISH AND WILDLIFE SERVICE (FWS) is a federal agency within the U.S. Department of the Interior. Congress has delegated the Department of Interior the authority to implement the ESA with respect to terrestrial and avian species, including northern spotted owls and marbled murrelets. The Department of Interior, in turn, has assigned this responsibility to FWS. Relevant here, FWS is responsible for approving habitat conservation plans (HCP) and issuing incidental take permits (ITP) under Section 10 of the ESA, as it has done with respect to Green Diamond's application for an exemption for "take" of northern spotted owls. FWS is also responsible, through authority delegated to the U.S. Department of the Interior by Congress in Section 7(a)(2) of the ESA, to render its biological opinion (BiOp) on whether any action taken by a federal agency, including FWS, is likely to jeopardize the continued existence of listed species or adversely modify or destroy listed species' critical habitat. This complaint also challenges the BiOp FWS prepared concerning its decision to issue Green Diamond the ITP it sought and approve the HCP Green Diamond proposed.

**FACTS**

Northern Spotted Owl (*Strix occidentalis caurina*)

10. The northern spotted owl is a subspecies of spotted owl (*Strix occidentalis*) adapted to the late-successional, mature, and old-growth coniferous forest ecosystems of the Pacific Northwest. The species' historic range extended from British Columbia, primarily west of the Cascade

mountains, to Marin County, California. The last population in southern British Columbia is now functionally extinct, with a single known individual alive in the wild there in 2023.

11. The northern spotted owl is one of the most studied birds in the world. The habitat requirements of the northern spotted owl are well documented in settled science.

12. The northern spotted owl relies on mature and old-growth forest habitats that contain structures and characteristics necessary to sustain the species' essential biological functions of nesting, roosting, foraging, and dispersal. The northern spotted owl relies on mature and old-growth forest habitats with multi-story, multi-species tree canopies featuring large overstory trees. The northern spotted owl relies on mature and old-growth forest habitats with moderate to high canopy closure to provide adequate thermal cover and escape from predation by other raptor species. The northern spotted owl relies on mature and old-growth forest habitats with a high proportion of mature conifers featuring large cavities and deformities, and large snags and other decadent components characteristic of late-seral forest ecosystems.

13. Northern spotted owls rely heavily on small mammals as prey. In northern California, the species' nutritional needs are met predominantly through foraging red tree voles, Sonoma tree voles, and woodrats. These prey species occur in mature and old-growth forest habitats with abundant large, dead wood on the forest floor. The northern spotted owl depends on adequate populations of these small mammal prey species to forage successfully and sufficiently.

14. The northern spotted owl requires some open space to fly below and within the upper canopy of the multi-story stands it inhabits.

15. Juvenile spotted owls—and spotted owls displaced by disturbance events or barred owl competition—require adequate dispersal habitat connecting local home ranges to suitable habitat elsewhere to successfully colonize new territories. Dispersal habitat allows spotted owls to recolonize territorial vacancies after resident spotted owls die or leave. Dispersal habitat is necessary to provide adequate gene flow across the species' range. Dispersal habitat consists of stands with sufficient tree size and canopy closure affording adequate foraging opportunities and protection from avian predators. Dispersing owls may temporarily tolerate younger or less

complex or diverse stands before reaching suitable new territories, provided such stands contain a minimum level of roosting structures that provide adequate opportunity for rest and foraging.

16. The northern spotted owl may occupy and use other mixed-conifer forest types, including younger and less complex stands, stands impacted by recent disturbance events such as wildfire, and marginal habitats, where the surrounding landscape is depauperate in more suitable, contiguous, late-successional forest habitats. The best available science indicates that northern spotted owls may successfully utilize areas of moderate to high severity burn for foraging and take refuge in pockets of low to moderate severity burn.

17. The northern spotted owl's average lifespan in the wild is 10 years, though some individuals have been documented surviving up to 17 years. The northern spotted owl is site-tenacious, and individual owls have been documented completing their adult lifecycle without ever leaving their home range.

