NAVI SINGH DHILLON (SBN 279537)
navidhillon@paulhastings.com
CHRISTOPHER J. CARR (SBN 184076)
chriscarr@paulhastings.com
LUCAS GRUNBAUM (SBN 314180)
lucasgrunbaum@paulhastings.com
GRAYSON A. PETERS (SBN 359997)
graysonpeters@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California 94111
Telephone:  (415) 856-7070
Facsimile:  (415) 856-7100

Attorneys for Defendant-Intervenor
GREEN DIAMOND RESOURCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>BRIAN R. NESVIK, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; and U.S. FISH AND WILDLIFE SERVICE,<br><br>　　　　　Defendants,<br><br>　　　and<br><br>GREEN DIAMOND RESOURCE COMPANY,<br><br>　　　　　Defendant-Intervenor. | Case No. 4:25-CV-03049-JST<br><br>**GREEN DIAMOND'S COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　　　　December 3, 2026<br>Time:　　　　2:00 p.m.<br>Judge:　　　Hon. Jon S. Tigar<br>Department:　Videoconference<br><br>Action filed:　April 3, 2025 |

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

**NOTICE OF MOTION AND MOTION**

Please take notice that on December 3, 2026 at 2:00 p.m., or at another time set by the Court, at the Ronald V. Dellums Federal Building & United States Courthouse, 1301 Clay Street, Oakland, CA 94612, Suite 400 S, before the Honorable Jon S. Tigar, Defendant-Intervenor Green Diamond Resource Company (Green Diamond) will, and hereby does, move for summary judgment as to each and every claim asserted in the operative complaint (ECF No. 20) filed by Plaintiff Environmental Protection Information Center.  This motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure.

This Cross-Motion is based on the accompanying Brief, the Declaration of Christopher J. Carr, Green Diamond's Request for Judicial Notice, the certified administrative record, and all argument or evidence that may be presented to the Court before this Cross-Motion is taken under submission.

Respectfully submitted,

DATED:  April 24, 2026

PAUL HASTINGS LLP

By: _____
CHRISTOPHER J. CARR

Attorneys for Defendant-Intervenor
GREEN DIAMOND RESOURCE COMPANY

ii
GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF ISSUES ...................................................................................................... 3

STATUTORY FRAMEWORK ............................................................................................... 3

BACKGROUND ........................................................................................................................ 4

    A.  The 2019 Habitat Conservation Plan Is Supported by Decades of Science. ....................... 4

        1.  The 1992 Northern Spotted Owl Habitat Conservation Plan. ........................................ 5

        2.  The 2009 Aquatic Habitat Conservation Plan. ............................................................. 6

        3.  Enhanced Scientific Understanding of the Northern Spotted Owl. ............................... 6

    B.  Multi-Year Development of the 2019 Habitat Conservation Plan. ..................................... 9

    C.  How "Take" Is Assessed in the 2019 Habitat Conservation Plan. ..................................... 10

    D.  Conservation Measures to Address Primary Threats to Northern Spotted Owl. ............... 11

        1.  Dynamic Core Areas. ..................................................................................................... 11

        2.  Barred Owl Management. ............................................................................................... 12

        3.  Terrestrial Retention of Ecosystem Elements (TREE) Program. ................................ 12

        4.  Northern Spotted Owl Occupancy Surveys. ................................................................. 13

    E.  The Biological Opinion and Incidental Take Permit. ......................................................... 13

    F.  Plaintiff Waits Until 2025 To Challenge the 2019 Habitat Conservation Plan. ................ 13

STANDARD OF REVIEW ..................................................................................................... 14

ARGUMENT ............................................................................................................................. 14

    A.  EPIC's Section 10 Claims Fail. ........................................................................................... 14

        1.  Dynamic Core Areas Protect Owl Habitat. ................................................................... 15

        2.  Highly Accurate Owl Occupancy Surveys Avoid Unauthorized Take. ....................... 20

        3.  Owls Are Protected During any Post-Fire Salvage Harvest. ....................................... 21

        4.  The 2019 Habitat Conservation Plan Addresses Threats from Barred Owl. ............... 22

    B.  EPIC's Section 7 Claims Fare No Better. ........................................................................... 24

        1.  The Service Considered the Best Available Science. ................................................... 24

        2.  The Best Available Science Includes Sophisticated Modeling. ................................... 26

        3.  The Addition of Lands from the Adjustment Area Was Analyzed. .............................. 27

        4.  The Dynamic Core Area Strategy Provides Dispersal Habitat. ................................... 28

        5.  Potential Climate Change Impacts Were Analyzed. ..................................................... 28

        6.  The Marbled Murrelet Claims Fail. .............................................................................. 32

CONCLUSION .......................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Krueger*,
664 F. App'x 674 (9th Cir. 2016) ................................................................. 14

*Baltimore Gas and Elec. Co. v. Nat'l Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ................................................................. 14, 17

*Blue Mountains Biodiversity Project v. Jeffries*,
99 F.4th 438 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1048 (2025) ................................... 25

*Cascadia Wildlands v. Scott Timber Co.*,
105 F.4th 1144, 1153 (2024) ................................................................. 33

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ................................................................. 28

*Ctr. for Biological Div. v. Fish & Game Com.*,
166 Cal.App.4th 597 (2008) ................................................................. 1

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015) ................................................................. 15, 16

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
146 F.4th 1144 (D.C. Cir. 2025) ................................................................. 19, 31, 32

*Ecology Ctr. v. Castaneda*,
574 F.3d 652 (9th Cir. 2009) ................................................................. 21

*Env't Prot. Info. Ctr. v. Cal. Dep't of Forestry & Fire Prot.*,
44 Cal.4th 459 (2008) ................................................................. 3

*Env't Prot. Info. Ctr. v. Cal. Dep't of Forestry & Fire Prot.*,
No. A163051, 2024 WL 295704 (Cal. Ct. App., Jan. 26, 2024) ................................... 6, 13

*Env't Prot. Info. Ctr. v. Simpson Timber Co.*,
255 F.3d 1073 (9th Cir. 2001) ................................................................. 14, 34

*Forest Conservation Council v. Rosboro Lumber Co.*,
50 F.3d 781 (9th Cir. 1995) ................................................................. 21

*Forest Guardians v. U.S. Forest Serv.*
329 F.3d 1089 (9th Cir. 2003) ................................................................. 14, 28, 29

*Friends of Santa Clara River v. United States Army Corps of Eng'rs*,
887 F.3d 906 (9th Cir. 2018) ................................................................. 34

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*
378 F.3d 1059,1066 (9th Cir. 2004), amended, 387 F.3d 968 (9th Cir. 2004) ................ 18, 35

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
99 F.Supp.3d 1033 (N.D. Cal. 2015) ..................................................... 19

*Lewis v. Casey*,
518 U.S. 343 (1996) ..................................................... 32

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*,
120 F.Supp.2d 1005 (M.D. Fla. 2000) ..................................................... 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 560-61 (1992) ..................................................... 32

*Miami-Dade Cnty. v. U.S. EPA*,
529 F.3d 1049 (11th Cir. 2008) ..................................................... 17

*Nat. Res. Def. Council v. Haaland*,
102 F.4th 1045 (9th Cir. 2024) ..................................................... 24, 25, 26, 27

*Nat. Res. Def. Council v. Kempthorne*,
506 F.Supp.2d 322 (E.D. Cal. 2007) ..................................................... 29

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,34
551 U.S. 644 (2007) ..................................................... 34

*Nat'l Res. Def. Council v. Kempthorne*,
539 F.Supp.2d 1155 (E.D. Cal. 2008) ..................................................... 24

*Nat'l Wildlife Fed'n v. Norton*,
306 F.Supp.2d 920 (E.D. Cal. 2004) ..................................................... 19

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
693 F.3d 1084 (9th Cir. 2012) ..................................................... 14

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
606 F.Supp.2d 1122 (E.D. Cal. 2008) ..................................................... 28

*PDK Lab'ys Inc. v. U.S. D.E.A.*,
362 F.3d 786 (D.C. Cir. 2004) ..................................................... 34, 35

*Sagebrush Rebellion, Inc. v. Hodel*,
790 F.2d 760 (9th Cir. 1986) ..................................................... 35

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ..................................................... 24

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ..................................................... 17, 25

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

*Selkirk Conservation All. v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003).................................................................................. 15

*Sierra Club v. E.P.A.*,
    No. 03-1084, 2004 WL 877850 (D.C. Cir. Apr. 16, 2004)........................................ 25

*Sierra Club v. Env't Prot. Agency*,
    356 F.3d 296 (D.C. Cir. 2004) ................................................................................ 25

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................................................ 32

*State of California v. Bureau of Land Mgmt.*,
    612 F.Supp.3d 925 (N.D. Cal. 2020) ................................................................. 33, 34

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
    878 F.3d 725 (9th Cir. 2017).............................................................................. 28, 30

*Union Neighbors United, Inc. v. Jewell*,
    831 F.3d 564 (2016)................................................................................................ 15

*W. Watersheds Project v. McKay*,
    No. 22-35706, 2023 WL 7042541 (9th Cir. Oct. 26, 2023)...................................... 29

*Wild Fish Conservancy v. Irving*,
    221 F.Supp.3d 1224 (E.D. Wash. 2016) ................................................................. 31

*Willamette Riverkeeper v. National Marine Fisheries Service*,
    763 F.Supp.3d 1203 (D. Or. 2025) ......................................................................... 31

**Statutes**

5 U.S.C. § 706.................................................................................................................. 34

5 U.S.C. § 706(2)(A)......................................................................................................... 14

16 U.S.C. § 1536(a)(2)...................................................................................................... 15

16 U.S.C. § 1539(a)(2)(B).............................................................................................. 14, 15

16 U.S.C. § 1539(a)(2)(B)(ii)..................................................................................... 1, 18, 21

16 U.S.C. § 1540............................................................................................................... 32

Cal. Fish & Game Code § 2080.1 ....................................................................... 1, 2, 15, 34

Cal. Fish & Game Code § 2081(a)..................................................................................... 24

Cal. Fish & Game Code § 2081(b) ......................................................................... 1, 2, 20, 34

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

Cal. Pub. Res. Code § 4511, *et seq.* ................................................................ 3

Cal. Pub. Res. Code §§ 4581-4583.5 ................................................................ 4

Cal. Pub. Res. Code §§ 4582.6-4582.7 ............................................................ 4

**Other Authorities**

50 C.F.R. § 402.02 ........................................................................................ 35

14 Cal. Code Regs. § 895, *et seq*.................................................................... 3

14 Cal. Code Regs. § 898.2(d) .................................................................. 4, 34

14 Cal. Code Regs. § 919.11 ..................................................................... 4, 34

14 Cal. Code Regs. § 939.9 ............................................................................ 4

14 Cal. Code Regs. §§ 1037-1037.11 ............................................................. 4

14 Cal. Code Regs. §§ 1056-1056.6 ............................................................... 4

14 Cal. Code Regs. § 15251(a) ....................................................................... 3

81 Fed. Reg. 7214, 7216 (Feb. 11, 2016)..................................................... 35

89 Fed. Reg. 72881 (Sept. 6, 2024).............................................................. 12

Cong. Rec. E1286 (July 31, 2014) .................................................................. 5

Emily Burns, *Loss of a Redwood Wildlife Champion, Lowell Diller* (Mar. 10,
    2017) available at:
    https://www.savetheredwoods.org/blog/loss-redwood-wildlife-champion-
    lowell-diller/ ............................................................................................ 5

U.S. Fish and Wildlife Service, *Final Barred Owl Management Strategy* (Aug.
    2024), available at https://www.fws.gov/sites/default/files/documents/2024-
    08/final-barred-owl-management-strategy-2024_508.pdf.................................. 23

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BaOw | Barred Owl |
| BiOp | Biological Opinion |
| CAL FIRE | California Department of Forestry and Fire Protection |
| CDFW | California Department of Fish and Wildlife |
| CESA | California Endangered Species Act |
| CEQA | California Environmental Quality Act |
| DCA | Dynamic Core Area |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EPIC | Environmental Protection Information Center |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FHCP | Forest Habitat Conservation Plan |
| FPA | California Forest Practice Act |
| FPRs | California Forest Practice Rules |
| FWS | U.S. Fish and Wildlife Service |
| HCP | Habitat Conservation Plan |
| ITP | Incidental Take Permit |
| MaMu | Marbled Murrelet |
| NSO | Northern Spotted Owl |
| OMU | Owl Management Unit |
| THP | Timber Harvest Plan |

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

**INTRODUCTION**

The voluntary habitat conservation plan at issue here was approved on June 13, 2019. Notably, Plaintiff Environmental Protection Information Center (EPIC) provided extensive comments on the plan prior to its approval. Thereafter, Green Diamond faithfully implemented the conservation objectives of the plan and continues to do so to this very day. For its part, EPIC waited nearly six years (2,121 days, to be precise) to file this lawsuit and now seeks to re-write a plan that underwent multi-agency review for many years prior to approval, including by the California Department of Fish and Wildlife (CDFW).[1] EPIC makes scattershot claims, and the Court can easily reject them.

