ADAM R.F. GUSTAFSON, Principal Deputy Assistant Attorney General
MEREDITH FLAX, Deputy Section Chief
MICHAEL R. EITEL, Acting Assistant Section Chief
ERIKA FURLONG, Trial Attorney (PA Bar No. 319350)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 598-9571
Email: Erika.Furlong@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER, <br><br> Plaintiff, <br><br> v. <br><br> BRIAN NESVIK, in his official capacity as Director of the U.S. Fish and Wildlife Service; and, U.S. FISH AND WILDLIFE SERVICE, <br><br> Defendants. | No. 4:25-CV-3049-JST <br><br> FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT <br><br> Date:      December 3, 2026 <br> Time:     2:00 PM <br> Judge:    Jon S. Tigar |

**Table of Contents**

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.   EPIC offers alternative scientific interpretations but does not support its claims that FWS violated the ESA and the APA. ................................................................. 2

    a.   Habitat conservation plans are indeed voluntary as landowners have several other (often less invasive) options for complying with ESA Section 9. .................... 2

II.   FWS's scientific determinations complied with Section 10 of the ESA. .......................... 3

    a.   The FHCP complied with ESA Section 10's fully offset standard. ......................... 3

    b.   The Dynamic Core Areas and other habitat retention measures are reasonable........ 5

    c.   Green Diamond's survey protocols are more rigorous than FWS's standard protocol and account for barred owls.........................................................................11

    d.   The FHCP's post-fire salvage protocol protects spotted owls. ............................... 12

    e.   The FHCP's barred owl provisions ensure that the threat of barred owl invasion will be properly managed throughout the term of the ITP. ....................... 14

III.   EPIC's Section 7 claims fail because it does not identify data FWS ignored—let alone data that would materially affect the jeopardy determination. ............................... 16

    a.   FWS properly considered the demographic data. ...................................................... 16

    b.   FWS considered the potential future models in the BiOp and included safeguards that ensure any use of such models will protect NSO. .......................... 18

    c.   Both the BiOp and the FHCP considered whether NSO would have sufficient dispersal habitat. ...................................................................................................... 21

    d.   FWS evaluated the entire adjustment area in the BiOp. ......................................... 22

    e.   FWS appropriately analyzed impacts associated with climate change.................... 23

    f.   EPIC improperly asserts for the first time new illusory mitigation claims.............. 25

IV.   FWS satisfied it ESA Section 7 obligations in reaching a no effect determination for marbled murrelet. ................................................................................................... 26

    a.   Plaintiffs lack standing on the marbled murrelet claim. ......................................... 26

    b.   EPIC's no effect claim fails on the merits. ............................................................. 28

CONCLUSION.................................................................................................................... 29

**Table of Authorities**

**Cases**                                                                      **Page(s)**

*All. for the Wild Rockies v. Marten*,
   789 F.App'x 583 (9th Cir. 2020).................................................................. 19, 24

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ............................................................................ 19

*Conservation Cong. v. U.S. Forest Serv.*,
   720 F.3d 1048 (9th Cir. 2013) ............................................................................ 29

*Ctr. for Biological Diversity v. Exp. Imp. Bank*,
   894 F.3d 1005 (9th Cir. 2018) ............................................................................ 26

*Defs. of Wildlife v. Zinke*,
   856 F.3d 1248 (9th Cir. 2017) ............................................................................ 23

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
   604 U.S. 542 (2025)............................................................................................ 29

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003)............................................................................. 26

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
   528 U.S. 167 (2000)...................................................................................... 27, 28

*Friends of Yosemite Valley v. Kempthorne*,
   520 F.3d 1024 (9th Cir. 2008)............................................................ 23, 25, 26, 27

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992)............................................................................... 19

*Jones v. L.A. Cent. Plaza LLC*,
   74 F.4th 1053 (9th Cir. 2023).............................................................................. 26

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008)..........................................................................11, 24

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).......................................................................................26, 27

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014)............................................................................... 13

*Selkirk Conservation All. v. Forsgren,*
  336 F.3d 944 (9th Cir. 2003) ................................................................................. 23

*Union Neighbors United, Inc. v. Jewell*,
  831 F.3d 564 (D.C. Cir. 2016) ................................................................................. 5

*Wild Fish Conservancy v. Irving*,
  221 F. Supp. 3d 1224 (E.D. Wash. 2016) ............................................................... 25

**Statutes**

5 U.S.C. § 706(2) ........................................................................................................ 28

16 U.S.C. § 1536(a)(2) ................................................................................................ 27

16 U.S.C. § 1539(a)(1)(B) ...................................................................................... 2, 7

16 U.S.C. § 1539(a)(2) ................................................................................................ 2

**Regulations**

50 C.F.R. § 17.22(b)(1)(iv) .......................................................................................... 2

50 C.F.R. § 17.3 ........................................................................................................... 9

50 C.F.R. § 402.02 ................................................................................................ 24, 25

50 C.F.R. § 402.13(c) ................................................................................................. 29

50 C.F.R. § 402.14(g) ................................................................................................. 24

50 C.F.R. § 402.16(a)(3) ...................................................................................... 19, 23

**Table of Acronyms**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| DCA | Dynamic Core Area |
| ESA | Endangered Species Act |
| EPIC | Environmental Protection Information Center |
| FWS | United States Fish and Wildlife Service |
| FHCP | Forest Habitat Conservation Plan |
| HCP | Habitat Conservation Plan |
| ITP | Incidental Take Permit |
| MATO | Master Agreement for Timber Operations |
| NSO | Northern Spotted Owl |
| RMZ | Riparian Management Zone |

**INTRODUCTION**

Green Diamond's Forest Habitat Conservation Plan ("FHCP") and corresponding Incidental Take Permit ("ITP") require the company to undertake conservation measures that create and maintain thousands of acres of northern spotted owl ("NSO") habitat and address threats that are not directly related to the plan's harvest activities (most notably by removing invasive barred owls from the Plan Area). Collectively, these conservation measures fully offset the limited habitat-based incidental take authorized in the ITP and confer benefits to NSO by comprehensively addressing the species' primary threats in the Plan Area. These conservation measures go beyond the take avoidance regimes that other timber harvest operations employ to comply with ESA Section 9 in NSO territory and demonstrate that Green Diamond is exceeding industry standards by voluntarily undertaking conservation measures that they would have no obligation or incentive to perform absent the FHCP. Put in this proper this context, the Environmental Protection Information Center's ("EPIC") flyspecking of forestry science is an effort to extract additional conservation measures in a manner that runs contrary to EPIC's stated aims as they threaten to upend a science-based voluntary agreement that reflects decades of scientific collaboration.

For the reasons described below and in Federal Defendants' opening brief, EPIC cannot meet its burden of establishing an Endangered Species Act ("ESA") or Administrative Procedure Act ("APA") violation. EPIC's ESA Section 10 claims lack merit because the U.S. Fish and Wildlife Service's scientific determinations were reasonable and well supported. And EPIC cannot establish an ESA Section 7 violation because it lacks standing to pursue its marbled murrelet claim, and it has not identified any best available science that could have materially affected FWS's no jeopardy determination that FWS failed to consider related to any of its ESA Section 7 claims.