18. In 1990, FWS listed the northern spotted owl as a "threatened" species under the Endangered Species Act. At the time, unabating habitat loss to rampant logging primarily drove population decline. Since that time, habitat loss has continued across the northern spotted owl's range, with a corresponding decline in population. Northern spotted owl populations in northern California, including at research sites in Del Norte and Humboldt counties, continue their decline.

19. Logging has eliminated 80–85% of mature and old-growth forests in the Pacific Northwest.

20. Logging causes direct harm to northern spotted owls, including potential injury and mortality to individual territorial owls, and displacement of owls from nests when nest trees and trees near nest trees are felled.

21. Logging causes further harm to northern spotted owls. Among the owl species, the northern spotted owl is particularly intolerant of habitat disturbance. Habitat disturbance events known to particularly impair the essential behaviors and life history requirements of northern spotted owls—nesting, roosting, breeding, foraging, and dispersal—include the noise and physical disturbance from mechanical timber harvest, brushing, roadbuilding, and log hauling.

22. Logging and associated roadbuilding causes and contributes to habitat fragmentation that may expose a local spotted owl population to heightened risk of mortality and other adverse outcomes during subsequent disturbance events or competitive interactions with barred owls. Logging that eliminates local foraging habitat may contribute to a heightened risk of depredation and starvation when individual owls are forced to travel further for foraging opportunities. Logging that degrades or eliminates suitable habitat increases mortality risk and decreases the likelihood of successful dispersal among juvenile northern spotted owls.

23. Logging can also cause deferred harm to northern spotted owl populations when trees comprising unoccupied but suitable sites are felled, precluding future territory establishment and occupancy.

24. Increased fragmentation and reduced habitat connectivity inhibit gene flow. Reduced gene flow can lead to genetic bottlenecks that heighten the risk of local extirpation in isolated spotted owl subpopulations.

25. Northern spotted owls surviving in stands affected by moderate to high severity burn are especially vulnerable to further disturbance. Post-fire salvage logging in and around burned stands adds stress and compounds existing harm to individual northern spotted owls surviving on post-fire landscapes.

26. Barred owls (*Strix varia*) are native to eastern North America. Barred owls arrived only recently in California, after intensified wildland fire suppression and expanded tree plantations across the northern United States and southern Canadian provinces by the mid-20th century created a patchwork of suitable habitat across the landscape enabling westward colonization.

27. Barred owls are larger and more aggressive than northern spotted owls.

28. Barred owls and northern spotted owls compete for the same habitat and prey. Barred owls use a wider range of habitat types than northern spotted owls. Barred owls prey on a wider range of prey species than northern spotted owls. Barred owls consistently outcompete northern spotted owls across habitat types.

29. Northern spotted owl territory occupancy is determined through surveys over two years. The likelihood of northern spotted owl occupancy increases when core areas contain a range of

habitat conditions suitable for use. The survival and fitness of northern spotted owls is positively correlated with larger patch sizes containing larger trees exhibiting mature and old-growth forest characteristics. The survival and fitness of northern spotted owls is negatively correlated with habitat fragmentation. The presence of barred owls is known to suppress spotted owl survey responses. The presence of barred owls may result in false-negative spotted owl survey results.

30. Researchers have tracked northern spotted owl demography for decades. Researchers have tracked estimated populations across the range of the species. Since listing under the ESA, northern spotted owl populations have continued to decline. In 2018 and again in 2021, researchers found that populations in all eleven demography study sites were in an ongoing state of decline.

### Marbled Murrelet (*Brachyramphus marmoratus*)

31. The marbled murrelet is a small Pacific seabird belonging to the family *Alcidae*.

32. The marbled murrelet's range extends from the Gulf of Alaska, through British Columbia, Washington, and Oregon, to Monterey Bay on the central California coast. The long-lived marbled murrelet is highly adapted to the specific configuration of coastal-marine and old-growth forest ecosystems present in this bioregion.

33. The marbled murrelet is unique among seabirds in that it spends most of its life in marine environments but nests exclusively in mature and old-growth forests occurring in a narrow coastal band that extends 10–50 miles inland.