For example, EPIC claims that the U.S. Fish & Wildlife Service's (Service or FWS) analysis of the scientific data and literature concerning Northern Spotted Owl (NSO) habitat needs was not up to snuff, leading it to approve nesting and roosting habitat retention requirements that are too low. That contention is belied by the administrative record (AR). *See, e.g.,* FWS 0135-36. As shown below, the Service, bringing to bear its decades of experience and deep expertise in NSO conservation within the forests of northern California, Oregon and Washington, and with critical input from CDFW, properly considered and analyzed relevant data and literature.

EPIC claims the Service did not address potential climate change impacts, such as increased wildfire risks. That is untrue, and the AR confirms it. *See, e.g.,* FWS 01110, 1112-13, 1456-57.

EPIC also takes aim at the Marbled Murrelet (MaMu). According to EPIC, the Service did not evaluate whether there would be potential impacts to the MaMu. Wrong again. The Service, with critical input by CDFW, properly concluded that harvesting under the FHCP would not affect

---

[1] *See* Cal. Fish & Game Code § 2080.1; Declaration of Christopher J. Carr (Carr Decl.), Ex. A at 3 (CDFW Consistency Determination finding the FHCP's measures "will minimize and fully mitigate the impacts of the authorized take[,]" and "the Project will not jeopardize the continued existence of NSO"). CESA's "fully mitigate" standard is more onerous than the ESA's requirement to minimize and mitigate impacts "to the maximum extent practicable." *Compare* Cal. Fish & Game Code § 2081(b) *with* 16 U.S.C. § 1539(a)(2)(B); *Ctr. for Biological Div. v. Fish & Game Com.*, 166 Cal.App.4th 597, 606 (2008) (noting that a CDFW spokesperson, addressing the effects of a federal listing, said "[s]tate standards like full mitigation are, in some instances, more restrictive than [the ESA].").

1

MaMu because of protective restrictions and measures imposed by multiple layers of California laws and regulations.[2]

EPIC also oddly challenges the use of validated, scientific modeling, based on decades of data collection, to assess potential take. On the one hand, EPIC concedes, at page 26 of its opening brief, ECF No. 38 at 36:1-4, that Green Diamond can only use such models "pending model validation," and after "Service review and approval." Yet a few lines later, on the same page, ECF No. 38 at 36:8-9, EPIC contradicts itself, criticizing the scientific modeling "because the models on which take will be determined have not been validated or approved by the [Service]." As elsewhere, EPIC can't keep its own story straight.

That takes us to the Barred Owl (BaOw).[3] EPIC agrees that the primary threat to the NSO is the BaOw. The FHCP addresses the BaOw, including via removal throughout the Plan Area. EPIC favors lethal removal of the BaOw, but disagrees with the requirements of the FHCP that seek to avoid unnecessary killing of the BaOw. More specifically, those provisions seek to promote co-existence of both the NSO and BaOw, thereby reducing the need for lethal removal of one species to protect another. Green Diamond is committed to protecting not just the NSO, but the BaOw too, all in close coordination with expert wildlife agencies. Frankly, EPIC's position is unreasonable.

Although reluctant to admit it, EPIC knows full well the FHCP greatly promotes the continued survival and recovery of the NSO. Confirmation of the same is EPIC's highly unusual step of asking this Court to remand the FHCP to the Service *without* vacatur. To put a fine point on it, EPIC wants to keep the FHCP in place. This is a tell if there ever was one. EPIC's position also raises the specter of whether a case or controversy exists within the meaning of Article III.

EPIC faces a heavy burden. The AR is enormous, spanning more than 76,000 pages. Recent Supreme Court case law only reinforces the need for deference to agencies on technical

---

[2] CDFW could not have issued its Consistency Determination for NSO if timber harvesting would result in unauthorized incidental take of other listed species, such as MaMu. *See* Cal. Fish & Game Code §§ 2080.1(c), 2081(b)(1).

[3] EPIC has intervened in litigation consolidated before the District of Oregon to defend the Service's program for BaOw removal under the NSO Recovery Plan in Washington, Oregon, and California. Carr Decl., Exs. E-H.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

matters squarely within their expertise and statutory mandates.  EPIC falls far short of meeting its burden.

We ask that the Court grant Green Diamond's motion in full, while denying EPIC's dueling motion.

**STATEMENT OF ISSUES**

The two overarching legal issues presented in this case can be summarized as follows:

1.    Did EPIC meet its burden to persuasively show the Service committed clear and prejudicial error when approving the FHCP in violation of Section 10 of the ESA?

2.    Did EPIC meet its burden to persuasively show the Service committed clear and prejudicial error by not using the best available science in violation of Section 7 of the ESA?

**STATUTORY FRAMEWORK**

***Endangered Species Act.***  Because the government summarized the relevant sections of the ESA and implementing regulations in its opening brief, ECF No. 45 at 9:14-11:12, and the Court's recent explanation of the Section 7 consultation process in the ESA Rules litigation cannot be improved upon, *Center for Biological Diversity v U.S. Department of the Interior*, 2026 WL 898264 (Mar. 30, 2026) at *2, we do not duplicate here what the government and the Court wrote.

***Z'Berg-Nejedly Forest Practice Act and Rules.***  California's Forest Practice Act (FPA) establishes a comprehensive system for regulating timber harvesting on private lands.  Cal. Pub. Res. Code (PRC) § 4511, *et seq*.  The Forest Practice Rules (FPRs), implementing regulations under the FPA, are adopted by the Board of Forestry and Fire Protection and are administered by the California Department of Forestry and Fire Protection (CAL FIRE).  14 Cal. Code Regs. (CCR) § 895, *et seq*.  The 2018 FPRs, in effect when the HCP was approved, span over 400 pages.  FWS 030986-31405.  In addition to compliance with the FPA and the highly prescriptive FPRs, every THP is subject to the California Environmental Quality Act (CEQA).  Because the multi-agency inter-disciplinary process for the review and approval of THPs is so robust, a THP has been certified as "the functional equivalent to, and hence an adequate substitute for, the full environmental impact report (EIR) process required by CEQA."  *Env't Prot. Info. Ctr. v. Cal. Dep't of Forestry & Fire Prot.*, 44 Cal.4th 459, 481 (2008); 14 CCR § 15251(a).

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

In California, no timber harvesting can occur on private lands without a THP and its corresponding environmental review process:  "Before any trees can be cut, [the FPA and FPRs] require the preparation of a [THP] by a registered professional forester."  *Friends of Gualala River v. Gualala Redwood Timber*, 522 F. Supp. 3d 924, 928-29 (N.D. Cal. 2021) (citing FPA and FPRs). "The THP must be submitted to [CAL FIRE] for review, public comment, and approval."  *Id.* (citing PRC §§ 4581-82).  CAL FIRE coordinates a multi-agency review team—including CDFW and the relevant Regional Water Quality Control Board—to evaluate, revise, and refine the THP and its supporting materials, including technical reports, before circulating it for public review and comment.  *See* PRC §§ 4581-4583.5; 14 CCR §§ 1037-1037.11.  Thereafter, CAL FIRE issues an "Official Response," which responds to public comments and sets forth CAL FIRE's decision on whether to approve or deny the THP.  *See* PRC §§ 4582.6-4582.7; 14 CCR §§ 1037.1, 1037.8. CDFW, as a statutorily-mandated "review team" agency, may administratively appeal CAL FIRE's approval of a THP (a "Head of Agency Appeal") to the Board of Forestry.  14 CCR §§ 1056-1056.6.

Most important for this case, the FPRs' "Special Conditions Requiring Disapproval of Plans" expressly prohibit CAL FIRE from approving any THP that "would result in either a 'taking' or finding of jeopardy" of any federally- or state-listed species.  14 CCR § 898.2(d).  The only exceptions are for takings authorized by the Service (for federally-listed species), CDFW (for state-listed species), or, for dual-listed species like the NSO and the MaMu, both agencies.  14 CCR § 898.2(d).  The FPRs also prescribe additional review procedures and standards to ensure no unauthorized take of NSO or MaMu occurs.  14 CCR §§ 939.9, 939.10 (NSO measures), 919.11 (MaMu measures).  THPs proposing timber harvest within the FHCP Plan Area must incorporate the Plan's conservation measures as enforceable requirements.  *See* FWS 0129-130.

### BACKGROUND

**A. The 2019 Habitat Conservation Plan Is Supported by Decades of Science.**

Green Diamond has been at the forefront of scientific and management efforts to conserve and recover the NSO since the species was listed as threatened in 1990.  Those efforts were spearheaded by Dr. Lowell Diller, a respected Wildlife Professor at Humboldt State University, a Senior Biologist for Green Diamond from 1990 to 2014, and "one of [the owls'] greatest allies"

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

due to his pioneering work in NSO conservation.[4]  Among other accomplishments, Green Diamond developed the first HCP for the NSO in 1992, and its extensive research of NSO on its lands resulted in the world's largest dataset of NSO on managed forest lands and a wealth of peer-reviewed studies on NSO.  Green Diamond and Dr. Diller also pioneered the removal of invasive BaOw to protect and recover NSO, a strategy recently implemented by the Service across the NSO's range.

The 2019 HCP, also known as the Forest HCP ("FHCP") because it covers certain other terrestrial species, builds and improves upon Green Diamond's groundbreaking 1992 HCP.[5]  Based on more than three decades of NSO monitoring data and peer-reviewed and published literature by leading scientists, the FHCP lies at the cutting edge of NSO conservation.  For example, the FHCP requires comprehensive monitoring of NSO and protects owls where they are, not where biologists think they "should be."  And it uses sophisticated modeling and decades of data to more accurately predict impacts to NSO, and it will test new conservation tools to address threats from BaOw.

Below Green Diamond provides a primer on the development and mechanics of the FHCP. To further aid the Court, Green Diamond is submitting a neutral summary of key science that the Service considered when evaluating the HCP.  Carr Decl., Ex. K.