**ARGUMENT**

I.    **EPIC offers alternative scientific interpretations but does not support its claims that FWS violated the ESA and the APA.**

As described in Federal Defendants' opening brief, FWS spent decades evaluating spotted owl and forestry science before reasonably reaching the scientific determinations at issue here. *See, e.g.,* FWS_5; FWS_22-24. By requesting that the Court remand the decisions without vacatur, EPIC implicitly recognizes that the conservation plan affords benefits to the covered species, including NSO. *See* ECF No. 38 at 45:7-12 ("Pl.'s Br."). Rather than explain why its claims survive under the APA's deferential standard, EPIC marshals its own interpretation of spotted owl and forestry science to argue FWS must extract *additional* conservation measures. EPIC, for example, misleadingly compares data that reflects different time frames and different geographic scales. Not only are such factual arguments unscientific but they cannot support EPIC's claims because they merely advance competing interpretations of the same scientific data that FWS considered in reaching the scientific determinations at issue.

a.    **Habitat conservation plans are indeed voluntary as landowners have several other (often less invasive) options for complying with ESA Section 9.**

EPIC states that the FHCP is not voluntary and is instead "a mandatory legal shield required to avoid liability under Section 9 of the ESA." ECF No. 49 at 21:1-12 ("Pl.'s Reply"). This argument is misguided. Habitat conservation plans ("HCP") enable private landowners to comply with the ESA while undertaking otherwise lawful activities that will incidentally take an ESA-listed species. *See* 16 U.S.C. § 1539(a)(1)(B), (a)(2); 50 C.F.R. § 17.22(b)(1)(iv); FWS_73441 (Handbook). HCPs are indeed voluntary because they represent just one manner for complying with the ESA, and, even after the plans are approved, permittees retain the ability to terminate the plans and relinquish the permit. *See* FWS_73441; FWS_73749. Other options for complying with

ESA Section 9 include obtaining take authorization through another ESA provision (such as Section 7 when the activity includes federal involvement) or, most relevant here, a take avoidance regime. *See* FWS_73441. Importantly, FWS has released guidance for how timber harvest operations can avoid incidental take of NSO without applying for a habitat conservation plan. *See* FWS_49739-50. As such, Green Diamond's commitment to developing comprehensive habitat conservation plans was voluntary, exceeds efforts used by other timber harvest operations to comply with ESA Section 9, and provides conservation benefits that go beyond those under a take avoidance regime. *Compare id. with* FWS_1-824.[1]

## II.     FWS's scientific determinations complied with Section 10 of the ESA.

### a.   The FHCP complied with ESA Section 10's fully offset standard.

EPIC's description of the fully offset standard overlooks and misstates elements that are key to understanding the standard's application to this case. *See* Pl.'s Reply at 21:13-24:1.

As described in Federal Defendants' opening brief and the Handbook, HCP applicants may minimize or mitigate the impacts of incidental take either by fully offsetting the impacts of the incidental take, or, if that is not possible, by demonstrating "that it is not practicable to carry out any additional minimization or mitigation." *See* ECF No. 45 at 16:20-17:7 ("Fed. Defs.' Br.") (citing FWS_73568-70). The Handbook clarifies that "mitigation" means "to offset impacts of taking on the species." FWS_73568. And it states that "fully offset means the biological value that will be lost from covered activities will be fully replaced though implementation of conservation measures with equivalent biological value" and that the "mitigation is commensurate (equal) with the impacts of taking." *Id*. To obtain an incidental take permit, the applicant must (1) estimate the

---

[1] Whereas take avoidance focuses on surveying and avoiding conducting activities in certain areas, the FHCP also commits to mitigatory conservation measures that are unrelated to Green Diamond's timber harvest activities (such as barred owl removal).

type and amount of take from the covered activities and the impacts of such take on the species and its habitat, (2) determine how from a biological perspective the HCP will minimize the impacts, and (3) determine how from a biological perspective the HCP will mitigate the remaining impacts. *See id*. Under the fully offset prong, the combination of minimization and mitigation must "leave[] no remaining impacts of the taking on the species that could be further mitigated or minimized." FWS_73569. Thus, "the amount of mitigation is directly related to the amount of and significance of the impacts of the taking that remain after minimization." *Id*.

Green Diamond's survey and harvest protocols avoid direct take of NSO by determining whether they are present, protecting nesting sites, and tailoring harvest activities to avoid operations that could be detrimental to NSO reproduction. *See* FWS_263-64. Accounting for such measures, the FHCP's authorized incidental take of NSO is limited to habitat disturbances near timber harvest sites that *could* reduce reproduction or displace NSO. *See* FWS_264. FWS specified the following annual maximum amount of incidental take each year:

| Active Sites | Maximum Amount of Annual Incidental Take |
|---|---|
| 100+ active sites | 3 |
| 75-99 active sites | 2 |
| 48-74 active sites | 1 |

FWS_1147. To mitigate the impacts associated with this incidental take, the FHCP includes conservation measures that both directly mitigate habitat impacts associated with Green Diamond's activities, FWS_264-65, and also mitigate other threats to NSO that go beyond Green Diamond's harvest activities (e.g., by removing barred owls), FWS_265.

EPIC suggests that to support the fully offset standard, Green Diamond must mitigate the maximum authorized incidental take over the fifty-year permit term (119 sites) "at the time FWS authorized the permit." *See* Pl.'s Reply at 32:17-18. But the Handbook acknowledges that the

"necessary duration of the mitigation outcome should be based on the biological value of what is lost," meaning that when habitat is "permanently lost" an offset "must be maintained in perpetuity." FWS_73554. Here, the permit at most authorizes temporary habitat-based impacts to three NSO sites each year. FWS_1147. Thus, mitigation of these impacts to up to three sites per year must ensure that these temporary habitat impacts are fully offset by Green Diamond's habitat and non-habitat conservation measures. *See* FWS_1706-09.[2] As explained below, EPIC's narrow focus on a subset of habitat conservation measures ignores the collective effect of all conservation measures in fully offsetting the impacts of incidental take. FWS's consideration of these collective effects of the conservation measures satisfied ESA Section 10. *See* Fed. Defs.' Br. at 16:13-18:17 (citing *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 583 (D.C. Cir. 2016)).

> b. **The Dynamic Core Areas and other habitat retention measures are reasonable**.

This Plan Area has been used for timber harvest for over a century and, despite being put to this productive use, has continued to support NSO throughout that time. FWS_45815-16. The FHCP ensures that Green Diamond timber harvest activities will further optimize NSOs' use of the Plan Area by creating a dynamic network of heterogenous habitat across the Plan Area, and providing habitat protections to areas that NSO actually use. *See* FWS_1706-07. Collectively, the FHCP's habitat conservation measures will increase stand ages from an average of forty-four years to ninety-four years during the permit term and ensure that forest stands contain the habitat features on which NSO depend. *See id.*, FWS_135, FWS_70-71. And the dynamic core areas' ("DCA") no

---

[2] For instance, the FHCP's requirement that Green Diamond maintain a minimum of forty-four DCAs ensures that each year there are a minimum of fourteen protected sites at which NSO can reproduce for each one site where displacement could occur. *See* FWS_1107; FWS_1147. The FHCP's other conservations (such as barred owl removal and prevention of impacts from third party illegal activities) provide benefits that further offset any incidental take. See FWS_1107-08.

harvest zones are consistent with Folliard and more recent scientific data, which demonstrate that NSO successfully reproduce under these habitat conditions. *See* Fed. Defs.' Br. at 19:6-20:5; FWS_135-36; FWS_76-88.