34. Marbled murrelets have exceptionally narrow habitat requirements for nesting: tall mature conifer trees with numerous broad platforms covered with moss or other thick substrate, and extensive horizontal and vertical cover with moderate to high canopy closure. Unlike most birds, marbled murrelets do not construct nests. Instead, they lay a single egg on a large, usually moss-covered branch each breeding season.

35. During the past century, California's murrelet population plummeted from an estimated 60,000 to approximately 4,000 individuals.

36. FWS listed a distinct population segment of marbled murrelet endemic to California, Oregon, and Washington as threatened under the Endangered Species Act in September 1992.

37. Following federal listing, the population continued its downward trajectory, declining nearly 30% between 2000 and 2010. Recent monitoring shows marbled murrelet population sizes may have stabilized around a lower baseline, but there is no evidence of the listed population segment recovering anywhere.

38. Loss and modification of nesting habitat to logging remains the primary threat to marbled murrelet survival and recovery.

### Climatic and ecosystem change in northern California

39. Forests in western North America and northern California specifically are significantly departed from historical conditions. Past timber harvest has removed large-diameter fire-resilient tree species. Fire suppression since the 20th century has reduced the frequency and extent of low- to mid-severity wildfire. The combined effects of past timber harvest and fire suppression efforts include denser stands that are more prone to high-severity wildfire.

40. Timber harvest that removes all or most of the forest canopy, allows younger second-growth early seral stands to establish. Early seral stands are associated with an elevated risk of wildfire compared to more mature stands. This elevated risk is particularly pronounced where spatially fragmented, "checkerboard" patterns of land ownership prevail. Much of the Plan Area consists of private and public lands spatially arranged in a checkerboard, with Green Diamond's parcels generally bounded by and alternating with parcels of federal land managed by the Forest Service or Bureau of Land Management.

41. Global climate change has resulted in and will continue to result in increasingly hot and dry summers, and less snow accumulation during the winters in the region, compared to historical averages. As a result, the "fire season" across northern California has grown longer and less predictable. As climactic changes continue, ecosystems across northern California can also be expected to change.

### Green Diamond Resource Company HCP

42. Green Diamond is a privately-owned timber company based in Seattle, Washington. Green Diamond owns approximately 365,000 acres of land in Del Norte and Humboldt counties in northern California. Green Diamond manages these landholdings primarily for commercial

timber production. Green Diamond's landholdings in northern California consist predominantly of redwood forests located on the west slope of the Coastal and Klamath Mountains, with Douglas-fir and mixed conifer forests on higher elevation and interior lands at the periphery.

43. In 1992, FWS approved Green Diamond's first northern spotted owl HCP for a period of 30 years. In 2018, Green Diamond applied for a new 50-year HCP to replace that 30-year HCP before it was set to expire in 2022. FWS completed its BiOp on Green Diamond's proposed HCP on April 16, 2019. In its BiOp, FWS concluded that issuing the ITP and approving the HCP would not jeopardize the continued existence of listed species including northern spotted owls and would have "no effects" on marbled murrelet or marbled murrelet critical habitat.

44. FWS approved the HCP and issued a corresponding ITP on June 13, 2019 (ITP #TE43702D-0) for a 50-year term. The ITP authorizes Green Diamond to take up to 119 out of 166 active northern spotted owl sites (238 individuals) on its lands. The HCP replaced the habitat set-asides from the 1992 HCP with a system of Dynamic Core Areas (DCAs). The HCP permits Green Diamond to incorporate up to 53,600 additional acres from the Adjustment Area into the Plan Area without requiring an HCP amendment or renewed consultation.

45. The HCP includes a barred owl research and removal program with three phases. Phase 1 tested barred owl removals in portions of the Plan Area and was completed before HCP approval. Phase 2 began upon issuance of the ITP and implements Plan Area-wide barred owl removal. Under Phase 2, Green Diamond removed 199 barred owls in 2022 and 179 barred owls in 2023. Green Diamond's current Migratory Bird Scientific Collecting Permit authorizes removal of up to 300 barred owls between May 2, 2024, and March 31, 2025.