**1.  The 1992 Northern Spotted Owl Habitat Conservation Plan.**

In 1992, the Service approved Green Diamond's 30-year HCP for NSO, the very first HCP for the species.  FWS 045798-046129 (1992 HCP), 022-24.[6]  The primary scientific support for that 1992 HCP was Lee Folliard's large-scale study of NSO habitat and occupancy *on Green Diamond's lands* (later published as Folliard 1993).  FWS 0226, 58085.  Folliard quantified the age classes and cover types of forest stands within a 0.5-mile radius of (a 502-acre circle around) 60

---

[4] *See* Emily Burns, *Loss of a Redwood Wildlife Champion, Lowell Diller* (Mar. 10, 2017), https://www.savetheredwoods.org/blog/loss-redwood-wildlife-champion-lowell-diller/. California Representative Jared Huffman likewise recognized Dr. Diller's "long and impressive service," stating that: "Dr. Diller's commitment and pioneering approach to scientific research and monitoring of fisheries and wildlife has been of tremendous benefit to California's North Coast and the United States."  Cong. Rec. E1286 (July 31, 2014).

[5] The FHCP covers NSO, fisher, red tree vole, and Sonoma tree vole.  FWS 0117.

[6] Unlike the federal ESA, CESA extends its take prohibition to "candidate" species.  Cal. Fish and Game Code § 2085.  In 2014, soon after NSO became a candidate under CESA, CDFW made a Consistency Determination for it, based on the ITP for Green Diamond's 1992 NSO HCP and its BiOp.  Carr Decl., Ex. B.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

NSO nest sites on Green Diamond's managed forest lands and evaluated when NSO were displaced by modification of nearby habitat. FWS 0226, 058084-58198 (full study). Working from that study, it was conservatively determined that NSO would not be displaced provided the 502-acre circle surrounding the NSO nest site includes 233 acres of stands ≥31 years (foraging habitat plus some roosting and nesting habitat) and 89 acres of stands ≥46 years (roosting and nesting habitat). The 1992 HCP incorporated those results in its area habitat thresholds, which predict when NSOs would be displaced (i.e., causing "take" under the ESA).

The 1992 HCP's primary conservation measure was a system of 39 static "set-asides" for NSO habitat in which timber harvest was prohibited. FWS 045994. Over the next two decades Green Diamond analyzed the efficacy of the static set-asides, gathered annual data, and conducted other investigations that would later underlie the FHCP's Conservation Program. FWS 023-24.

### 2. The 2009 Aquatic Habitat Conservation Plan.

In 2007, Green Diamond voluntarily concluded another property-wide HCP—the 50-year Aquatic HCP (AHCP)—for salmonids and steelhead. FWS 025, 038447-39592 (full AHCP); *see Env'l Prot. Info. Ctr. v. Dep't of Fish and Wildlife*, No. A163051, 2024 WL 295704 (Cal. Ct. App., Jan. 26, 2024), at *6. A primary feature of the AHCP is the protection of Riparian Management Zones (RMZs) and geologically unstable areas to ensure sufficient stream shading to maintain temperatures appropriate for the covered fish species and limit sediment input to those streams. FWS 038737-38752. Those RMZs also, taken together, provide a "well-distributed network of late seral habitat[,]" i.e., mature forest stands that contribute to NSO nesting and roosting habitat.[7] FWS 025, 130. The AHCP and its attendant protections are set to expire in 2057, twelve years before the FHCP is set to expire.

### 3. Enhanced Scientific Understanding of the Northern Spotted Owl.

The FHCP is the product of extensive scientific research dating back to 1989, when Green Diamond started mark-recapture studies to identify and monitor NSO on what is now the FHCP Plan Area. FWS 076. By 1994, virtually all resident NSO had been identified. *Id.* This dataset

---

[7] Discussed further below, these protections are independently required for the 50-year permit term of the FHCP, ensuring they will remain in effect throughout the life of the FHCP. FWS 0130.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

served as the foundation of the 1992 HCP, which required Green Diamond to study and report the accuracy of its underlying assumptions going forward. FWS 023, 76, 336. The resulting 248-page Ten-Year Review Report (in FHCP Appendix C), which, despite its name, covered NSO data from 1990 to 2006, was "possibly the most comprehensive review ever conducted of any NSO population, based on the single largest NSO dataset in existence."[8] FWS 0336, 481.

As part of the Ten-Year-Review, Green Diamond compared the actual and projected amount of displacement, or take, of NSO sites from timber harvesting. Following the thresholds derived from Folliard 1993, timber harvesting within a 502-acre area around an owl site was conservatively "assumed to cause a displacement of spotted owls and therefore trigger[ed] a report, whether or not the location of spotted owls in the site actually change[d]." FWS 0352-53. Follow-up assessments showed this approach to be hyper-precautionary, finding that NSO continued to occupy or nest at 40% of the sites that fell below the area thresholds. FWS 0354-58; *see also* FWS 0358 (finding no instances of direct harm or injury to NSO from timber harvest operations).

Green Diamond also conducted an "abandonment" study to further understand the factors that cause NSO to leave a roosting or nesting site.[9] FWS 0358-59. That study, which used "logistic regression analysis" to analyze data on various habitat characteristics of 350 owl sites collected between 1990-2005, found that "abandonment was lowest when timber harvesting had created small patches of approximately equal amounts of younger and older forests." FWS 0359-61, 1406. This supported "the conclusion that increasing habitat heterogeneity"—a mix of older and younger forest stands—"provides more favorable habitat conditions for spotted owls." FWS 0362. Other published studies were in accord, finding that "increasing habitat heterogeneity resulted in increased habitat fitness for spotted owls." *Id.*

Green Diamond also investigated NSO nest site selection by analyzing data from hundreds of nests surveys conducted from 1990-2003. Sophisticated modeling efforts that considered "yearly GIS data on stand characteristics (e.g. age and tree species)" and other "covariates" that

[8] The initial 2002 deadline set by the 1992 HCP was extended to 2008 because Green Diamond was under its take limit. *See* FWS 0351, 356.
[9] The term "abandonment" refers to sites that remain unoccupied for a minimum of three consecutive years. FWS 0360. In the FHCP, Green Diamond uses the term "vacant" to refer to such unoccupied sites, recognizing that NSO could potentially reoccupy them later. FWS 0241.

7

may influence nest site selection showed NSO tend to select older stands adjacent to younger ones with more abundant prey.[10] FWS 0378-87, 381-84. "Because dusky-footed woodrats, the primary prey of spotted owls in [the] study area, occurred in highest densities in young stands (Hamm 1995, Hughes 2005), high open edge density would reflect nesting habitat in close proximity to good foraging areas." FWS 0387. In short, NSO prefer their kitchen next to the bedroom.[11]

Furthermore, Green Diamond investigated the diet of NSO to confirm the types of prey NSO rely on for survival and population growth. Researchers identified more than thirty prey species by collecting and analyzing owl pellets (owls regurgitate them) from 245 owl sites. FWS 0418-20. The predominant prey was the dusky-footed woodrat, accounting for 73.9% of the pellets' biomass, FWS 0420, leading researchers to conclude that promoting woodrat habitat "is likely to have the greatest positive influence" on NSO populations. FWS 0423, 565. Separate investigations based on capturing and tagging more than 2,000 dusky-footed woodrats found they are "in greatest abundance in young stands <40 yrs of age." FWS 0425-27, 430, 435.

While these studies provide insight into NSO behavior, survival, and fecundity in Green Diamond's ownership, "the specific site selection criteria of a NSO remains unknown to humans." FWS 080. Monitoring of the 1992 HCP's static set-asides proves the point. While biologists selected those set-asides believing they had high potential *to become occupied sites*, subsequent monitoring and statistical analyses showed that "unoccupied locations that were selected because they appeared to have suitable habitat were very unlikely to ever be used by NSO." *Id.* That discovery, combined with other research reaching similar conclusions, FWS 078-80, led Green Diamond and the Service to pivot from static set-asides to Dynamic Core Areas (DCAs)—"no harvest" zones designed to move across the landscape to protect NSO where they choose to settle, not where biologists think NSO should settle. *See* FWS 0135, 738.

---

[10] The resulting resource selection model was only one of the four models that helped create the highly detailed Habitat Fitness Model in the FHCP. FWS 0165-66.

[11] In another study on Green Diamond lands, after tracking nearly 30 owls for an average of seven months, FWS 0370, researchers found "that spotted owls in [the] study area select the older stands available in a managed landscape for most of their nighttime activities." FWS 0377. But "[p]robability of selection of a site also increased when the nearest stand was 6-20 or 21-40 years, probably because those were the stand ages in which dusky-footed woodrats (primary prey for spotted owls in [that] region) were most abundant." *Id.*

8

In addition to conducting studies on its own timberlands, Green Diamond participated in four meta-analyses of NSO that evaluated data from eleven study areas (including Green Diamond lands). FWS 083, 481 (Franklin et al., 1999; Anthony et al., 2006; Forsman et al., 2011; Dugger et al., 2016), 33277-78. Later meta-analyses like Dugger et al., 2016, which used 20+ years of data, built upon earlier studies to provide a more granular analysis of the impacts of climate and BaOw.[12] FWS 033273. Based on a statistical analysis, Dugger et al., 2016 found that while "the rate of [NSO] decline was increasing in many areas, including southern Oregon and northern California[,] [t]he only exception was the treatment area within [Green Diamond's lands], where populations started increasing after Barred Owl removal" began and "nearly recovered." FWS 033308.[13]

In summary, the Ten-Year Review of the NSO HCP (published in 2010) and subsequent research on Green Diamond's lands resulted in: (i) creation of a habitat fitness model for NSO, which aims to predict optimal habitat for NSO based on 14 years of collected data; (ii) evidence that NSO benefit from a mix of older nesting stands next to younger forests where its primary prey (dusky-footed woodrat) thrives; and (iii) data showing many of the pre-determined static habitat set-asides were "never or rarely occupied[.]" FWS 023, 337. Green Diamond also recognized the new threat of invading BaOw. FWS 023-24. Building on these lessons, Green Diamond identified various conservation measures "requiring adjustment, addition or improvement," culminating in the FHCP. FWS 024.

**B. Multi-Year Development of the 2019 Habitat Conservation Plan.**

Beginning in 2009, Green Diamond and the Service began exploring development of a multispecies FHCP to establish "[d]ynamic core areas" and "[b]arred owl experiments and subsequent management programs." FWS 03102. Between 2009 and approval of the FHCP in 2019, the Service and CDFW provided multiple rounds of review and insisted on many revisions to the FHCP to further enhance conservation measures for NSO. *See, e.g.,* FWS 03247-3254, 3508-

---

[12] Across the study areas, "Green Diamond had the largest NSO dataset with 982 non-juvenile NSO banded, 4,733 total encounter histories and 1,998 assessments of nesting (fledging) success." FWS 083. And Green Diamond's dataset uniquely included the effects of a BaOw removal experiment pilot study that Green Diamond conducted between 2009 and 2014. FWS 083, 160, 33286-33317.

[13] Discussed further, *infra*, Green Diamond also undertook studies to develop best practices for BaOw management under the FHCP.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

09, 13772-77, 10181-85 ("Priority Items Needing Further Discussion"), 3092 (2018 summary of edits).  After a decade of iteration, the Service approved Green Diamond's FHCP, completed the BiOp, and, in June 2019, issued the ITP.  FWS 01641-685 (ROD), 1699 (ITP transmittal letter).

The FHCP covers activities which "may incidentally take NSO" through:  (1) "habitat modification that . . . interfer[es] with essential behavior," and (2) "visual and audible disturbance" amounting to "interference with essential behavior."  FWS 0224.  The FHCP also covers activities that may result in "inadvertent, but direct, injury or death" to NSO, though that type of take is "unlikely."  *Id.*  The ITP allows for variable levels of take based on the total number of active NSO sites identified in that year.  FWS 0234 (FHCP), 1697-98 (ITP).  For each year of the 50-year permit term:  three (3) takes per year are permitted if there are more than 100 active NSO sites on the Plan Area; two (2) takes if there are 75 to 100 NSO sites; only one (1) take if there are between 48 and 74 NSO sites; and no takes at all if there are 47 or fewer NSO sites.  FWS 0234.