EPIC advances several arguments to challenge the DCAs, none of which withstand scrutiny. First, in an effort to undermine these habitat standards, EPIC attempts to narrowly frame their impact by cherry-picking data from the record. *See* Pl.'s Reply at 25:15-24. Yet the record clearly demonstrates how the conservation measures will address impacts associated with the authorized incidental take and represent an improvement over Green Diamond's prior habitat management. For instance, the FHCP evaluated the biological value of the DCAs by reviewing their "mean annual fecundity" (or reproductive potential) and determined that there was "compelling evidence" that the DCAs would provide "much greater biological value" than the set asides used in the 1992 HCP. FWS_139. The FHCP calculated biological value based on annual reproduction rates and noted that the DCAs "produced an average of 16.7 fledgling NSOs per year[,]" which more than offsets the one to three NSO active sites that Green Diamond is authorized to incidentally take through *temporary* habitat modification each year. *See id.;* FWS_1147. Thus, the annual reproduction rate supports the determination that the DCA conservation measure alone offsets Green Diamond's incidental take as there are at least fourteen DCAs available to support reproduction for each occurrence of incidental take in a given year. *See id*. And this analysis was consistent with the Handbook, which emphasizes that biological value should be reviewed in the same time frame as the incidental take (or in this case on an annual basis). *See* FWS_73554. By insinuating that the DCAs must annually offset 119 sites (the maximum amount of incidental take over the fifty-year permit term), EPIC attempts to muddy the water by focusing on the biological value of fifty years' worth of incidental take rather than the

biological value of the DCAs annually as is scientifically appropriate. *See* Pl.'s Reply at 25:15-24.

Second, EPIC's analysis of the DCAs' habitat threshold limits suffers from similarly unscientific flaws. EPIC claims that FWS must require habitat conditions that comply with the conclusions in Folliard's 1993 thesis but offers no explanation for why FWS should disregard decades' worth of additional data (including Plan Area-specific data) that supports the DCAs' habitat requirements. *See* Pl.'s Reply at 26:14-28:7.[3] Instead, EPIC implies that the DCAs must afford the highest possible quality nesting habitat. *See, e.g., id*. at 30:22-24. Yet HCPs are intended to find an appropriate balance between authorizing incidental take that allows landowners to engage in otherwise lawful activities and creating conditions that benefit an ESA-listed species. *See* 16 U.S.C. § 1539(a)(1)(B); Fed. Defs.' Br. at 10:23. The FHCP meets this standard, where extensive data demonstrates that NSO successfully reproduce under habitat conditions consistent with and often below those required for the DCAs. *See, e.g.*, FWS_36.

EPIC also incorrectly claims that the DCA standards conflate "take-avoidance" with a "mitigation reserve standard" and therefore do not provide replacement biological value. Pl.'s

---

[3] EPIC relies on a later publication by Folliard to imply that the 1993 habitat recommendations accounted for the importance of edge habitat to provide easy access to woodrats, NSOs' primary prey in this area. *See* Pl.'s Reply at 28:10-12. But EPIC again fails to report the full context of the article. For instance, Folliard reported that in the study area "forest age classes of 31-45 and 46-60 [year] were the most prevalent age classes in landscapes of nesting Northern Spotted Owls" with the majority located in stands "35-60" years old, which is again consistent with the FHCPs habitat requirements for DCAs. FWS_35221; *see also* FWS_35222 ("We found owls using small patches of older forest (>60-yr old) if the surrounding landscape had a high proportion of forested area > 30-yr old. Small patches of older forest provided roosting and nesting areas, while the surrounding younger forest presumably provided foraging habitat."). Likewise, Folliard's conclusions in this article underscore the importance of edge habitat in providing NSO with abundant access to woodrats. *See id.* ("[I]n northern California, a certain degree of openness created by timber harvest may be beneficial to Northern Spotted Owls by providing younger seral habitat for major prey species such as woodrats.").

Reply at 28:16-20.[4] Again, EPIC ignores the fact that the focus of the fully offset standard is at the level of the FHCP—not individual conservation measures. Even so, the DCAs provide protections that exceed take avoidance because their protections apply whether or not a DCA is occupied at a particular time. *See, e.g.,* FWS_134-41; FWS_144-46.

Third, EPIC claims that the DCAs are inadequate because their habitat requirements do not include the structural elements that are required elsewhere in the FHCP. *See* Pl.'s Reply at 29:1-30:11. As an initial matter, the DCA selection criteria require that DCAs provide high quality habitat for NSO (based on high occupancy and fecundity), which necessarily means that these areas contain beneficial habitat (including decadent and structurally diverse habitat). *See* FWS_135. In any event, EPIC neglects to recognize that there is a separate conservation measure that promotes precisely this type of habitat. *See* Fed. Defs.' Br. at 20-21. The FHCP requires Green Diamond to implement the TREE standard to promote structural diversity and late seral habitat elements that are beneficial to NSO. *See id*. Although this requirement is not part of the DCA conservation measure, it separately ensures that Green Diamond will promote structurally diverse habitat both in DCAs and elsewhere in the Plan Area. Rather than responding to this point directly, EPIC's reply pivots back to the DCAs' acreage thresholds. Pl.'s Reply at 29:19-24. Again, these arguments express EPIC's preference for creating "features where they are absent," rather than promoting structures in stands that already exist. *See id*. at 31. But they do not support a conclusion that the TREE standard conservation measure is unreasonable or that FWS clearly erred in finding that it, in concert with the other conservation measures, fully offsets impacts from Green

---

[4] Industry-level take avoidance documents (such as FWS_49739) identify conservative take avoidance thresholds to prevent FWS from having to review specific applications of the guidance. Project proponents who anticipate doing less than what is recommended in the guidance may still seek FWS's technical assistance to determine whether such activities could result in take.

Diamond's incidental take.

Fourth, EPIC claims that the DCAs, which are designed to provide protections to the habitat that NSO actually use, are too dynamic. *See* Pl.'s Reply at 30:22-32:18. EPIC would instead prefer for Green Diamond to continue to use static set asides even as some of these areas remain unoccupied by NSO during the permit term. *See id*; FWS_78-80; FWS_139. Absent from EPIC's argument is any recognition that DCAs may only be replaced "if replacement DCAs perform better" (or in other words improve occupancy and fecundity). *See* FWS_1107; FWS_146. This safeguard alone means that it will be exceedingly rare for DCAs to be replaced and will most likely occur only when DCAs are underperforming (and thus have low occupancy and fecundity data), which will prevent the parade of horribles that EPIC claims will occur by affording habitat protections to sites that NSO actually use. *See id.*; Pl.'s Reply. at 30:22-32:18. Moreover, all occupied NSO sites are afforded protections to avoid direct take[5] and the remaining authorized incidental take is low. FWS_1107; FWS_118-20. Even so, habitat modification associated with timber harvest is not, as EPIC claims, a permanent condition. *See* Pl.'s Reply at 31:12-17; FWS_42-43 (stands reach ages of 45 to 70 years old before they are harvested again). Indeed, NSO in this Plan Area routinely nest and forage in habitat that was harvested sometime in the past. *See, e.g.,* FWS_35222.