46. Green Diamond's forestland holdings include suitable and occupied northern spotted owl and marbled murrelet habitats. FWS has designated approximately 1,400 acres of Green Diamond's forestland holdings and an additional 3,350 acres of Adjustment Area lands as marbled murrelet critical habitat. Marbled murrelets are known to occur in multiple residual old-growth stands and one or more second-growth stands in the Plan Area.

## FIRST CLAIM FOR RELIEF

### Violations of Section 7 of the Endangered Species Act

47. Plaintiff realleges and incorporates the allegations in all preceding paragraphs.

48. Section 7(a)(2) of the Endangered Species Act imposes a substantive obligation on each Federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." 16 U.S.C. § 1536(a)(2). When engaged in consultation under Section 7(a)(2) of the Endangered Species Act, FWS must use the best scientific and commercial data available. *Id*. FWS cannot ignore available studies or biological information relevant to the species and the action being evaluated. An agency violates the ESA's best available science mandate when it fails to consider more recent data that may affect its determination. *Id*.

49. Mitigation measures relied on in a BiOp to support a no jeopardy determination must address the threats to the species sufficient to satisfy the jeopardy standard. 16 U.S.C. § 1536(a)(2). Mitigation measures must be reasonably specific, certain to occur, capable of implementation, subject to enforceable obligations, and must effectively address the threats to the species such that they support the conclusion that the action is not likely to jeopardize the continued existence of the species.

50. When FWS concludes in a BiOp that the proposed action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat for such species, FWS must prepare an incidental take statement. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The incidental take statement must specify the amount or extent of such incidental taking on the species, any reasonable and prudent measures FWS determines are necessary or appropriate to minimize such impact, and mandatory terms and conditions to implement those measures. *Id*. FWS may use a surrogate, such as habitat or ecological conditions, to express the amount or extent of anticipated take. 50 C.F.R. § 402.14(i). To use a surrogate for anticipated incidental take, FWS must: (1) describe the causal link between the surrogate and take of the listed species; (2) explain why it is not practical to express the amount or extent of anticipated take in terms of individuals of the listed species; and (3) set a clear standard for determining when the level of anticipated take has been exceeded. *Id*.

## COUNT 1
### FWS's Northern Spotted Owl Biological Opinion
### is Arbitrary and Capricious and Violates the ESA.

51. Plaintiff realleges and incorporates the allegations in all preceding paragraphs.

52. FWS's BiOp for the Green Diamond HCP fails to acknowledge or consider northern spotted owl demography and occupancy data newer than 2015, despite more current data being available at the time the BiOp was issued in 2019. Given the well-documented, severe, ongoing decline of northern spotted owl populations across the species range, and increasing competition from barred owls, current demography and occupancy data is necessary for making an accurate assessment of the species' status and the potential impacts of the proposed action. FWS's failure to use the most recent available northern spotted owl demography and occupancy data in the BiOp is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and constitutes a failure to use the best available scientific and commercial data in violation of Section 7(a)(2) of the ESA 16 U.S.C. § 1536(a)(2).

53. The BiOp fails to analyze how the removal of dispersal habitat will impact northern spotted owl dispersal across the landscape. The BiOp does not analyze potential impacts to listed species from the 53,600 additional acres that may be added from the Adjustment Area and managed under the HCP without amendment. The BiOp contains no analysis of impacts to northern spotted owls from salvage logging permitted in Dynamic Core Areas after fire events, despite the best available science showing that salvage logging compounds existing harm to northern spotted owls persisting on post-fire landscapes, even following high severity burn events. The BiOp fails to analyze how impacts on northern spotted owl prey species and their habitats will affect northern spotted owl survival by reducing foraging opportunities and exacerbating negative outcomes of competitive interactions with barred owls. The BiOp contains no analysis of the effects of climate change to the Plan Area ecosystem and on northern spotted owls in the Plan Area. These omissions are arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violate Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

54. The area thresholds for take in the BiOp are below occupancy thresholds identified in the best available science. The best available science confirms spotted owls require at least half of

the area surrounding their nest sites to be composed of stands with mature and old-growth forest characteristics. The area thresholds used for determining take in the HCP and the ITS were retained from the 1992 HCP. The 1992 HCP derived its area thresholds by subtracting one standard deviation from the mean amounts of forest within 0.5 miles of 60 northern spotted owl sites on Green Diamond's ownership. FWS's conclusion that harvest may reduce some stands to 17.8%, and others to 28.8%, without even triggering the possibility of take, is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violates its obligation to use the best available science to insure against jeopardy under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(2)(A).