**C.  How "Take" Is Assessed in the 2019 Habitat Conservation Plan.**

The FHCP provides a two-step process to assess whether "take" has occurred via habitat modification.  First, the FHCP requires "extensive NSO surveys in conjunction with every THP in order to determine when timber harvesting resulted in NSO displacement or reductions in fecundity."  FWS 0232.  If surveys show a stand falls below the habitat thresholds for age and acreage (derived from Folliard 1993), discussed *supra* at pp. 5-6, take accounting is triggered for those sites.  FWS 0235.  In the second step, once the "likely" locations of NSO displacement have been identified, the Service makes a "designation of take" that is "based on the post-harvest demographic performance of NSO" for three to five years.  *Id.*  That "designation," based on actual NSO performance, confirms or rejects the presumption of take established in step one.

The FHCP also allows Green Diamond to prepare a "site occupancy model" that, once validated by FWS, would replace the above thresholds to determine when timber harvest will cause take. FWS 0242-244.  To advance that transition, Green Diamond has developed a habitat fitness model to "analyze all of the habitat (including timber harvest, set-asides, and take) and non-habitat variables influencing NSO population trends[.]"  FWS 0165-66.  The site occupancy model will take the habitat fitness model one step further and make "spatially explicit projections of NSO

occupancy and reproduction[.]" FWS 0166. Under the site occupancy model, the annual level of authorized take (between three [3] and zero [0]) will not change. FWS 0243; *see also* FWS 0234.

Green Diamond may only transition to the site occupancy model if NSO population and occupancy are increasing, showing the FHCP's conservation measures are working as intended. FWS 0167-68. The Service, or a panel of scientific experts, would approve that transition, and the Service and CDFW will oversee and approve implementation of the model. FWS 0167-68, 1104. Unless and until model "validation" occurs, take will continue to be assessed using the current habitat thresholds and subsequent monitoring of NSO nesting and occupancy. And regardless of the method for calculating take, comprehensive plan area surveys will continue and, if NSO populations decline, the amount of authorized take under the ITP will decrease and Green Diamond must take remedial action to increase the NSO population. FWS 0209, 245.

**D. Conservation Measures to Address Primary Threats to Northern Spotted Owl.**

Loss of habitat and competition from BaOw are the leading threats facing NSO on the Plan Area. *See, e.g.*, FWS 01110. The FHCP addresses these threats by protecting existing NSO habitat through DCAs and NSO occupancy surveys, retaining essential habitat elements under the Terrestrial Retention of Ecosystem Elements ("TREE") program, and mitigating competition from BaOw through Phases Two and Three of Green Diamond's Barred Owl Program.

**1. Dynamic Core Areas.**

Upon issuance of its ITP in 2019, Green Diamond designated 44 DCAs. Each DCA prohibits any harvesting that would bring the DCA below the FHCP's habitat thresholds: an 89-acre core of nesting habitat (age $\geq 46$) and a minimum of 144 acres of age class $\geq 31$ (primarily foraging and roosting habitat), totaling 233 acres within a 502-acre circle. FWS 0135, 139. Green Diamond selected the most functional sites (determined by high NSO occupancy and fecundity) as DCAs, while considering extenuating factors, such as spatial distribution between DCAs and the influence of BaOw. FWS 0135. Going forward, Green Diamond must maintain at least 44 DCAs, FWS 0140, and designate an additional DCA for each net increase to the Plan Area of 8,000 acres added from the Plan's identified "Adjustment Area." FWS 0205; *see also* FWS 03092.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

### 2. Barred Owl Management.

In 2024, the Service finalized its Barred Owl Management Strategy, which provides for the lethal removal of BaOw to protect NSO in the Pacific Northwest (including northern California). *See* 89 Fed. Reg. 72881 (Sept. 6, 2024). FWS recognized that "[w]ithout management of barred owls, extirpation of northern spotted owls from major portions of their historic range is likely in the near future." *Id.* at 72882. The Barred Owl Management Strategy recognizes Green Diamond's pioneering Barred Owl Program and its multi-state effort to save the NSO. Carr Decl., Ex. D.

During Phase One of its Barred Owl Program (also called a "management experiment") between 2009 and 2014, Green Diamond removed BaOw from limited portions of its lands ("treatment areas") to determine the feasibility of large-scale removal and its impact on NSO recovery. FWS 0160; *see also* FWS 089-90. The results demonstrated that removal of BaOw increased NSO survival and site occupancy. FWS 0161. Phase Two builds upon those successes by requiring Plan Area-wide lethal removal of BaOw. *See* FWS 0161-62. Green Diamond began implementing Phase Two after approval of the FHCP. *Id*.

In Phase Three of the Barred Owl Program, subject to "concurrence by the Service," Green Diamond will implement BaOw "invasion" and "coexistence" experiments. FWS 0164, 209. If Green Diamond and FWS cannot agree whether to initiate Phase Three, an independent scientific review panel will decide. FWS 0123. As an alternative to permanent lethal removal, Phase Three would allow BaOw to re-enter a limited set of "treatment areas" to gauge effects on NSO and how to "fine tune suppression" of BaOw to "achieve a stable equilibrium" in which both BaOw and NSO can persist. FWS 0162-63. The benefits of this further experiment are many, including assessing the ability of NSO to adapt to the presence of BaOw and the efficacy of non-lethal management tools. FWS 0123. Phase Three would be discontinued, and lethal removal may need to be resumed, if NSO populations decline below projections. FWS 0163.

### 3. Terrestrial Retention of Ecosystem Elements (TREE) Program.

The FHCP's TREE Program requires "long-term retention and recruitment of late seral habitat elements beneficial to NSOs[.]" FWS 0153. TREE was developed under the 1992 HCP to "accelerate future NSO habitat development[,]" and was augmented in 2005 by Green Diamond's

Terrestrial Dead Wood Management Plan. *Id.* The TREE Program's complex retention guidelines establish a "scoring" mechanism to retain trees with beneficial features, such as "an internal hollow or large cavity[,] … complex crown, lateral large limbs, [or] epicormic branching[.]" FWS 0156.

### 4. Northern Spotted Owl Occupancy Surveys.

For every THP, Green Diamond must conduct pre-harvest surveys pursuant to protocols designed to achieve a "minimum 95% detection probability." FWS 0220, 227, *see also* FWS 0718-736 (FHCP Appendix F: NSO Survey Protocol). These protocols include measures to reduce the risk of false negative survey results for NSO, FWS 0242, including detailed measures to account for the possibility that BaOw will increase false negative results. FWS 0728. No THP can be approved unless it incorporates and complies with those protocols. Additionally, and separate from the THP process, all DCAs must be surveyed annually using the same 95% probability-of-detection survey protocol. FWS 0153.

### E. The Biological Opinion and Incidental Take Permit.

In its role as "consulting" agency under Section 7, FWS published a 70-page Intra-Service Biological Opinion on Issuance of a Section 10(a)(1)(B) Permit for the Green Diamond FHCP. FWS 01102-71. That BiOp was informed by correspondence, meetings, and site visits concerning development of the FHCP and associated EIS, plus those documents themselves. FWS 01102-1103. After a lengthy discussion of the FHCP's conservation measures and authorized take under the ITP, FWS concluded the level of anticipated take would not jeopardize the NSO. FWS 01148-49. As to MaMu, FWS memorialized its determination that "no effects" were expected, and that there would be no adverse modification of critical habitat. FWS 01102.

### F. Plaintiff Waits Until 2025 To Challenge the 2019 Habitat Conservation Plan.

On September 17, 2020, EPIC[14] sent the FWS a 60-day Notice of Intent to Sue for Violations of the Endangered Species Act concerning Green Diamond's FHCP (2020 NOI). Carr

---

[14] EPIC is a repeat player when it comes to suing agencies for actions concerning Green Diamond's lands. Most recently, EPIC sued CDFW alleging that a Safe Harbor Agreement for the Humboldt Marten on Green Diamond's timberlands violated the CESA. *Env'l Prot. Info. Ctr. v. Dep't of Fish and Wildlife,* No. A163051, 2024 WL 295704 (Cal. Ct. App., Jan. 26, 2024). The First District Court of Appeal affirmed the trial court's ruling in favor of CDFW and Green Diamond. *Id.* at *16. EPIC also unsuccessfully filed suit to require the Service to reinitiate consultation on the ITP for

Decl., Ex. I.  On February 12, 2025, EPIC sent another letter, styled as an "Updated" Notice of Intent to Sue (2025 NOI), with allegations not presented in the 2020 NOI.  Carr Decl., Ex. J.[15]

EPIC filed suit on April 3, 2025, 50 days after serving the amended NOI.  *See* ECF No. 1.  EPIC followed up by filing an amended complaint on April 23, 2025.  ECF No. 20.  EPIC styled its action as one brought pursuant to both the APA and the ESA's citizen suit provision.  *Id.* at 2:20-21.  EPIC's suit presents claims under both section 7 and section 10 of the ESA.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) provides the standard of review for all of EPIC's claims.  *All. for the Wild Rockies v. Krueger*, 664 F. App'x 674, 675 (9th Cir. 2016).  Under the APA, a court reviews whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'"  *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012).

A court's review is also "at its most deferential" where, as here, the claims at issue concern an agency's "area of special expertise," *Baltimore Gas and Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 (1983), and the agency must make decisions "at the frontiers of science," *Forest Guardians*, 329 F.3d at 1099.

## ARGUMENT

### A.  EPIC's Section 10 Claims Fail.

EPIC contends the FHCP fails to "minimize and mitigate" the impacts of take to the "maximum extent practicable" as required by Section 10 of the ESA.  ECF No. 38 at 25:23-26:6, *see* 16 U.S.C. § 1539(a)(2)(B).  EPIC is wrong on multiple levels.

---

Green Diamond's 1992 NSO HCP, with the Ninth Circuit affirming Judge Breyer's order dismissing EPIC's suit. *Env'l Prot. Info. Ctr v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001).

[15] For example, the 2025 NOI newly alleged that FWS failed to identify designated MaMu critical habitat within the FHCP's Plan Area, and that FWS erred by failing to analyze the effects of the FHCP on that critical habitat in the BiOp.  Carr Decl., Ex. J.

First and foremost, the "minimize and mitigate" standard applies to the FHCP's "conservation plan" *as a whole*, not separately to each individual conservation measure.[16] 16 U.S.C. § 1539(a)(2)(B); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1047 (N.D. Cal. 2015). Although the two conservation measures (DCAs and BaOw removal) upon which EPIC focuses are essential, the FHCP establishes a complex conservation program with eleven (11) separate but synergistic measures. *See* FWS 01107-08. EPIC cannot carry its burden by ignoring most of those measures.

Second, the "minimize and mitigate" standard is satisfied so long as the HCP accompanying an ITP "fully offsets" the impacts of take. *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 583 (2016) ("[I]f combined minimization and mitigation fully offset the take, it does not matter whether [the applicant] *could* do more; [the applicant] has already satisfied what is required under the ESA."). Here, the Service found exactly that: "the impacts of take we have assumed to occur under the FHCP will be offset by the conservation measures and the operating conservation program as a whole." FWS 1708-10. And CDFW agreed with that conclusion, issuing its Consistency Determination under CESA after finding that the FHCP "minimizes and fully mitigates" the impacts of the incidental take of NSO. Cal. Fish & Game Code §§ 2080.1, 2081(b)(2); Carr Decl., Ex. A.

While EPIC's claims can be rejected for these reasons alone, below Green Diamond provides a more detailed discussion of why EPIC's Section 10 arguments all fail.

### 1. Dynamic Core Areas Protect Owl Habitat.

After more than two decades of study, FWS and Green Diamond found that the 1992 HCP's static habitat set-asides, which attempted to *ex ante* predict where NSO would occupy the landscape, were of limited biological value. FWS 078-80. In response, the FHCP transitioned to a dynamic habitat conservation strategy to protect lands NSO actually use. FWS 078-80, 134-35.