Finally, EPIC argues that the FHCP should not be credited for providing protections if there is any overlap between the DCAs and riparian management zones ("RMZs"). *See* Pl.'s Reply at 32:19-36:1. Yet the DCAs' and RMZs' acreage overlaps on average by just thirty-four percent (with a range of 8.3 to 80.4%). Fed. Defs.' Br. at 21:12-16; FWS_1136; FWS_1444. Not only are

---

[5] Direct take in this context refers to injury or mortality of the ESA-listed species, whereas habitat-based take indirectly impairs life functions such as breeding, feeding, or sheltering. *See* 50 C.F.R. § 17.3 (definition of harm).

these areas not geographically co-extensive but they involve different conservation commitments to serve very different purposes. For instance, although timber harvest is prohibited in both areas, they are defined and managed in very different ways. DCAs are delineated based on habitat conditions that support NSO reproduction, FWS_784, while the purpose of RMZs "is to maintain and enhance the key riparian functions" of watercourses to benefit salmonids and other aquatic species. *See* FWS_38496; FWS_789. As such, DCAs include specific habitat elements to benefit NSO (e.g., nesting and foraging habitat), *see, e.g.,* FWS_140, and RMZs include requirements for habitat elements that benefit aquatic species (e.g., slope stabilization and features that cool watercourses), *see, e.g.,* FWS_38496-502. Thus, contrary to EPIC's claims, this is not a situation of Green Diamond benefitting from conservation commitments that exist independent of the FHCP.

And, even if it was, EPIC has not explained why Green Diamond cannot design compounding conservation measures that benefit additional species of conservation concern. As described in Federal Defendants' opening brief, EPIC relies on cases that are inapt because they involved conservation commitments made by third parties—not conservation commitments made by the same permittee. *See* Fed. Defs.' Br. at 21:15-24. Further, EPIC's approach would disincentivize large, institutional landowners from participating in these types of ambitious conservation plans. Many of the most impactful habitat conservation plans cover vast areas that contain numerous species of conservation concern. Although it may be ideal to address all of these species through one document, that may not always be possible due to the complexity of the science and the number of parties collaborating on a particular plan. If, as EPIC suggests, applicants cannot include overlapping conservation measures that build on past commitments, it would disincentive applicants from creating HCPs that afford benefits to additional species,

especially across geographically vast areas where species might benefit the most. *See* FWS_73407.

For all the above reasons, EPIC's claims related to the DCAs are factually and legally meritless. To successfully challenge FWS's scientific determination related to NSO habitat requirements, EPIC must show that FWS's determination constituted a "clear error of judgment." *See, e.g., Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) *overruled in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). EPIC has not met this burden because the record demonstrates that the challenged habitat conditions support successful NSO reproduction.

### c. Green Diamond's survey protocols are more rigorous than FWS's standard protocol and account for barred owls.

The FHCP and ITP require Green Diamond to perform NSO surveys to avoid both direct take and habitat-based incidental take of NSO. *See, e.g.,* FWS_718-34. The FHCP's NSO survey protocol is highly accurate (greater than 95% probability of detection), accounts for the suppressive effects of barred owls by removing barred owls and using barred owl-specific protocols, and exceeds requirements in FWS's current NSO survey protocol guidance document. Fed. Defs.' Br. at 23-25; FWS_227-28; FWS_725-26; FWS_770-71; FWS_241-42; FWS_13932-33.

Despite the overwhelming record support for the protocol, EPIC claims that the FHCP's protocol undercounts occupied sites because NSO may eventually "recolonize" sites and an outdated 2008 Technical Assistance document recommended more than three years of surveys. *See* Pl.'s Reply at 36:16-21. Absent from EPIC's reply is any explanation for why the Court should credit an agency guidance document that has since been replaced with a new survey protocol that recommends just two years of six surveys when barred owl detection measures are used. *See id*.; FWS_13919; FWS_13932-33. Instead, EPIC now suggests that the Court should disregard that

accuracy data because for much of that period "barred owls had not yet reached current population levels in the Plan Area." Pl.'s Reply at 37:8-13. But the FHCP's protocol conservatively requires far more surveys when barred owls are present than FWS's current protocol guidance (five years of negative surveys with six surveys per year), which accounts for barred owl expansion into NSO territory. *Compare id*. *with* FWS_770-71. And scientific data demonstrates that this six-visit protocol ensures an accuracy rate that exceeds ninety-five percent, even when barred owls are present. *See* FWS_771 (Table H10). Although EPIC proclaims that recolonization could still occur many years later, Pl.'s Reply at 36:16-21, the purpose of the FHCP protocol is to avoid direct take of NSO and to determine when they have been displaced by harvest activities near activity centers, such that incidental take should be assessed. *See* FWS_718-34. The potential for recolonization at some later point reflects EPIC's attempt to move the goal post and does not affect the validity of FWS's determination that the protocol, in concert with the FHCP's other conservation measures, minimizes and mitigates the impacts of incidental take to the maximum extent practicable.

Altogether, EPIC's argument does not meaningfully explain why the Court should disregard the protocol's thoughtful and science-based approach for detecting NSO when barred owls are present. As such, it is the height of flyspecking and does not provide a basis for upending FWS's determination that the survey protocol was appropriate.

### d. The FHCP's post-fire salvage protocol protects spotted owls.

The FHCP permits DCAs to be moved only if they both fall below minimum biological criteria (such that they no longer optimally support NSO) and FWS agrees that the DCA is no longer functional and should be retired. *See* FWS_152; FWS_192. This approach is conservative and benefits NSO in the Plan Area by replacing non-functional DCAs with habitat that can support species while retaining post-fire DCAs that continue to function as suitable NSO habitat. *See id*.

Retaining habitat protections for non-functional habitat does not benefit NSO and would run contrary to the FHCP's purpose of minimizing and mitigating incidental take.

EPIC's reliance on the Clark study[6] is beside the point. The FHCP's post-fire protocol determines whether to retain or replace DCAs using on-the-ground data that demonstrates whether the habitat continues to support NSO. *See id*. In contrast, EPIC conflates all post-fire salvage (without consideration of the severity or subsequent site-specific data) to determine that it is a "joint driver" of NSO abandoning habitat at post-fire sites. *See* Pl.'s Reply at 38:6-8. This is wrong. First, there is scientific consensus that wildfires' effects on spotted owls "vary with fire intensity." *See* FWS_1110; FWS_53978. Even the Clark study repeatedly recognized this by observing that NSO continued to use habitat after low intensity burns (FWS_56980; FWS_57023), while stand-replacing fire endangered "stands critical to the conservation of northern spotted owls." FWS_56978. Second, Clark does not separate out the impacts of wildfire and salvage harvest when evaluating whether NSO continued to use post-fire sites, which means it cannot support the conclusion that the salvage harvest itself prevents continued use of such sites. *See* FWS_57019-20.