55.     The ITP and HCP allow Green Diamond to remove up to 4,000 acres of tree vole habitat per year, totaling 200,000 acres over the 50-year term. Removing such large swaths of habitat for northern spotted owl prey species constitutes a further threat to northern spotted owl survival and recovery that the BiOp fails to consider. Specifically, the BiOp entirely fails to consider how removing northern spotted owl prey species habitats will further intensify competitive interactions between northern spotted owls and barred owls. This analytical omission is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violates Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

56.     In its BiOp, FWS relies on the establishment of 44 Dynamic Core Areas (DCAs) to support its finding of "no jeopardy" to northern spotted owls. The DCAs provide insufficient protection to support FWS's conclusion. Most DCAs (61%) protect less area than the threshold for a "take" determination (89 acres). The majority of DCAs overlap aquatic reserves, riparian buffers, geologically unstable areas, and other areas already protected by Green Diamond's Aquatic HCP. Areas that were already protected from harvest cannot constitute new mitigation to offset new impacts to northern spotted owls, as the ESA requires. To support a "no jeopardy" determination in a BiOp, any measures FWS relies on must be voluntary, reasonably certain to occur, and address threats to the species sufficient to satisfy the jeopardy standard. The DCAs provide insufficient protection to support FWS's "no jeopardy" determination. FWS's decision to rely on them in its BiOp is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violates Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

57. The BiOp improperly relies on Green Diamond conducting barred owl research and removal experiments as a mitigation measure for northern spotted owls. To implement these measures, Green Diamond must obtain an incidental take permit under the Migratory Bird Treaty Act and a permit from the California Department of Fish and Wildlife, either of which may be denied. The BiOp fails to establish a deadline for initiating barred owl control or make it an enforceable obligation. This uncertainty renders the barred owl control measures speculative rather than reasonably specific, certain to occur, and capable of implementation. FWS's reliance on these uncertain measures in its no jeopardy determination is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violates Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

58. The BiOp fails to analyze the effects of climate change on northern spotted owls. The BiOp contains no analysis of how climate change will affect northern spotted owls beyond a single sentence noting that climate change may cause more wildfires in the future. This omission is significant given the well-documented vulnerability of northern spotted owls and their habitat to climate-related impacts, including other stressors beyond wildfire, such as drought and aridification, loss of shifts in vegetation patterns toward forest types less suitable or unsuitable to northern spotted owl use and occupancy. By failing to consider how climate change may affect northern spotted owls over the 50-year permit term, the BiOp fails to use the best available science. This analytical omission is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violates Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

**COUNT 2**
**FWS's "No Effects" Determination for Marbled Murrelet**
**is Arbitrary and Capricious and Violates the ESA.**

59. Plaintiff realleges and incorporates the allegations in all preceding paragraphs.

60. Any agency action that is "likely to adversely affect" a listed species triggers the formal consultation requirements of Section 7(a)(2) of the Endangered Species Act. 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14.

61. The BiOp states that approving the HCP and issuing the ITP will have "no effects" on marbled murrelet. FWS based this conclusion on the incorrect premise that no marbled murrelet critical habitat had been designated on Green Diamond's lands.

62. FWS's no effects determination further relies on a 2010 Master Agreement for Timber Operations, and analysis from 2008, without any current assessment of marbled murrelet presence, habitat conditions, or impacts. FWS required and received updated information and analysis for other species covered by the HCP but not for marbled murrelet.

63. The 2010 Master Agreement with California Department of Fish and Wildlife explicitly disclaims coverage of any activity that would result in take under the federal ESA. The Master Agreement allows certain heavy equipment activities on "mainline roads" that may be near occupied murrelet nests, which may cause adverse effects including take through nest abandonment. The Master Agreement moreover does not address auditory disturbance on the flight paths of murrelets from the ocean to their forest nests, which FWS has acknowledged constitutes take.