---

[16] Although EPIC contends that certain conservation measures do not reflect the "best available science," the Ninth Circuit has made clear that the "best available science" standard, rooted in Section 7's statutory text, *see* 16 U.S.C. § 1536(a)(2), does not apply to the design of conservation measures under Section 10. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1048 (9th Cir. 2015); *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 954-58 (9th Cir. 2003).

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

While EPIC "primarily lament[s] the Service's refusal to adopt *their* list of measures in issuing the ITP," the Service's statutory duty is to "select measures that minimize and mitigate impacts to the maximum extent practicable[,]" which "selection is entitled to deference due to its biological expertise." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 120 F.Supp.2d 1005, 1022 (M.D. Fla. 2000); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 202 F.Supp.2d 594, 623-24 (W.D. Tex. 2002) (similar).

### a. The Dynamic Core Areas' 89-Acre Core Area Threshold Is Backed by Science.

As discussed above, the DCAs, like the FHCP's take thresholds, use stand age and acreage thresholds from Folliard's pioneering 1993 study of NSO habitat selection on Green Diamond's lands, the utility of which was confirmed by Green Diamond's research of NSO behavior under the 1992 HCP. *See* FWS 0226 (discussing Folliard), 135-36 (subsequent research). EPIC nevertheless contends the Service erred by using the 89-acre "core area" habitat threshold around NSO nests sites. ECF No. 38 at 26:15-28:11. The argument must be rejected.

The Service's judgment in selecting the core area threshold finds ample support in the record. In addition to Folliard 1993, the Service considered the leading Report of the Interagency Scientific Committee (ISC) To Address the Conservation of the Northern Spotted Owl (Thomas et al. 1990) and decades of Green Diamond's monitoring and research of NSO on its own lands, all of which support the 89-acre threshold.[17] FWS 076-78 (FHCP), 135-36, 46804 (1990 NSO Conservation Strategy). In fact, Green Diamond's research on 94 NSO territories found that most (80 percent) had core nest areas of 76 acres or less. FWS 0135-36; *see also* FWS 076-88 (summarizing NSO habitat analyses).

Despite all this, EPIC asserts that the DCAs fail to reflect the "best available science." ECF No. 38 at 26:7-30:11. Of course, that argument assumes that the "best available science" standard applies to FWS's approval of the DCAs. As already noted, it does not.[18] Nevertheless, the

---

[17] The 1992 HCP required that Green Diamond conduct research into whether the static set-asides were achieving conservation goals, including studies on NSO habitat preferences and demographic trends. *See, e.g.,* FWS 078-82, 486-87. The results further support the FHCP's thresholds.

[18] As discussed, the "best available science" standard governs the Service acting as a consulting agency under Section 7, not when it is the "action" agency approving an HCP and issuing an ITP under Section 10. *See Ctr. for Biological Diversity*, 807 F.3d at 1048.

Service's decision to rely on Folliard, other leading scientific literature, and decades of research performed pursuant to the 1992 NSO HCP meets the best available science standard. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) ("[W]hat constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference" that courts "'should be especially wary of overturning'" [citations omitted]).  And while not required to adopt EPIC's preferred studies, the Service cited many of them in the FHCP.[19]

EPIC next tries to gin up controversy where none exists by pointing to FWS's decision to set the DCA's core area threshold at one standard deviation below the mean derived from Folliard 1993.  *See* ECF No. 38 at 26:19-25.  This is a distraction.  The Service relied upon years of data when reaffirming use of these habitat thresholds, finding that setting the threshold at 89 acres protected NSO.  *See, e.g.,* FWS 0135-36.  And regardless of the precise threshold, the FHCP requires Green Diamond to continuously monitor and survey its lands to assess actual take and the accuracy of its thresholds, just as Green Diamond had done for years under the 1992 NSO HCP. *See* FWS 0351-67 (study of NSO displacement).

Beyond all that, EPIC's objections to Folliard's methodology misunderstand the FHCP's take accounting process.  The mean identifies typical forest conditions across nest sites, while the standard deviation measures the amount of variation from site to site.  By using a mean-minus-one-standard deviation, the FHCP (like the 1992 HCP) sets the habitat take threshold at the *lower* end of the range of conditions that have caused displacement in the past.  This conservative approach, based on decades of real-world data, ensures that any timber harvesting that could potentially result in take triggers years of surveys and careful scrutiny by FWS to determine whether take has actually occurred.  EPIC's request that this Court second-guess those hyper technical scientific decisions is inconsistent with the deference owed to the Service.  *Baltimore Gas & Elec. Co.*, 462 U.S. at 103; *Miami-Dade Cnty. v. U.S. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) (a reviewing court "must look at the [agency's] decision not as the chemist, biologist, or statistician that [it is] qualified

---

[19] *See* ECF No. 38 at 27:1-23 (citing Folliard et al. 2000, Meyer et al. 1998, Bart and Forsman 1992, Dugger et al. 2005); 0369 (citing Bart and Forsman 1992), 077, 372 (citing Folliard et al. 2000), 0298 (citing Meyer et al. 1998), 0447-48, 488, 501 (citing Dugger et al. 2005), 052, 296 (citing the Service's 1990 NSO Status Review).

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

neither by training nor experience to be, but as a reviewing court exercising . . . certain minimal standards of rationality." [internal quotations omitted]).

### b. The Use of Stand Age as a Proxy for NSO Habitat Is Reasonable.

EPIC complains the DCAs rely on stand age as a proxy for habitat suitability, and thereby fail to account for particular habitat features, e.g., snags (dead or dying trees) and decadent trees with cavities. ECF No. 38 at 28:12-26. The argument fails. First, the case EPIC cites for support, *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1066 (9th Cir. 2004) amended, 387 F.3d 968 (9th Cir. 2004), involved a challenge to FWS's biological opinions for NSO and their assessment of jeopardy—not a challenge to the adequacy of conservation measures. Again, those Section 7 standards do not apply to this Section 10 claim. Moreover, the *Gifford Pinchot* court deferred to the Service's expertise and approved its decision to rely on a habitat proxy so long as it "reasonably ensures" accurate results. *Id.* (citing *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.* 273 F.3d 1229, 1250 (9th Cir. 2001)). Here, consistent with *Gifford Pinchot*, the FHCP explains why stand age is a reasonable proxy for NSO habitat fitness. FWS 076-77, 126-27, 58156-57.

As to EPIC's claim that so-called "monoculture" plantations—timberlands subject to even-aged management or clearcutting—will lack the complex features required for NSO habitat, ECF No. 38 at 28:17-19, California law and the FHCP provide the answers. For more than three decades, the FRPs have mandated that "all Snags shall be retained," 14 CCR § 919.1, meaning snags that existed in the past are still present despite any recent harvesting. The FHCP's TREE program reinforces and expands that mandate, requiring retention not only of snags but also other decadent habitat elements and coarse woody debris so they remain available for future NSO habitat. FWS 0153-56 (FHCP), 701-717 (FHCP Appendix E: TREE Program). The Service rightly credited background California law and the FHCP's TREE Program to find that the impacts of take would be fully offset. *See* 16 U.S.C. § 1539(a)(2)(B)(ii).

### c. The Dynamic Core Areas Build on the Protections of Green Diamond's 2007 Aquatic HCP.

EPIC argues that DCAs are duplicative of protections already established under the AHCP. ECF No. 38 at 29:1-19. In the first instance, any overlap between the FHCP and the AHCP is still a conservation benefit because it ensures that NSO sites are protected independently, and after the expiration of, the AHCP. The law does not prohibit multi-leveled, multi-species conservation efforts. *Union Neighbors United, Inc.*, 831 F.3d at 583. EPIC also exaggerates the extent of overlap, saying the DCAs "largely" overlap with RMZs and geologically unstable areas protected under the AHCP. ECF No. 38 at 29:10-12. On average, only 34% of each DCA overlaps with an RMZ or geologically unstable area, with some overlapping as little as 8.3%. FWS 01136, 1444.

The cases that EPIC cites lend it no aid. *Klamath-Siskiyou Wildlands Center,* 99 F.Supp.3d 1033, held that an ITP applicant could not "piggyback[] off of already-existing conservation efforts *by their non-applicant neighbors*." *Id.* at 1052 (emphasis added); *see also id.* at 1050. *Klamath-Siskiyou* does not foreclose the Service from encouraging an HCP applicant to expand on its *own* already-existing conservation efforts. Nor does *National Wildlife Federation v. Norton*, 306 F.Supp.2d 920, 928 (E.D. Cal. 2004) support EPIC's position. In that case, the Eastern District upheld the Service's issuance of an ITP, noting Section 10 "does not suggest that an applicant must ever do more than mitigate the effect of its take of species[,]" and that a rational relationship between the level of mitigation and the level of take is sufficient. *Id.* at 927-28. Here, the Service has more than satisfied *Norton*.

### d. The Dynamic Core Areas Provide Durable and Adaptive Protections.

EPIC argues that replacing a DCA—i.e., the "dynamic" in DCAs—unlawfully allows destruction of known habitat for "speculative" future benefits. ECF No. 38 at 29:21-30:11. The argument is misguided and should be rejected. The dynamic character of DCAs is a scientifically-grounded innovation that represents an improvement over the static habitat reserves under the 1992 NSO HCP. FWS 0145. EPIC turns this on its head to argue that the designation of habitat reserves should be a one-way ratchet—that once one is designated, it should never be replaced—meaning, of course, that over time more and more areas of Green Diamond's timberlands would be off limits

to timber harvesting regardless of whether they protect NSO. It should suffice to observe that the Service, applying its scientific expertise, thought differently about an indisputably technical question calling for deference to the Service's judgment. But EPIC's argument also ignores the limitations on replacing DCAs. FWS 0145-46, 152-53. In addition to having recent owl use, each new DCA must meet specific habitat fitness criteria that ensure NSO can thrive in those areas. FWS 0145-46. And Green Diamond must continuously monitor DCAs to ensure the adaptive, dynamic benefits of DCAs are achieved. FWS 0145-153.

EPIC enlists CDFW's comment letter on the draft EIS to support its desire to forever lock in the initial DCAs. ECF No. 38 at 29:27-30:5 (citing FWS 27472). Setting aside that CDFW later retracted that critique, *see* Carr Decl., Ex. C, the Service reasonably determined the initial DCAs constituted some of the best habitat available in 2019, FWS 0135-36, and it considered and responded to CDFW's comment letter. FWS 01594-95. CDFW ultimately approved of that approach when issuing a Consistency Determination and finding the FHCP "minimized and fully mitigated" the impacts of take. Carr Decl., Ex. A; Cal. Fish & Game Code § 2081(b)(2). Moreover, making the initial DCAs permanent would defeat the dynamic nature of the DCAs, effectively reverting to the 1992 HCP's static set-asides that have been shown to provide limited biological value. FWS 078-80.

## 2. Highly Accurate Owl Occupancy Surveys Avoid Unauthorized Take.

Green Diamond has been performing mark-recapture studies of NSO for nearly forty years, since 1989. *See* FWS 076. By 1994, "virtually all resident NSO" had been located on Green Diamond's ownership. *Id.* The FHCP's occupancy survey protocol is designed to achieve a minimum 95% probability of detection, i.e., if an NSO is, in fact, present, then the survey will identify it 95% of the time. FWS 0227, 0751, 0770-71 (probability of detection calculations). Moreover, it accounts for factors that might complicate NSO detection, including rain, wind, stream noise, time of year, and suppression of NSO responses due to BaOw. FWS 0770.