EPIC argues that the FHCP's retention standard enables Green Diamond to actively manage functional post-fire DCAs without a "quantitative standard" that defines what may or may not be retained, Pl.'s Reply at 38:13-22, and that the FHCP's TREE retention standards, which require Green Diamond to retain beneficial habitat (such as snags and other decadent features) "contain a categorical exception for hazard trees." *See id*. at 39:25. These arguments are without

---

[6] Contrary to EPIC's claim, Pl.'s Reply at 38:7, FWS has not identified the Clark study as the best available science, and this determination is the agency's to make. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) ("[W]hat constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference") (citation omitted).

merit.

First, EPIC ignores that active management of these DCAs (which includes reforestation requirements) optimizes DCAs' post-fire habitat value for NSO. *See, e.g.,* FWS_192. Nor does EPIC explain why a quantitative standard would be beneficial—let alone legally required—under these circumstances. *See* Pl.'s Reply at 38:13-22. Second, EPIC's arguments ignore the flexibility needed to nimbly respond to disruptive events, in particular where hazard and safety concerns are implicated. Third, contrary to EPIC's claim, *id*. at 39:25-26, the safety and hazard exception provides an objective parameter by prescribing that Green Diamond "make a concerted effort to retain all…standing dead or mostly dead tree[s]…unless it constitutes a clear safety or fire hazard." FWS_707. Before Green Diamond can remove trees under this standard, it must engage in additional conversations with "responsible parties" and must leave felled trees on-site to continue to provide habitat benefits. *Id*.

At bottom, EPIC attempts to treat all fires the same and conflates the effects of fire and subsequent salvage harvest in a manner that is both unscientific and runs contrary to EPIC's stated aim of conserving NSO habitat. The Court should reject EPIC's invitation to second-guess FWS's reasonable determination that it is appropriate for Green Diamond to engage in limited salvage harvest post-fire and to replace DCAs that no longer afford NSO functional habitat.

### e. The FHCP's barred owl provisions ensure that the threat of barred owl invasion will be properly managed throughout the term of the ITP.

As described in Federal Defendants' opening brief, any experimental barred owl co-existence management will require further FWS approvals and, as such, Green Diamond's challenge of such a future program is unfounded and premature. Fed. Defs.' Br. at 26:13-16. Moreover, the FHCP includes safeguards to ensure that approval of such an experiment involves extensive oversight and will continue to protect NSO in the Plan Area. *See id*. at 26:17-27:8.

EPIC claims that its "opening brief demonstrates that replacing a proven conservation strategy with an experiment" fails to comply with ESA Section 10's minimization and mitigation standard because including adaptive management schemes that envision further oversight is "too speculative." *See* Pl.'s Reply at 39:13-25. But EPIC disregards that the FHCP requires barred owl removal. *See id.*; FWS_123. Until Green Diamond can support and obtain FWS approval for a coexistence strategy, barred owl removal is "reasonably certain to occur" throughout the Plan Area. *See* FWS_123. And even if FWS eventually authorizes barred owl coexistence, lethal removals will merely be reduced in "selected areas" while barred owl removals will continue elsewhere in the Plan Area. *See id.*

EPIC's argument also ignores the practical reality of long-term conservation plans, which must ensure continued conservation benefits to the protected species for decades while also adapting to change circumstances in the plan area. If HCPs were prohibited from including phased approaches to emerging problems (especially ones with multiple safeguards), it would undermine their ability to respond to changes that occur decades into a plan that may require adaptive management to continue to protect important resources in the plan area. In this case, the FHCP strikes the right balance by including requirements for barred owl removal at each possible phase while also building in safeguards to ensure that any efforts to eventually reduce lethal barred owl removal remain subject to FWS oversight at multiple points. *See* FWS_123.

EPIC further claims that the FHCP's use of a scientific review panel to mediate disputes between FWS and Green Diamond related to whether to initiate barred owl coexistence management is too speculative and "not subject to the agency's ultimate control." *See* Pl.'s Reply at 39:26-40:12. As an initial matter, HCPs often include scientific review panels to assist in mediating future scientific controversies. *See, e.g.,* FWS_73623. If these types of provisions

rendered fifty- to hundred-year plans too speculative, it would undermine the adaptive management core that is essential to ensuring continued benefits under these long-term plans. In any event, the scientific review panel's role is limited to evaluating whether demographic metrics are met to justify transitioning to the third phase of barred owl management. *See* FWS_123. Although the panel would provide a "recommendation" about whether and how to proceed with Phase 3 of barred owl management, *id*., FWS retains approval authority over barred owl coexistence management because at a minimum implementation of the program will require FWS's issuance of a Migratory Bird Treaty Act permit. Even if barred owl coexistence management is eventually permitted, its implementation would continue to include removal of barred owls from key areas while minimizing lethal removal in others. FWS_163. And such a program would not undermine the FHCP's minimization and mitigation measures because it would also require Green Diamond to revert to more wide-scale lethal removal of barred owls if NSO population levels decline. *See id*.

### III.    EPIC's Section 7 claims fail because it does not identify data FWS ignored—let alone data that would materially affect the jeopardy determination.

#### a.  FWS properly considered the demographic data.

FWS considered post-2015 data, Green Diamond's 2019 annual report, and the NSO's downward population trend in the Plan Area in reaching the no jeopardy determination challenged here. Fed. Defs.' Br. at 28:2-29:17. Thus, EPIC has not identified any new data—let alone best available science—that FWS failed to consider or that could have materially changed the no jeopardy determination.

On reply, EPIC lays out a new theory of this claim, all premised on a new interpretation of the 2019 Annual Report and flawed assessments of the relevant data. *See* Pl.'s Reply at 41:23-27. To begin, EPIC cites three pages in the 2019 Annual Report to argue that the NSO population had

already declined by forty to fifty percent when FWS issued the Biological Opinion ("BiOp"). *Id*. at 42:13-25 (citing FWS_27660; FWS_27664; FWS_27677). This alleged decline is unsupported by any of these cites, as it is comparing two different types of owl data across different geographic areas. For instance, the 166 "active sites" reported for 2015 in the BiOp reflect sites that were occupied at least once within three years across the entire Plan Area. *See* FWS_1132; FWS_233. In contrast, the 101 total owl sites reported in the 2019 Annual Report reflect occupancy data for a single year within a portion of the Plan Area. *See* FWS_27664; FWS27654-55; FWS_1132. When comparing the 2019 Annual Report's occupancy data across years, the population is much more stable than EPIC claims. *See* FWS_27664. For instance, there was no change in occupancy between 2017 and 2018, and a much more modest change in occupancy between 2015 and 2018 (a reduction from 133 occupied sites to 101). *See id*. The modest change between 2015 and 2018 is also consistent with what FWS analyzed in the BiOp. Fed. Defs.' Br. at 29:13-23 (relying on Dugger et al. (2016) at FWS_1111 to evaluate a modest decline in NSO population numbers). Finally, weather conditions may have also contributed to differences in nesting in 2015 versus 2018. For instance, the mild climate in 2015 likely contributed to greater nesting success, while 2018 was a wet year that may have contributed to reduced nesting success. *See* FWS_51; FWS_27666. For these reasons, EPIC's arguments that there was a material decline in NSO's population size between 2015 and 2018 lacks merit.