64. The Master Agreement notes that nesting birds could be disturbed by noise from heavy equipment required for some projects. The Master Agreement allows requirements to be modified on a site-specific basis with the email concurrence of CDFW. Barred owl control activities may also disturb and harm marbled murrelet without creating benefits for the species.

65. FWS's conclusion in the Biological Opinion that approving the Green Diamond HCP and issuing the permit would have "no effects" on marbled murrelet is factually wrong, arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violates Section 7(a)(2) of the Endangered Species Act. 16 U.S.C. § 1536(a)(2).

**COUNT 3**
**FWS's Decision to Approve Green Diamond's Habitat Conservation Plan and to Issue the Incidental Take Permit Violates its Duty to Avoid Jeopardy to Northern Spotted Owls.**

66. Plaintiff realleges and incorporates the allegations in all preceding paragraphs.

67. Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), imposes a substantive duty on FWS to ensure that its actions, including approving a habitat conservation plan and issuing an incidental take permit, do not jeopardize the continued existence of listed species. FWS violates this substantive duty when it arbitrarily and capriciously relies on a flawed biological opinion.

68. FWS's BiOp concludes that the HCP and ITP will not jeopardize northern spotted owls.

69. FWS's no jeopardy conclusion in the BiOp relies on flawed analyses and inadequate measures, including outdated demography data, and unaccounted dispersal habitat loss and climate change effects, as detailed in Count 1.

70. FWS's no jeopardy conclusion in the BiOp relies on analyses that predict incidental take of northern spotted owls for only the first 10 years of the 50-year HCP and ITP. Incidental take for the final 40 years of the HCP and ITP will be estimated with a model that was not approved by the FWS when it approved the BiOp and therefore cannot estimate take.

71. By relying on the flawed BiOp, FWS failed to ensure that authorizing the HCP and issuing the ITP will not jeopardize northern spotted owls. This failure is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violates Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2).

## COUNT 4
**FWS's Decision to Approve Green Diamond's Habitat Conservation Plan and to Issue the Incidental Take Permit Violates its Duty to Avoid Jeopardy to Marbled Murrelets or Adverse Modification of Marbled Murrelet Critical Habitat.**

72. Plaintiff realleges and incorporates the allegations in all preceding paragraphs.

73. Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), imposes a substantive duty on FWS to ensure that its actions, including approving a habitat conservation plan and issuing an incidental take permit, do not jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat. FWS violates this substantive duty when it arbitrarily and capriciously relies on a flawed biological opinion.

74. FWS stated in the BiOp that approving the HCP and issuing the ITP has no effect on marbled murrelets because no marbled murrelet critical habitat has been designated on Green Diamond's lands. FWS is factually wrong. Relying on the flawed and factually wrong BiOp, FWS's decision to approve the HCP and issue the ITP authorizes logging, mechanized forestry activities, road-building and maintenance, and barred owl control activities that harm marbled murrelets and adversely modify marbled murrelet critical habitat. These activities remove mature conifers with nesting platforms, reduce canopy closure essential for marbled murrelet use, and cause auditory disturbances along flight paths, threatening murrelets in the HCP area.

75. By relying on the factually flawed BiOp, FWS has failed to ensure that approving the HCP and issuing the ITP will not jeopardize marbled murrelets or result in the destruction or adverse modification of marbled murrelet critical habitat. This failure is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violates Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2).

## SECOND CLAIM FOR RELIEF
### Violations of Section 10 of the Endangered Species Act, 16 U.S.C. § 1539

76. Plaintiff realleges and incorporates the allegations in all preceding paragraphs.

77. Under Section 10 of the Endangered Species Act, 16 U.S.C. § 1539, FWS must ensure an applicant for an incidental take permit with a habitat conservation plan "will, to the maximum extent practicable, minimize and mitigate the impacts" of take, secure adequate funding for the plan, and confirm that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. §§ 1539(a)(2)(B)(ii)–(iv). FWS must also receive assurances that the HCP will be fully implemented and publish findings that the permit complies with the purposes of the ESA. 16 U.S.C. §§ 1538(a)(2)(B), (d). Minimization and mitigation measures must be specific, certain, enforceable, and effective.