EPIC nonetheless insists that three years of negative survey results are inadequate to determine whether an NSO site is vacant, and therefore whether take will occur. ECF No. 38 at 30:12-31:11. EPIC is wrong on the facts and the law. In the first instance, take under the ESA can

only occur if a spotted owl site is "occupied" when harvesting occurs; the modification of habitat that *might* be occupied in the *future* is not "take." *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995) ("[T]he Secretary inserted [in the regulation defining "harm"] the phrase 'actually kills or injures wildlife' to preclude claims that only involve habitat modification without any attendant requirement of death or injury to protected wildlife."). That an NSO could theoretically reoccupy a former nest site ten or more years in the future is immaterial.[20]

EPIC next raises concerns that BaOw will increase false negatives for NSO, ECF No. 38 at 31:12-32:1, despite acknowledging that the FHCP already contains measures to reduce the risk of false negative surveys. *See* FWS 0242; FWS 0728 (FHCP Appendix F: NSO Survey Protocol). If a BaOw is repeatedly seen or heard at a site or colonizes a recently active NSO site, the FHCP extends surveys from three years to five years to maintain a minimum detection probability for NSO of 95%. FWS 0242. EPIC also ignores the fact that BaOw removal across the Plan Area will reduce the risk of false negatives. FWS 0161-64. If EPIC's argument were correct, then every survey protocol would be inadequate unless it is guaranteed to be 100% accurate. But the law does not demand mathematical certainty or perfection, especially where the Service is called on to apply its expertise to technical issues like the acceptable probability of detection. 16 U.S.C. § 1539(a)(2)(B)(ii) (requiring minimization and mitigation to the maximum extent *practicable*); *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 664 (9th Cir. 2009).

### 3. Owls Are Protected During any Post-Fire Salvage Harvest.

EPIC next criticizes the HCP for allowing salvage harvesting in DCAs following fire events. ECF No. 38 at 32:2-33:1. The critique is misplaced. Following a fire event in a DCA, Green Diamond and the Service must determine if the DCA remains "functional" before any salvage

---

[20] EPIC turns to its own comment letter, which cited the Service's 2008 Technical Assistance for NSO (a nonbinding guidance document), for further support. ECF No. 38 at 31:3-11. But that Technical Assistance discussed permanent site *abandonment*, not current *occupancy* (the relevant inquiry for "take" by habitat modification under the ESA). *See* FWS 028670. In any event, the Service saw the comment letter and responded to it. FWS 01613-14 (explaining, *inter alia*, that "the 2008 memo referenced in EPIC's comment" predated the Service's revised 2011 survey protocol which "account[ed] for reduced detection rates for NSO in areas with barred owls.").

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

harvest can occur.[21]  FWS 0191-92, 3092.  If a DCA is no longer functional, a new DCA is established at the closest available NSO site that meets DCA criteria, and any salvage harvest must comply with the FHCP's TREE Program and California law.[22]  FWS 0192.  On the other hand, if the DCA remains functional, Green Diamond may only perform salvage harvest subject to the same limitations of California law and the FHCP's TREE guidelines, plus three additional "supplemental prescriptions."  *Id*.  Those prescriptions:  (i) prohibit Green Diamond from removing "more timber than it would have been allowed to remove had no fire occurred in the stand . . . unless the Service determines removal of such additional timber would not materially reduce the habitat's functional benefit[;]" (ii) require that salvage "retain structural features that contribute to future habitat[;]" and (iii) mandate "reforestation . . . as soon as reasonably possible."  *Id*.

Although EPIC contends these protections for burned sites are insufficient, ECF No. 38 at 32:2-33:1, it provides no reasoned basis to set aside the Service's determination that post-fire salvage controls, in conjunction with the FHCP's other conservation measures, collectively "minimize and mitigate" the impacts of take to the maximum extent practicable.[23]

### 4.   The 2019 Habitat Conservation Plan Addresses Threats from Barred Owl.

Green Diamond undertook a pioneering Phase One study with the California Academy of Sciences to assess the viability of lethal removal of BaOw on a portion of its lands prior to approval of the FHCP.  *See* FWS 092, *supra,* at p. 12.  The FHCP builds on those efforts in the on-going Phase Two experiment, expanding lethal removal to the entire Plan Area.  FWS 0161-62.  *If and when* Phase Two concludes, the FHCP provides that Green Diamond would undertake in Phase Three a coexistence experiment with the aim of identifying an equilibrium that ensures NSO

[21] A DCA is "functional" if it has a mean annual occupancy of at least 0.75 and mean fecundity of at least 0.25, averaged over the last four years.  FWS 0205.

[22] For example, Green Diamond must prepare and secure approval of a THP "[i]f the volume to be salvaged exceeds 10% of the average existing timber volume per acre."  FWS 041.  Further, salvage is "not permitted within floodplains or channel migration zones," is "limited" in RMZs, and must comply with TREE Program requirements.  *Id*.

[23] EPIC makes too much of Clark 2007, cited for the assertion that post-fire salvage "increase[s] extinction rates."  ECF No. 38 at 32:9-19.  That study found that "high severity fire and salvage logging" reduced NSO occupancy compared to unburned landscapes, but it did not separate out the effect of salvage logging as opposed to high severity fire.  FWS 056998, 57008, 57017, 57019-20, 57042.  And regardless, Clark's analysis did not consider, and thus has no bearing on, the FHCP's restrictions on salvage logging.  *See* FWS 0192.

protection with reduced BaOw removal.  FWS 0123, 162-63.  EPIC contends Phase Three is harmful to NSO.  ECF No. 38 at 33:2-34:6.

First of all, EPIC completely ignores the intended benefits of Phase Three.  Although BaOw management is currently essential to prevent the extirpation of NSO, *see, e.g.,* FWS 01110, the lethal removal of BaOw presents unavoidable "social and ethical" dimensions.[24]  FWS 091, 3879 (acknowledging "ethical concerns about killing one species to benefit another").  Moreover, it would be difficult to remove all BaOw, a widely dispersed and highly mobile avian species, from all NSO habitat in perpetuity.  Phase Three—which would study adaptive opportunities for NSO to better coexist with BaOw (i.e., change their behavior), generate data to support non-lethal BaOw management strategies (e.g., management actions that could be undertaken parallel to targeted lethal removal), and identify an equilibrium level of BaOw that can coexist with NSO—thus has inherent conservation value.  *See* FWS 0123.[25]

What is more, EPIC elides the many levels of agency supervision that ensure the Phase Three experiments are scientifically rigorous and will benefit—rather than harm—NSO populations.  *See* ECF No. 38 at 33:2-34:6.  First, the Service must "concur" with Green Diamond on completing Phase Two and proceeding to Phase Three.  FWS 0123.  In the absence of that concurrence an independent scientific review panel will decide whether Phase Three is appropriate.[26]  FWS 0123, 164.  Next, the design of the Phase Three experiment must be "approved" by the Service, and Green Diamond must secure a permit under the Migratory Bird Treaty Act to conduct it.  FWS 0123, 162-64.  CDFW, too, has been and "will be deeply involved

---

[24] The Service's Barred Owl Management Strategy discusses the "ethics of conducting lethal removal," "humane and ethical treatment of affected animals[,]" and the need for personnel to be trained in "ethical" issues.  U.S. Fish and Wildlife Service, *Final Barred Owl Management Strategy* (Aug. 2024) at 86, 93, 97, available at https://www.fws.gov/sites/default/files/documents/2024-08/final-barred-owl-management-strategy-2024_508.pdf.

[25] Green Diamond's long-standing efforts are cited and relied upon by the Service's program for BaOw removal in Washington, Oregon, and California that is being challenged in federal district court in Oregon.  If Green Diamond's efforts under the FHCP shows that co-existence can be accomplished, it could inform such management actions through the NSO's range.

[26] EPIC states Phase Two is "limit[ed]" to a "duration of approximately 10 years."  ECF No. 38 at 33:11-13.  In fact, the conclusion of Phase Two and commencement of Phase Three are triggered not by a temporal deadline, but by a showing that Phase Two has succeeded.  *See* FWS 0123.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

in the design of the BaOw experiments." Carr Decl., Ex. C (2019 CDFW Letter) at 8.[27] Last, if Phase Three commences but NSO populations ultimately decline below projections as BaOw re-enter NSO territory, Green Diamond would revert to lethal removal in the limited areas previously designated for occupation by BaOw. FWS 0163.

In sum, Phase Three would be implemented only after significant benefits to NSO accrue under Phase Two, and only if FWS approves the experiment's parameters and ensures guardrails are in place to minimize impacts to NSO. That considered decision deserves deference.

### B.  EPIC's Section 7 Claims Fare No Better.

EPIC contends the Service's "no jeopardy" and "no effects" determinations regarding the FHCP's effects on NSO and MaMu, respectively, failed to use the best available science. ECF No. 38 at 34:7-44:26. EPIC is wrong.

BiOps are technical documents that reflect the Service's scientific expertise and are entitled to substantial deference. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."); *Nat. Res. Def. Council v. Kempthorne*, 539 F.Supp.2d 1155, 1170 (E.D. Cal. 2008) ("biological opinions . . . are entitled to great deference"). To prevail on a "best available science" challenge to a BiOp, a plaintiff must: (i) identify "relevant scientific evidence that the agency ignored"; (ii) explain how that evidence "is in some way better than the evidence [the agency] relies on"; and (iii) "show that any disregarded scientific evidence would materially affect the agency's conclusion." *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1067 (9th Cir. 2024) (internal quotations and citations omitted). EPIC cannot meet this high bar.

### 1.  The Service Considered the Best Available Science.

EPIC identifies Green Diamond's 27th Annual Report under the 1992 HCP, submitted in February 2019, as "science" that the Service purportedly failed to analyze. ECF No. 38 at 35:1-8

---

[27] Indeed, CDFW has ongoing supervision over Green Diamond's BaOw removal efforts because they require a Scientific Collecting Permit under CESA (per Fish and Game Code section 2081(a)) which CDFW must review and reissue every three years. FWS 01553.

(citing FWS 027598). But EPIC fails to establish *any* of the three elements needed to prevail on this "best available science" claim. *See Haaland*, 102 F.4th at 1067.

First, that the BiOp itself does not include a citation to the 2019 Report does not mean the Service ignored it. EPIC's entire argument hinges on its conclusory assertion that because the Service ignored all post-2015 science, it must have ignored the 2019 Report.[28] ECF No. 38 at 34:25-27. But the BiOp did not observe the FHCP's 2015 data "freeze" when analyzing the risk of jeopardy under Section 7; it repeatedly discussed data and science that post-dated 2015. *See, e.g.,* FWS 01112-13 (BiOp conducting "Range-wide Analysis" of NSO habitat "Through May 22, 2018"), 1136 ("As of 2017, 55 northern spotted owl pairs had been taken."), 1111 (citing Dugger et al. 2016). Regardless, it is undisputed that the Annual Report is in the administrative record. FWS 027598. The Service is presumed to have considered the Annual Report and EPIC cannot show otherwise. *See Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 444-45 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1048 (2025).

Further, even if EPIC could establish that the Service "ignored" or "disregarded" the 2019 Report (which it did not), EPIC does not and cannot explain why its occupancy data is "better" than Green Diamond's decades of other NSO monitoring data (1989-2018) and the leading scientific analyses (also spanning decades) on NSO abundance and habitat needs on which the BiOp also relies. *See Haaland*, 102 F.4th at 1067; FWS 083, 481. The Service was well within its discretion to find that this corpus of data and literature constitutes the best available science. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d at 995. The Court should not credit EPIC's flyspecking of a single Annual Report over the Service's expert judgment informed by decades of data and research. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if . . .a court might find contrary views more persuasive.").