Moreover, the NSO occupancy data underscores the importance of the FHCP's barred owl removal conservation measure and lends more support for FWS's decisions. Green Diamond began experimentally removing barred owls in select treatment areas in 2009, which resulted in increased NSO occupancy that year and stabilized NSO occupancy in later years. *See id.*; FWS_27676. Then in 2014, Green Diamond paused its barred owl removal efforts until FWS approved the HCP and

issued necessary permits. *See* FWS_160; FWS_1774-79. Thus, the declined occupancy levels observed in 2017 and 2018 likely also reflected the pause on barred owl removals, which supports FWS's approval of the BiOp and issuance of the ITP because Green Diamond's implementation of barred owl removals is expected to improve or at least stabilize NSO declines in the Plan Area. *See* FWS_27679.

In sum, EPIC's demographic arguments misinterpret the 2019 NSO population data and its importance in the FWS's jeopardy determination. FWS's evaluation of NSO population data for the Plan Area was reasonable because it considered recent declines, factored in the impact of barred owl removal efforts, and the modest decline in NSO observed between 2015 and 2018 was consistent with these analyses.

### b. FWS considered the potential future models in the BiOp and included safeguards that ensure any use of such models will protect NSO.

EPIC challenges the adequacy of future habitat fitness and site occupancy models because it claims they are uncertain and not yet validated. Pl.'s Br. at 36:6; Pl.'s Reply at 43:16-17. Although the FHCP provides for the possible future use of models, their use remains contingent on FWS approval and nothing in the plan guarantees Green Diamond a right to integrate the models into take calculations or evaluation of habitat fitness. *See* Fed. Defs.' Br. at 30:22-31:11.

Although the FHCP envisions potential future use of the models, it also includes steps to validate the models over at least seven years as well as other safeguards to ensure that the models function as intended and continue to protect NSO even if they are approved. *See* Fed. Defs.' Br. at 31:12-32:13. In the BiOp, FWS recognized these safeguards by noting that "[a]fter 10 years of FHCP implementation, Green Diamond may estimate annual incidental take of northern spotted owls using their habitat fitness models and site occupancy models, pending model validation (which will occur during the initial 10 years) and [FWS] review and approval of the two models."

FWS_1104. Thus, FWS expressly considered the information that it had available about the models, the FHCP's validation requirements, and the future approval process as part of the agency action in reaching the no jeopardy determination. *See id*. Contrary to EPIC's assertions, there is no basis for the Court to ignore FWS's consideration of these provisions in the FHCP simply because Federal Defendants cited to the plan's more detailed descriptions of this information. *See* Pl.'s Reply at 44:7-14. This is especially true because FWS collaborated with Green Diamond in the development of the FHCP and incorporated the FHCP by reference into the BiOp. *See* FWS_1102; FWS_1148; *see All. for the Wild Rockies v. Marten*, 789 F.App'x 583, 583 n.1 (9th Cir. 2020) (rejecting the contention that the Court's review is "limited to what the agency actually said in the BiOp," where the BiOp "expressly referred" to other documents) (citation modified)).

For similar reasons, EPIC's reliance on *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), is misplaced because that case merely stated that ESA consultation "must be coextensive" with the agency action—not that the agency must never act in the face of uncertain data. *Id*. at 1457-58. Here, FWS considered all the information that it had available concerning the models, although it acknowledged some uncertainty about what these models might look like and whether they would be approved. *See* FWS_1104. This is consistent with later Ninth Circuit decisions, in which the Court has recognized agencies may make jeopardy determinations even in the face of uncertainty, as long as they consider the best available science and do not make a "clear error of judgment." *See, e.g., Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992). If while evaluating the models, FWS determines that the models will modify the approval of the FHCP and issuance of the ITP "in a manner that causes an effect" to NSO that was not considered in the BiOp, then FWS will reinitiate consultation consistent with the ESA regulations. *See* 50 C.F.R. § 402.16(a)(3). This reinitiation trigger provides further safeguards to ensure that NSO will be protected and

considered during the validation and approval of any future models.

EPIC next challenges the sufficiency of future monitoring under the models. Pl.'s Reply at 44:15-45:9. Green Diamond will remain responsible for extensive monitoring even if the models are eventually approved, and it is only mark-recapture monitoring that would be reduced. *See* Fed. Defs.' Br. at 32:7-13. And the FHCP requires Green Diamond to validate the model to ensure it can accurately predict occupancy, including by comparing expected versus observed occupancy. *See* FWS_777. Even so, EPIC implies without explanation that the only valid surveying approach is "direct monitoring of the entire spotted owl population," and that such monitoring is the only way to calculate whether the numerical take limit has been exceeded. *See* Pl.'s Reply at 45:2-9. Yet scientific literature supports the use of site occupancy models. *See, e.g.,* FWS_1163 (citing Olson (2005)); FWS_165 (citing multiple studies by MacKenzie). And pervasive monitoring can itself have detrimental impacts on NSO, such that its continued use despite a reasonable alternative is not optimal for NSO. *See, e.g.,* FWS_13930 (survey calls can stress NSO, disrupt their behavior, and increase the risk of predation); FWS_727.

EPIC also rehashes its claim that the models cannot be used at the scale of the Plan Area, this time relying on California Department of Fish and Wildlife's characterization of Franklin. *See* Pl.'s Reply at 45:10-18. Yet FWS expressly considered Franklin's concerns with large-scale models and rejected the idea that site-specific models (like the ones envisioned in the FHCP) should not be used for HCP-level planning. *See* Fed. Defs.' Br. at 32:14-33:5. Scientific models can also reliably and effectively determine occupancy, especially when they are appropriately validated.

At bottom, EPIC's argument implies that the scientific framework for long-term conservation plans must be set in stone for such actions to be defensible, but this ignores that such

an unbending approach would lock agencies into outdated science rather than affording the type of flexibility (with safeguards) that is necessary for these plans to continue to function over the long-term. For all the above reasons, EPIC's claims fail.

### c. Both the BiOp and the FHCP considered whether NSO would have sufficient dispersal habitat.

As described in Federal Defendants' opening brief, juvenile NSO have extensive dispersal ranges (up to ninety-three miles), which insulates them from experiencing connectivity barriers that limit other species. *See* Fed. Defs.' Br. at 33:10-14. Despite the practical reality that NSO are less constrained by this condition than other species, EPIC insists that the BiOp should have included a detailed analysis to explain how NSO could disperse in and around the expansive, predominantly forested Plan Area.

First, both the BiOp and the FHCP[7] evaluated connectivity, dispersal, and fragmentation. In the BiOp's effects of the action section, FWS noted that altering vegetation in the Plan Area impacts the "fitness" of NSO, especially when habitat changes occur in NSOs' home ranges and core areas. FWS_1138. For this reason, the DCAs promote high quality NSO habitat and the DCAs' cluster strategy is designed to provide supportive habitat to fledgling NSOs' home ranges and core areas. *See* FWS_136. Moreover, habitat modification near NSO activity centers is controlled by strict and judicious annual incidental take limits that further conserve NSO habitat that is occupied. *See* FWS_1138-39. Moreover, collectively, the DCAs, RMZs, TREE retention standards, incidental take limits, and other harvest protections ensure that Green Diamond's management practices will continue to enable the Plan Area to support NSO, as these productive timber lands have successfully done for the past century. *See e.g.*, FWS_153-56; FWS_139.

---

[7] FWS collaborated with Green Diamond to develop the FHCP and incorporated it into the BiOp. *See* FWS_1102; FWS_1148.