78. Through the ITP and HCP, FWS has authorized Green Diamond to take up to 119 of 166 active northern spotted owl sites, totaling 238 individuals, by logging 365,000 acres over a 50-year term. FWS has also authorized Green Diamond to remove 4,000 acres of tree vole habitat annually, totaling 200,000 acres over the permit term.

79. The HCP includes 44 Dynamic Core Areas (DCAs) as a conservation measure. Of these, 61% preserve less than 89 acres of spotted owl habitat, which the HCP sets as its threshold for a take determination. The majority of DCAs also overlap pre-existing protected areas, such as aquatic reserves, riparian buffers, and geologically unstable lands under Green Diamond's Aquatic HCP.

80. The HCP also relies on a barred owl removal program as a mitigation measure. The barred owl removal program is conducted under Scientific Collection permits that require annual renewal. Barred owl removal is not planned to continue beyond Phase 2 of the program, which lasts up to 10 years, or at most 20% of the permit term. Phase 3, which follows, tests whether

barred owls can coexist with northern spotted owls but does not specify actions if coexistence fails.

81. The HCP does not address the loss of dispersal habitat, impacts from salvage logging in DCAs after fire events, or the effects of climate change on northern spotted owl survival and recovery.

82. The 50-year term of the HCP cannot ensure that impacts to the northern spotted owl and its habitat will be minimized or mitigated as required by the ESA. Ecosystem dynamics, climate change effects, species interactions, and forest conditions 50 years into the future cannot be predicted with sufficient certainty to guarantee the effectiveness of the proposed conservation measures. The HCP lacks adequate mechanisms for FWS to address unforeseen ecological changes over the 50-year permit term sufficient to fulfill its statutory responsibilities under the ESA.

83. FWS's approval of Green Diamond's HCP and issuance of the ITP violate Section 10 of the ESA because the HCP fails to minimize and mitigate the impacts of take to the maximum extent practicable, relies on uncertain and speculative mitigation measures, lacks adequate assurances of implementation, and is not supported by the best available science. These deficiencies render FWS's decision arbitrary, capricious, and contrary to law, 5 U.S.C. § 706(2)(A), and violate Section 10 of the Endangered Species Act, 16 U.S.C. § 1539.

## PRAYER FOR RELIEF

Based upon the foregoing, Plaintiff respectfully requests that this Court:

    A. Declare that FWS violated the ESA and the APA by failing to use the best available science in the BiOp;

    B. Declare that FWS violated the ESA and the APA by relying on inadequate conservation measures in the BiOp and ITS;

    C. Declare that FWS violated the ESA and the APA by relying on an illegal definition of "take" in the BiOp and ITS;

    D. Declare that FWS violated the ESA and the APA by failing to consider climate change in the BiOp;

E. Declare that FWS violated the ESA and the APA by incorrectly determining "no effects" to marbled murrelet in the BiOp;

F. Declare that FWS violated the ESA by approving Green Diamond's HCP without applying the best scientific information available and without information on which to determine whether Green Diamond's timber operations will result in jeopardy to the northern spotted owl for the final 40 years of the 50-year HCP and ITP;

G. Set aside the BiOp and ITS until the Court finds that FWS has complied with the law;

H. Award Plaintiff reasonable fees, costs, and expenses, including attorney fees; and

I. Grant Plaintiff such other and further relief as the Court deems equitable and just.

Respectfully submitted this 23rd day of April, 2025,

/s/ Thomas E. Wheeler
THOMAS E. WHEELER
California Bar No. 304191
ENVIRONMENTAL PROTECTION
INFORMATION CENTER
145 G Street #A
Arcata, CA 95521
707.822.7711
tom@wildcalifornia.org

/s/ Sangye Ince-Johannsen
SANGYE INCE-JOHANNSEN
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, OR 97401
541.776.6626
sangyeij@westernlaw.org
*Appearing pro hac vice*

MARLYN J. TWITCHELL
WESTERN ENVIRONMENTAL LAW CENTER
206.487.7230 ext. 144
twitchell@westernlaw.org
*Appearing pro hac vice*