---

[28] The Service explained that "[d]ata was frozen at 2015 in order to allow time for analysis to occur during the development of the proposed FHCP and the DEIS." FWS 01612; FWS 028666. That decision was lawful. *Sierra Club v. Env't Prot. Agency*, 356 F.3d 296, 308 (D.C. Cir. 2004), amended sub nom. *Sierra Club v. E.P.A.*, No. 03-1084, 2004 WL 877850 (D.C. Cir. Apr. 16, 2004) ("To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval processes.").

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

If any doubt remained, EPIC must still show that this purportedly "ignored" science would have "materially" altered the agency's decision. *See Haaland*, 102 F.4th at 1067. This it cannot do. Although the 2019 Report shows increasing BaOw numbers and decreasing NSO occupancy on Green Diamond's ownership, *see* ECF No. 38 at 35:1-8, the BiOp recognizes this same trend. *See* FWS 01111. The 2019 Report thus ***supports***, rather than undermines, the Service's no jeopardy determination based on implementation of the FHCP's conservation measures. After all, it is under the FHCP—not the preceding 1992 HCP—that mandatory BaOw removal actions will be taken to address the trend recognized in the BiOp and reflected in the 2019 Report. *See* FWS 0122 (noting Phase One of the Barred Owl Program ended in 2014); FWS 0123 (FHCP summarizing Barred Owl Program Phases Two and Three measures).

### 2.  The Best Available Science Includes Sophisticated Modeling.

Having previously taken issue with the FHCP's habitat thresholds as a measure of take, EPIC now quibbles with the FHCP's efforts to improve on these thresholds through new, more precise statistical models. ECF No. 38 at 35:19-37:1. EPIC's critiques of these models—the habitat fitness model and site occupancy model—misapprehend the FHCP and the underlying science. Green Diamond takes each in turn.

EPIC first implies that the level of "take" will become unlimited after the habitat fitness model is "validated" and the site occupancy model is developed and implemented. ECF No. 38 at 36:8-11. That is incorrect. To be clear, it is not the habitat *fitness* model that will measure take; it is the later-to-be-developed site *occupancy* model.[29]  *See, e.g.,* FWS 0165-67. In any event, the claim is nonsense because prior to model validation take is carefully assessed based on multiple years of surveys and the Service's review. FWS 0209. Similarly, EPIC's concern that it will "be impossible to confirm actual take" once models are validated, ECF No. 38, at 36:10-11, completely ignores that models must be "validated" before they are used, i.e., the models must be shown, based on correlation with copious real-world data, to accurately predict, among other things, the likelihood that any given site will be occupied by owls. FWS 0167-68, 209, 245, 773-77 (FHCP

---

[29] The habitat fitness model synthesizes the results of other models, trained on data derived from decades of scientific study, to predict suitable NSO habitat. The occupancy model, by contrast, will identify occupied NSO sites. FWS 0165-67.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

Appendix I: Model Validation Process).  Furthermore, on-the-ground surveys will continue even after model validation.  Every year, Green Diamond must survey (i) all DCAs; (ii) "20% of the potential take sites"; and (iii) "at least 12 additional spatially stratified randomly selected sites[.]" FWS 0168.  Site occupancy surveys must also continue "throughout the Plan Area."  *Id*.

Next, EPIC argues that 2007 statements made by Dr. Alan Franklin, the creator of a *different* NSO habitat fitness model, proves the *FHCP's* proposed models are inappropriate.  ECF No. 38 at 36:12-37:1.  The argument fails.  First, the FHCP's habitat fitness model is developed by Green Diamond, not Dr. Franklin as EPIC asserts.  ECF No. 38 at 36:20.  Second, EPIC's argument is comparing apples to oranges.  Dr. Franklin's criticisms were context specific and directed at a model (used in the Service's Draft Recovery Plan for NSO) that had a single covariate.  In contrast, the FHCP model relies on multiple covariates to collectively explain habitat fitness, FWS 01593-94, thereby avoiding the concerns raised by Dr. Franklin.  Last, even if EPIC's argument fairly characterized Dr. Franklin's concerns, EPIC has already conceded, as it must, that the Service considered and rejected this argument (raised by CDFW) before approving the HCP.  ECF No. 38 at 36:21-25.  EPIC's argument thus fails for the simple reason that the Service did not "disregard" any science here.  *See Haaland*, 102 F.4th at 1067.

### 3. The Addition of Lands from the Adjustment Area Was Analyzed.

EPIC contends the Service's analysis of future additions of land to the Plan Area wrongly "assumed" the lands to be added from the Adjustment Area were similar to those in the Initial Plan Area.  ECF No. 38 at 37:22-38:11 (citing FWS 02228).  Not so.  The FHCP's Plan Area contains both an "Initial Plan Area" (357,415 acres) and an "Adjustment Area" from which acreage can be added to the FHCP without amending the Plan.  FWS 030-31 (FHCP), 01132 (BiOp).  The BiOp analyzed impacts to the *Action Area*, which includes **both** the initial Plan Area and the Adjustment Area.  FWS 01132.

Further, EPIC's citation to the record (FWS 02228) offers no support for its claim; it is a blank page of the FEIS with only a single word ("Tables"), and the pages that follow have no bearing on the Service's jeopardy analysis.  *See* ECF No. 38 at 38:3-11.  Regardless, the Service reasonably concluded that the Adjustment Area lands *are* similar to lands in the Initial Plan Area

27

based on its analysis of the ecoregions encompassing both areas, as set forth in FHCP Section 4. *See* FWS 032, 070-76, 0811-13 (maps showing similarities).

EPIC's citation to *Conner v. Burford*, 848 F.2d 1441, 1455 (9th Cir. 1988) is also unavailing. *See* ECF No. 38 at 37:27-38:2. In that case, the Ninth Circuit held that iterative jeopardy analysis is improper and that "biological opinions must be coextensive with the agency action." *Conner*, 848 F.2d at 1457-58. Here, the BiOp properly analyzed the full scope of the proposed activity, encompassing both the Initial Plan Area and *all* of the Adjustment Area lands. *See id.* at 1457-58; FWS 01132 (BiOp). No analysis was deferred.

### 4. The Dynamic Core Area Strategy Provides Dispersal Habitat.

EPIC contends that the BiOp contains "no" analysis of connectivity between DCAs. ECF No. 38 at 37:2-21. To the contrary, the BiOp and FHCP explain the importance of connectivity and how a DCA "cluster" strategy will create an interconnected set of DCAs across the landscape that collectively provide NSO dispersal habitat. FWS 0136-38. The DCA "cluster" strategy and its connected dispersal habitats are expressly incorporated into and relied upon by the BiOp. FWS 01148. Enough said.

### 5. Potential Climate Change Impacts Were Analyzed.

Contrary to EPIC's contention, ECF No. 38 at 38:12-42:8, the BiOp addressed the impacts of climate change. EPIC's flyspecking cannot defeat the Service's comprehensive analysis, especially given the deference due to the Service's treatment of this complex scientific issue within its area of expertise and sitting at the "frontiers of science." *Forest Guardian*, 329 F.3d at 1099.

***Scope of Analysis.*** Section 7 of the ESA does not mention climate change. 16 U.S.C. § 1536. Any requirement to examine climate change in a Biological Opinion is based on the Service's obligation under Section 7 to rely on "the best scientific and commercial data available." *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 739-40 (9th Cir. 2017); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1154 (E.D. Cal. 2008). And because Section 7 is concerned with impacts to species, the Service's BiOp need not analyze climate change writ large (an impossible task given the vast scope of climate science), but rather must consider how, if at all, climate change will interact with impacts of the agency action (here,

issuance of the ITP) on the species in question (NSO). *See W. Watersheds Project v. McKay*, No. 22-35706, 2023 WL 7042541, at *2 (9th Cir. Oct. 26, 2023) (agency must address how climate change would affect listed species "on top of" the action consulted on).

This Court must also afford "substantial deference" to the Service's decisions about the "depth and breadth of its inquiry" on these scientific matters, and "should not micromanage [] agency choices so long as they fall within a broad zone of reasonableness." *Seven County Infrastructure Coal. v. Eagle Cnty., Col.*, 605 U.S. 168, 183 (2025). Indeed, the Ninth Circuit has recognized the need for "substantial deference" to an expert agency with respect to its treatment of climate change because it is "very difficult to estimate climactic changes or to assert with any confidence how [a species] will change" in response. *Forest Guardians*, 329 F.3d at 1099; *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1167 (D.C. Cir. 2025).

*The Service's Analysis Was Reasonable.* The Service appropriately considered the effects of a changing climate on NSO, its habitat, and the threats to both. Importantly, the BiOp contains an extensive discussion of wildfire, FWS 01110, which is one of two primary threats to NSO along with BaOw. It also acknowledges that climate change may cause "changes to forest composition and structure" and alterations to "snow packs, and natural disturbance regimes." FWS 01121. Thus, consistent with applicable law, the Service analyzed the expected impacts of the agency action in light of possible changes attributable to climate change. *Cf. Kempthorne*, 506 F.Supp.2d at 367-370.

The BiOp also expressly incorporates the FHCP's conservation measures by reference, building on that Plan's own comprehensive treatment of climate change. FWS 01148. For example, the FHCP expressly identifies climate change as a "newly emerging threat[]" to NSO which complicates calculation of NSO site abandonment. FWS 0231. The FHCP, like the BiOp, recognizes climate change as a factor exacerbating wildfires. FWS 0319. And it anticipates that "fluctuations in weather" due to climate change "will cause fluctuations in nesting success, potentially leading to temporary NSO population declines." FWS 0195. The FHCP thus recognizes a changed circumstance if "climate change causes substantially above average rainfall in the late

winter and spring continuously for two decades or more resulting in continuous large-scale NSO nesting failures." *Id.*

Similarly, the FHCP's robust adaptive management provisions ensure that conservation measures will be adapted, as needed, to account for the "known unknowns" of climate change.[30] FWS 0174-183. For example, Green Diamond may be required to designate additional DCAs, modify the size or silvicultural prescriptions of DCAs, or adjust the level of authorized take as necessary to address decreases in NSO populations due to, *inter alia*, the manifested impacts of climate change. FWS 0176-77 (adaptive management triggers), 182 (responses).

Finally, the BiOp expressly incorporates the Service's Final Environmental Impact Statement (FEIS). FWS 1102-03. The FEIS further discusses the effects of climate change on NSO, including, *inter alia*, the effects of drought and hot temperatures on NSO recruitment and survival; the relationships of precipitation to NSO survival, recruitment, and reproduction; and the physiological effects of heat and heat stress on NSO. FWS 01456-57 (citing literature studying the effects of climate change on NSO).

***EPIC's Critiques of the BiOp and Its Effects Analysis.*** EPIC offers various critiques of the Service's analysis in the BiOp, but each fails. First, EPIC argues the BiOp fails to analyze the threats of climate-exacerbated wildfire in conjunction with harvesting under the FHCP. ECF No. 38 at 38:26-39:12. Not so. The BiOp expressly acknowledges that timber harvesting and wildfire may contribute to NSO habitat loss, FWS 01110, 1112-13, and it analyzes the effects of harvesting in conjunction with those risks as discussed in the FHCP. FWS 053 (habitat loss due to timber harvesting and wildfire), 0311-12 (similar), 145-46 (replacement DCAs must be located to "mitigate the risk of concentrating multiple DCAs vulnerable to the same localized adverse impact, such as a wildfire"), 313-14 (habitat loss from timber harvesting and wildfire), 319 (climate change

---

[30] EPIC asserts the Service cannot rely on uncertainty to excuse a failure to analyze climate change, citing *Turtle Island Restoration Network*, 878 F.3d at 740. ECF No. 38 at 41:21-42:8. But unlike in *Turtle Island*, where the Ninth Circuit found "that the data available was too indeterminate for the agency to evaluate the potential sea-turtle impacts with any certainty[,]" 878 F.3d at 740, here, FWS considered many ways climate change may affect NSO, such as by exacerbating wildfire, changing habitat, and disrupting weather patterns. *See, e.g.,* FWS 0195, 231, 0318-19, 1110.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

"may further exacerbate" lightning fires).  FWS also linked climate change to increased "risk of wildfire" and "high-intensity fires" in the FEIS.  FWS 01456-57.