In response, EPIC mischaracterizes the nature and amount of incidental take authorized by the ITP. *See* Pl.'s Reply at 47:13-18. Contrary to EPIC's claim that the ITP authorizes "destroying" 119 NSO activity centers, the incidental take merely permits EPIC to temporarily degrade habitat near NSO activity centers for up to a maximum of three sites per year. *See* FWS_1104; FWS_1138-39.

EPIC's argument that all Owl Management Units should have DCAs, even if they do not contain high quality NSO habitat, also lacks merit. *See* Pl.'s Reply at 47:23-25. Designating DCAs in areas that do not meet selection criteria (because NSO do not demonstrate a strong preference for using it) would not promote NSO conservation as it would come at the expense of better functioning habitat elsewhere in the Plan Area, and limits on incidental take further ensure that there will be habitat reserves for activity centers that NSO occupy. *See* Fed. Defs.' Br. at 34:1-7. Moreover, far from failing to support NSO recovery efforts, the BiOp explains why this type of geographically expansive HCP is consistent with the 2011 Recovery Plan by ensuring important habitat contributions adjacent to state and federal land that collectively provide NSO habitat and support NSO populations. *See* FWS_1141.

### d.  FWS evaluated the entire adjustment area in the BiOp.

Contrary to EPIC's claim, FWS evaluated the adjustment area in the BiOp and accounted for it in reaching the no jeopardy determination. *See* Fed. Defs.' Br. at 34:26-35:2. For instance, the BiOp identified the universe of potential adjustment land, *see* FWS_1106, and described the potential acreage involved, FWS_1132. FWS also defined the action area that the BiOp analyzed as including the initial Plan Area, the adjustment area, and a 0.7-mile buffer area around both the Plan and adjustment areas. *See id.* (citing FWS_1106 (Figure 1)). Despite EPIC's claims, *see* Pl.'s Reply at 48:10-17, this is plainly not a situation where FWS deferred evaluation of the adjustment

area for some later consultation. FWS conservatively included the adjustment area in its evaluation of the action for the ESA consultation and also built in additional safeguards to ensure that the later addition of portions of the adjustment area would not alter its determination in the BiOp. *See* Fed. Defs.' Br. at 34:19-35:3. This procedural safeguard complies with the ESA because it builds in an evaluation of whether the later inclusion of specific portions of the adjustment area could modify the action in a manner that was not considered in the BiOp, consistent with the ESA's regulatory reinitiation requirements. *See* 50 C.F.R. § 402.16(a)(3).

EPIC also incorrectly claims that the FHCPs' detailed description of the adjustment area cannot be factored into the BiOp's analysis. *See* Pl.'s Reply at 49:6-50:6. But FWS collaborated with Green Diamond to develop the HCP and also incorporated the FHCP into the BiOp*, see* FWS_1102; FWS_1148, which is proper under Ninth Circuit precedent. *See Selkirk Conservation All. v. Forsgren,* 336 F.3d 944, 953 n.4 (9th Cir. 2003) (FWS may properly incorporate conservation agreements into ESA consultation documents); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1264 (9th Cir. 2017) (same, as applied to mitigation measures).

### e.  FWS appropriately analyzed impacts associated with climate change.

EPIC raises new insect infestation, stand age, and heat/drought arguments in the climate change section for the first time on reply. *See* Pl.'s Br. 39:13-41:20 (identifying only climate impacts associated with wildfire, prey species, and reforestation rates—without any mention of insect infestations, stand age, or heat stress or drought). As these claims were not brought in EPIC's opening brief, the Court should not consider them. *See, e.g., Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("[a]rguments not raised by a party in its opening brief are deemed waived").

Even so, FWS analyzed potential consequences of climate change in the BiOp and the other

decision documents that it incorporates. *See* Fed. Defs.' Br. at 36:16-40:7 (evaluating wildfire, prey species, and how to handle uncertainty and changed circumstances under the FHCP); *see All. for the Wild Rockies,* 789 F.App'x at 583 n.1. These analyses ensured that FWS accounted for the relevant climate considerations in reaching the no jeopardy determination, and EPIC did not identify any data that FWS failed to consider that could have materially affected this determination.

Undeterred by these detailed analyses of relevant climate impacts, EPIC claims that the ESA requires an "additive" climate analysis. *See* Pl.'s Reply at 50:9-24. Although the ESA regulations require FWS to factor the effects of the action, any cumulative effects and the environmental baseline into the jeopardy determination, there is no requirement that FWS perform this analysis on an issue-by-issue basis, especially in the absence of scientific data to suggest that the issues are directly or indirectly related or have additive effects. *See* 50 C.F.R. §§ 402.14(g), 402.02 (2016) (definition of "effects of the action"); *Lands Council*, 537 F.3d at 993 (courts may not impose procedural requirements that do not exist in the relevant statutes). EPIC identifies no record or other support to tether the climate issues that it raises to the FHCP's effects. Although EPIC notes that forest stands will increase in age over the life of the FHCP, it does not identify scientific data to explain how this projected change will directly or indirectly relate to any climate impacts in the Plan Area. *See* Pl.'s Reply at 51:13-19. Nor does EPIC provide any scientific support to demonstrate that the FHCP's covered activities directly or indirectly relate to climate-based wildfire risk in the Plan Area. *See id.* at 53:5-13. Likewise, EPIC states that climate change is causing NSO "heat stress, thermoregulatory costs, and water loss" and "insect outbreaks," but it does not explain why such impacts are tethered in any way to effects of the FHCP. *See id*. 52:20-53:7.

Similarly, EPIC shifts its prey species claim from one focused on tree voles to a challenge

to FWS's analysis of all NSO prey species. *See id.* at 54:2-11. But EPIC's arguments are untethered from the applicable ESA standard, as EPIC does not explain why climate impacts to NSO prey species directly or indirectly relate to the FHCP's covered activities. *See id*. 54:2-19; see 50 C.F.R. § 402.02. In any case, the BiOp analyzed the relationship between prey abundance and wildfire and observed that some fire "creates habitat necessary for an abundance of their key prey species." *See* FWS_1110; Fed. Defs.' Br. at 36:25-26, 37:6-9, 38:13-39:11.

Finally, EPIC claims that the Court should not credit the FHCP's adaptive management regime in considering whether FWS adequately accounted for uncertainty related to climate change because the management plans must first include a "rigorous upfront analysis of climate change." *See* Pl.'s Reply at 53:20-54:21. Yet FWS considered relevant climate impacts and EPIC provides no basis for concluding that FWS failed to consider the best available science or was required to do more. Fed. Defs.' Br. at 35:14-40:7. And the FHCP's adaptive management provides safeguards that ensure that uncertain or unanticipated climate impacts will be addressed through further coordination and supplemental prescriptions. *See id*. at 39:13-40:7.

FWS's climate change analysis is a fact-bound determination, and it performed that inquiry here. Beyond that, "[i]t is, of course, not the Court's place to tell the agency how [to] consider climate change in it its analysis, it simply must consider it." *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1234 (E.D. Wash. 2016) (unlike the situation present here, remanding to FWS to consider climate change impacts in the first instance).