These are precisely the sorts of uncertain future effects that the ESA entrusts to the scientific judgment of the Service.  *Ctr. for Biological Diversity*, 146 F.4th at 1167.  The BiOp thus appropriately analyzed effects to the NSO in light of the Service's appraisal of these climate risks.  *See* FWS 01110.  Not deterred, EPIC cites *Willamette Riverkeeper v. National Marine Fisheries Service*, 763 F.Supp.3d 1203 (D. Or. 2025), but the case lends it no aid.  In *Willamette Riverkeeper*, the challenged BiOp anticipated "negative effects of climate change" on winter steelhead but failed to "evaluate the consequences" of those worsening conditions or meaningfully "assess whether [the species] can sustain impacts" from the project on top of climate change effects.  *Id.* at 1237-38.  In contrast, here the Service directly and repeatedly grappled with the synergistic effects of climate change, wildfire, and timber harvesting.  The BiOp and FHCP both "evaluate the consequences" of climate change and wildfire on NSO (habitat loss) and "assess" whether NSO can "sustain" their combined impacts by, e.g., dispersing DCAs to "mitigate the risk" of wildfire.  *See Willamette Riverkeeper*, 763 F.Supp.3d at 1237-38; FWS 0145-46.

Pivoting, EPIC contends the BiOp fails to "integrate" its finding that climate change is harming the NSO prey base into its jeopardy analysis, citing *Wild Fish Conservancy v. Irving*, 221 F.Supp.3d 1224, 1234 (*Irving*) (E.D. Wash. 2016).  ECF No. 38 at 40:4-20.  But *Irving* has no application here.  In *Irving*, the National Marine Fisheries Service "included **no discussion whatsoever** of the potential effects of climate change in the BiOp's analysis of the Hatchery's future operations and water use."  *Irving,* 221 F.Supp.3d at 1233 (emphasis added).  It was insufficient for NMFS to "discuss[] the effects of climate change generally" but assume without explanation that "there [would] be no change to the hydrology of Icicle Creek."  *Id.* at 1233-34.  Here, by contrast, FWS connected the dots between climate change and impacts to the NSO prey base.  *See* FWS 01110 (BiOp analyzing relationship between prey abundance and fire, citing Hanson et al. 2009), 0195 (FHCP discussing prey species activity and NSO "foraging success" as modified by changing precipitation patterns due to climate change), 1457 (FEIS analyzing relationship of "[d]rier, warmer summers, or high-intensity fires" on NSO prey).

31

Finally, EPIC argues the Service failed to consider the effects of climate change on the efficacy of the FHCP's conservation measures, ECF No. 38 at 40:21-41:20, particularly with respect to post-harvest forest regeneration, *id.* at 41:1-20.  But the Service amply considered those issues.  The FHCP provides for adaptive management responses if DCAs are not working as expected, including if stands do not regenerate as expected.  For example, Green Diamond may be required to modify the size and/or silvicultural prescriptions of DCAs, modify the acreage threshold for take assessment in DCAs, and/or designate up to 12 additional DCAs.  FWS 0178-79, 182.  The ESA "assigns to the Service" these "close judgment calls about scientifically uncertain data" on topics like climate change.  *Ctr. for Biological Diversity*, 146 F.4th at 1167.

### 6.   The Marbled Murrelet Claims Fail.

Even though the ITP does not authorize incidental take of MaMu, EPIC argues the Service's BiOp should have analyzed the effects of timber harvesting on the MaMu and its critical habitat.  But EPIC lacks standing to make these arguments, the arguments are procedurally defective, and the Service's handling of potential impacts to MaMu and its critical habitat is reasonable and lawful.

***Standing*.**  EPIC has failed to meet its burden to establish that any of its members has an interest in any MaMu on Green Diamond's lands sufficient to establish an injury-in-fact.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016).  Ms. Baker's and Mr. DiPerna's standing declarations allege vague interests in MaMu without specifying any "actual or imminent" injury based on "concrete plans." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992); *see* ECF Nos. 39 at ¶¶ 5, 11-12; 41 at ¶¶ 4, 7-8.  And while Mr. Burton alleges vocational interests related to birdwatching, he focuses solely on NSO and never mentions MaMu.  ECF No. 40 at ¶¶ 3, 6, 7.  "[S]tanding is not dispensed in gross[,]" *Lewis v. Casey*, 518 U.S. 343, 358 n. 6 (1996), and EPIC has failed to establish standing with respect to its MaMu claims.

***60-Day Notice Letter Requirement*.**  EPIC's claim that the Service failed to properly address effects to MaMu critical habitat, brought under the ESA's citizen suit provision (16 U.S.C. § 1540(g)), ECF No. 20 at 2:21, violates the ESA's 60-day notice requirement.  EPIC never put the Service on notice that it planned to sue regarding the BiOp's treatment of MaMu critical habitat until it sent the Service its 2025 notice letter, and EPIC filed suit fewer than 60 days thereafter.

Carr Decl., Ex. J. The argument is therefore barred. *Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1153 (2024)

***The Service's "No Effects" Determination for MaMu Is Reasonable and Lawful.*** The BiOp shows the Service did not engage in *formal* Section 7 consultation when evaluating the effects to MaMu and its critical habitat from timber harvesting under the FHCP. Instead, the BiOp's brief treatment of those potential effects (on the first page of the BiOp) reflects the Service's conclusion, following *informal* consultation, concerning the FHCP's impacts to MaMu. This distinction is fatal to EPIC's claims. Here, the Service properly considered background requirements of the ESA, California law and Green Diamond's other binding commitments to find that the proposed action would have "no effects" on MaMu or its critical habitat.

This Court explained the Section 7 consultation process, and the differences between formal and informal consultation, in its recent decision in the ESA Rules Litigation. *Ctr. for Biological Diversity*, 2026 WL 898264 at *2. It wrote: "For actions that 'may affect' listed species and have not yet received the 'not likely to adversely affect' determination via informal consultation, formal consultation is required. [50 C.F.R.] § 402.14(a), (b)(1)." *Id.* The situation in this case is similar to the one reviewed by this Court in *State of California v. Bureau of Land Mgmt.*, 612 F.Supp.3d 925, 931 (N.D. Cal. 2020). That case involved a challenge to BLM's determination, made without even informal consultation with the Service, that the recission of regulations restricting hydraulic fracturing would have "no effect" on protected species. *State of California*, 612 F.Supp.3d at 949. The Court upheld the "no effects" determination "in light of the totality of the record[,]" especially existing regulatory protections: "BLM explained that it 'already had an extensive process in place to ensure that operators conduct oil and gas operations in an environmentally sound manner.'" *Id.* at 950-51 (citation omitted). Simply stated, the action agency's "no effect" determination was appropriate because other, overlapping regulatory requirements ensured no new impacts to protected species.

The same is true here. As in *State of California*, the Court's task here is to "review the entire administrative record" to determine whether the Service's "no effect" determination for MaMu was supported by a rational connection to the facts. *See* 612 F.Supp.3d at 950. The record

shows it was.  Just like in *State of California*, the agency's action (issuance of the ITP) neither authorizes timber harvesting (the regulated activity) nor increases impacts to MaMu.  *See* 612 F.Supp.3d at 950.  Rather, harvest is permitted only by "site-specific" approvals (THPs) that must be issued in compliance with California's FPRs, which prohibit take of any species that, like MaMu, is listed under CESA and/or the ESA, 14 CCR § 898.2(d), and require MaMu-specific review and take avoidance measures, 14 CCR § 919.11.  In addition, any future harvesting (pursuant to a THP) must comply with any and all "applicable State and Federal Laws"—a phalanx that includes, *inter alia*, the ESA,[31] CESA, and FPRs—plus "Green Diamond's management policies and practices," including the Master Agreement for Timber Operations (MATO), AHCP, and FHCP.  FWS 101103.  As in *State of California*, there is "an extensive process" to ensure harvesting operations do not impact MaMu, regardless of the FHCP.[32]  *See* 612 F.Supp.3d at 950.

For that reason, EPIC's sole reliance on an out-of-context sentence about the MATO is a red herring; the proper analysis considers the "totality of the record," and background requirements provide multiple layers of protection that will collectively ensure no effects to MaMu.  *See Friends of Santa Clara River v. United States Army Corps of Eng'rs*, 887 F.3d 906, 923 (9th Cir. 2018) (affirming "no effects" determination where agency action did not increase impacts beyond baseline conditions).  To the extent there was any doubt, CDFW could not have issued its Consistency Determination if harvesting contemplated in the ITP would result in take of MaMu. Cal. Fish and Game Code §§ 2080.1(c), 2081(b)(1).

Withal, the APA requires prejudicial error, which EPIC cannot show here.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) ("due account shall be taken of the rule of prejudicial error" (citing 5 U.S.C. § 706)); *PDK Lab'ys Inc. v. U.S. D.E.A.*, 362 F.3d 786,

---

[31] As the Ninth Circuit explained in rejecting EPIC's claim that the Service had to reinitiate consultation on the ITP for the 1992 HCP to consider potential effects of timber harvesting on MaMu, EPIC can seek relief against Green Diamond if its timber harvesting is reasonably certain to harm MaMu. *Env't Prot. Info. Ctr.*, 255 F.3d at 1082-83.

[32] Correspondence between CDFW and Green Diamond concerning two THPs illustrate how MaMu are protected through the THP review and approval process.  See AR 076988-77036 (THP 1-16-137 HUM), 076964-87 (THP 1-16-104 HUM).  The Service also has provided technical assistance by recommending measures be included in THPs to avoid take of MaMu from the use of "mainline roads" during timber operations.  *See* AR 077037-38.

GREEN DIAMOND'S BRIEFING RE SUMMARY JUDGMENT CROSS-MOTIONS

799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."). The Court should therefore reject EPIC's argument for no other reason than correcting any purported errors in the BiOp would not change the ultimate decision (no jeopardy to MaMu). *See Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 765 (9th Cir. 1986).[33]

In sum, EPIC's MaMu claims are barred. If, nonetheless, the Court considers the merits of any of EPIC's MaMu claims, it should reject them or, at a minimum, decline to grant any relief on the grounds that such errors simply were not prejudicial.

## CONCLUSION

We ask that the Court grant Green Diamond's motion, and deny EPIC's motion.

Respectfully submitted,

DATED:  April 24, 2026                         PAUL HASTINGS LLP

By: _____
CHRISTOPHER J. CARR

Attorneys for Defendant-Intervenor
GREEN DIAMOND RESOURCE COMPANY

---

[33] EPIC also cannot show that any purported failure to analyze the effects to MaMu critical habitat resulted in prejudicial error. When the BiOp was approved, the operative (pre-2019) ESA regulation defined "destruction or adverse modification" as a "direct or indirect alteration that *appreciably diminishes the value* of critical habitat for the conservation of a listed species," 81 Fed. Reg. 7214, 7216, (Feb. 11, 2016) (amending 50 C.F.R. § 402.02) (emphasis added), with appreciable diminution determined "at the scale of the entire critical habitat designation." *Id.* at 7222. *see Gifford Pinchot Task Force*, 378 F.3d at 1075. Approval of the FHCP and issuance of the ITP does not meet that standard because the acreage of MaMu critical habitat at issue here is at most 1,400 acres, a tiny fraction of the 40,417 acres designated as MaMu critical habitat, FWS 018460, 076839, and harvesting in those areas, if any, would be subject to the myriad MaMu protective measures and limits on harvesting imposed in the THP review and approval process.