**f.   EPIC improperly asserts for the first time new illusory mitigation claims.**

EPIC improperly adds a new mitigation claim in its Reply. *Compare* Pl.'s Br. at 29:1-19 *with* Pl.'s Reply at 54:22-55:21. As with the new climate change argument above, the Court should not consider these new arguments because they are deemed waived. *See Friends of Yosemite*

*Valley*, 520 F.3d at 1033.

Even if the Court considers these untimely arguments, they are without merit. As described above, the FHCP's barred owl management regime properly includes safeguards to ensure that each phase of barred owl management will continue to remove barred owls and provide mitigation value to NSO. *See* FWS_162-63. And FWS has also previously explained why the designated DCAs were appropriate and consistent with the DCA selection criteria notwithstanding recent years of reduced performance due to the "negative influence of barred owls." FWS_1598-99. FWS's scientific determination that the DCAs and barred owl removal efforts in the BiOp are appropriate is well supported by the record documents and is entitled to deference. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (expert agencies are entitled to deference when deciding complex scientific issues at the frontiers of science).

### IV.  FWS satisfied it ESA Section 7 obligations in reaching a no effect determination for marbled murrelet.

#### a.  Plaintiffs lack standing on the marbled murrelet claim.

Plaintiffs have failed to usher evidence to support each element of standing related to their marbled murrelet claim. Standing is determined based on the "facts as they exist when the complaint is filed." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n. 4 (1992) (citation modified).The elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1057 (9th Cir. 2023) (quoting *Lujan*, 504 U.S. at 561). "[A]t the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element" of Article III standing. *Id*. at 1058 (quoting *Ctr. for Biological Diversity v. Exp. Imp. Bank*, 894 F.3d 1005, 1023 (9th Cir. 2018)).

As an initial matter, the Court should disregard the Declaration of Gary Falxa because EPIC

offered Mr. Falxa as a new standing declarant for the first time in its reply, without explaining why it failed to provide evidence or argument concerning Mr. Falxa's alleged bases for standing in its opening brief. *See Friends of Yosemite Valley*, 520 F.3d at 1033; Pl.'s Reply at 14:1-16:8.

EPIC has neither met the requirements for associational standing nor met the elements of standing. First, although EPIC claims to have associational standing, it did not provide any facts that demonstrate that the standing declarants were members at the time the Complaint was filed. *See Lujan*, 504 U.S. at 569 n. 4. Mr. Burton offers two declarations, but noticeably absent from both are any statements about being a member of EPIC. *See* ECF Nos. 40, 50. Ms. Baker, Mr. DiPerna, and Mr. Falxa all state that they are members of EPIC, but none states that they became members before EPIC filed the Complaint. *See* ECF Nos. 39 ¶ 3, 41 ¶ 1, 51 ¶ 2; *see Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000) (describing the characteristics members must have to support associational standing).

Second, EPIC's standing declarants identify an "interest" in marbled murrelets. But rather than explaining how that interest is or imminently will be injured by FWS's no effect determination for marbled murrelet, they instead offer only speculative injuries and no explanation for how they are traceable to FWS's approval of the FHCP. For example, the standing declarants all express a concern that the activities authorized in the FHCP *could* reduce the species' habitat but do not describe how or why that will occur. ECF Nos. 51 ¶ 19, 39 ¶ 10, 50 ¶ 9. Nor do they offer no facts to show such injuries are concrete, actual, or imminent. *See id*.

EPIC also does not explain how FWS caused its alleged injury nor how the Court could redress this claim. ESA consultations are based on the proposed action, which here is FWS's approval of the FHCP and issuance of an ITP. *See* 16 U.S.C. § 1536(a)(2) (requiring ESA consultation for actions "authorized, funded, or carried out" by an agency). The FHCP only

included "conservation efforts for northern spotted owl, fisher, red tree vole, and Sonoma tree vole." FWS_1104. And although as part of the Section 7 consultation FWS was required to consider the effects of the FHCP and ITP on all ESA-listed species in the Plan Area, this evaluation was based on the FHCP as Green Diamond proposed it (i.e., without protections for marbled murrelet). *See* FWS_1102. Thus, EPIC cannot demonstrate that the failure to include marbled murrelet protections in the FHCP was "fairly traceable" to any action taken by FWS because EPIC decided what species to include in the FHCP. *See Friends of the Earth*, 528 U.S. at 180 (describing standing's traceability requirement). Nor could the Court grant any relief that would redress the declarants' desire for marbled murrelet protections in the FHCP because the APA only permits the Court to set aside FWS's approval of the FHCP and issuance of the ITP; it should not order Federal Defendants to include species Green Diamond elected not to include in the FHCP. *See* ECF Nos. 39 ¶ 11, 50 ¶ 11, 51 ¶ 20; *see also*, 5 U.S.C. § 706(2) (challenges to agency actions under the APA are a limited waiver of sovereign immunity that confers jurisdiction to "hold unlawful and set aside" agency actions under certain circumstances).

### b. EPIC's no effect claim fails on the merits.

FWS evaluated potential effects of the FHCP on marbled murrelet and determined that implementation of the FHCP (with the prescriptions included in the Master Agreement for Timber Operations ("MATO")) would not affect the species or its critical habitat. *See* Fed. Defs.' Br. at 41:9-22. Although EPIC claims that the MATO will permit vehicle traffic that could impact marbled murrelet through noises, Pl.'s Reply at 17:13-17, it neglects to mention that the FWS guidance upon which it relies states that only noises greater than twenty decibels above ambient levels affect marbled murrelets. *See* FWS_28051-69. Moreover, many of the roads in the action area have been present for decades or even a hundred years or more, which makes it likely that

they are accustomed to noises associated with ongoing forest management activities in the Plan Area. *See* FWS_1138. Likewise the MATO requires buffers and seasonal restrictions around marbled murrelet critical habitat, which prevents Green Diamond's activities from affecting critical habitat. Fed. Defs.' Br. at 42:7-13.

Even assuming that there is an effect, FWS would still not be required to engage in formal consultation. When FWS determines that an action is "not likely to adversely affect" an ESA-listed species, it need not proceed further. *See* 50 C.F.R. § 402.13(c). Given the extensive habitat protections in the Plan Area, EPIC has provided no factual basis for concluding that the FHCP's effects on marbled murrelets of its critical habitat were more than discountable, insignificant, or completely beneficial. *See Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1052 n.5 (9th Cir. 2013). As such, EPIC cannot establish that any error to this analysis was prejudicial. (APA requires courts to take "due account" of "the rule of prejudicial error"); *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 590 (2025) (plaintiffs bear the burden of establishing prejudicial error).

## CONCLUSION

For all of the foregoing reasons, the Court should deny Plaintiff's motion for summary judgment and grant Federal Defendants' cross motion for summary judgment.

Dated: June 18, 2026                    Respectfully submitted,

                                        ADAM R.F. GUSTAFSON
                                        Principal Deputy Assistant Attorney General
                                        United States Department of Justice
                                        Environment & Natural Resources Division

                                        */s/ Erika Furlong*
                                        ERIKA FURLONG (PA Bar No. 319350)
                                        Wildlife & Marine Resources Section
                                        Trial Attorney
                                        150 M Street NE
                                        Washington, DC 20002
                                        Tel: (202) 598-9571
                                        Fax: (202)305-0506
                                        Erika.Furlong@usdoj.gov

                                        *Attorneys for Federal Defendants*