NAVI SINGH DHILLON (SBN 279537)
navidhillon@paulhastings.com
CHRISTOPHER J. CARR (SBN 184076)
chriscarr@paulhastings.com
LUCAS GRUNBAUM (SBN 314180)
lucasgrunbaum@paulhastings.com
GRAYSON A. PETERS (SBN 359997)
graysonpeters@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California 94111
Telephone:  (415) 856-7070
Facsimile:  (415) 856-7100

Attorneys for Defendant-Intervenor
GREEN DIAMOND RESOURCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN R. NESVIK, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; and U.S. FISH AND WILDLIFE SERVICE,<br><br>Defendants,<br><br>and<br><br>GREEN DIAMOND RESOURCE COMPANY,<br><br>Defendant-Intervenor. | Case No. 4:25-CV-03049-JST<br><br>**GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:         December 3, 2026<br>Time:        2:00 p.m.<br>Judge:       Hon. Jon S. Tigar<br>Department: Videoconference<br><br>Action filed: April 3, 2025 |

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

DISCUSSION ................................................................................................................... 2

    A.   The FHCP Fully Offsets the Impacts of Incidental Take. ................................. 2

        1.   EPIC Misstates the Legal Standard. ............................................................ 2

        2.   The DCAs Protect High Quality Owl Habitat. ........................................... 4

        3.   The Occupancy Surveys Avoid Unauthorized Take. .................................... 6

        4.   The FHCP Protects Owls During Post-Fire Salvage. ................................... 7

        5.   Barred Owl Removal Offsets the Take of NSO. .......................................... 8

    B.   The Biological Opinion Reasonably Determined that Approving the FHCP Was Not Likely To Jeopardize the NSO. ................................................................. 10

        1.   EPIC Misrepresents the Record To Dispute the Demographic Baseline. ................. 10

        2.   The BiOp's Acknowledgement that Green Diamond Could Use Models To Monitor Take, If the Service Approves, Was Reasonable. ................................ 11

        3.   The BiOp Reasonably Considered Dispersal Habitat. ............................... 13

        4.   The BiOp Reasonably Considered Impacts on the Adjustment Area. ....................... 14

        5.   The BiOp's Climate Change Analysis Is Lawful. ...................................... 14

    C.   EPIC's Marbled Murrelet Claims Fail. ........................................................ 17

        1.   EPIC Failed To Establish Standing. ......................................................... 17

        2.   The Service's No Effect Determination for MaMu Was Lawful. ............................. 18

    D.   The Court Should Consider the Documents EPIC Seeks to Exclude. ............................. 20

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska Oil & Gas Ass'n v. Pritzker*,
840 F.3d 671 (9th Cir. 2016)........................................................................................ 15

*All. for the Wild Rockies v. Gassmann*,
678 F. Supp. 3d 1249 (D. Mont. 2023) .......................................................................... 3

*All. for the Wild Rockies v. Marten*,
585 F. Supp. 3d 1252 (D. Mont. 2021) ........................................................................ 20

*All. for the Wild Rockies v. Marten*,
789 F.App'x 583 (9th Cir. 2020) ................................................................................. 15

*Am. Petroleum Inst. v. EPA*,
216 F.3d 50 (D.C. Cir. 2000) ...................................................................................... 18

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
273 F.3d 1229 (9th Cir. 2001)........................................................................................ 6

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*,
889 F.3d 584 (9th Cir. 2018)....................................................................................... 20

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988)..................................................................................... 14

*Center for Biological Diversity v. Fish & Game Comm'n*,
166 Cal.App.4th 597 (2008).......................................................................................... 2

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020)......................................................................................... 9

*Ctr. for Biological Diversity v. Haaland*,
87 F.4th 980 (9th Cir. 2023).......................................................................................... 8

*Ctr. for Biological Diversity v. Kempthorne*,
588 F.3d 701 (9th Cir. 2009)....................................................................................... 15

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015)....................................................................................... 3

*Dream Games of Ariz., Inc. v. PC Onsite*,
561 F.3d 983 (9th Cir. 2009).................................................................................. 10, 16

*Env'l Prot. Info. Ctr. v. Dep't of Fish and Wildlife*,
No. A163051, 2024 WL 295704 (Cal. Ct. App., Jan, 26, 2024)........................................ 19

*Env'l Prot. Info. Ctr. v. Pac. Lumber Co.*,
    469 F.Supp.2d 803 (N.D. Cal. 2007) ................................................................................. 18

*Forest Conservation Council v. Rosboro Lumber Co.*,
    50 F.3d 781 (9th Cir. 1995) ................................................................................................ 7

*Freedom from Religion Found., Inc. v. Weber*,
    951 F. Supp. 2d 1123 (D. Mont. 2013) ............................................................................. 18

*Friends of Animals v. U.S. Fish & Wildlife Serv.*,
    28 F.4th 19 (9th Cir. 2022) ................................................................................................. 9

*Friends of the Earth, Inc. v. Laidlaw Env'l Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .......................................................................................................... 18

*Friends of Endangered Species, Inc. v. Jantzen*,
    760 F.2d 976 (9th Cir. 1985) .............................................................................................. 3

*Friends of the Wild Swan v. Jewell*,
    No. CV 13-61-M-DWM, 2014 WL 4182702 (D. Mont. Aug. 21, 2014) .............................. 12

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir.), *amended,* 387 F.3d 968 (9th Cir. 2004) ............................................ 5

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
    2010 WL 2643537 (D. Ariz. June 29, 2010) ..................................................................... 11

*Greater Yellowstone Coal., Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) .......................................................................................... 17

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) .............................................................................................. 6

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
    99 F. Supp. 3d 1033 (N.D. Cal. 2015) .......................................................................... 3, 11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................................... 18

*Nat. Res. Def. Council v. Haaland*,
    102 F.4th 1045 (9th Cir. 2024) ............................................................................... 10, 15, 16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    184 F. Supp. 3d 861 (D. Or. 2016) ......................................................................... 10, 15, 16

*Nat'l Wildlife Fed'n v. Norton*,
    No. CIV-S-04-0579 DFL JF, 2005 WL 2175874 (E.D. Cal. Sept. 7, 2005) .......................... 13

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
    384 F.3d 1163 (9th Cir. 2004) ............................................................................................ 3

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

*Oregon Nat. Desert Ass'n v. Tidwell*,
   716 F. Supp. 2d 982 (D. Or. 2010) ................................................................................ 10

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
   606 F. Supp. 2d 1122 (E.D. Cal. 2008) ........................................................................ 17

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
   No. 97-CV-775, 1998 WL 1988556 (W.D. Wash. May 29, 1998) ................................. 12

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ........................................................................................ 12

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) .......................................................................... 2, 10, 12, 20

*San Luis v. Badgley*,
   136 F. Supp. 2d 1136 (E.D. Cal. 2000) ........................................................................ 20

*Sierra Club v. Babbitt*,
   69 F. Supp. 2d 1202 (E.D. Cal. 1999) .......................................................................... 20

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
   506 F.3d 832 (9th Cir. 2007) ........................................................................................ 18

*Southwest Center For Biological Diversity v. Bartel*,
   470 F. Supp. 2d 1118 (S.D. Cal. 2006) ........................................................................ 14

*State of California v. Bureau of Land Management*,
   612 F. Supp. 3d 925 (N.D. Cal. 2020) ...................................................................... 18, 19

*The Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) (en banc), *overruled in part on other grounds by*
   *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .................................................... 2

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
   878 F.3d 725 (9th Cir. 2017) ........................................................................................ 14

*Union Neighbors United, Inc. v. Jewell*,
   831 F.3d 564 (D.C. Cir. 2016) .................................................................................... 2, 3

**STATUTES**

16 U.S.C. § 1539(a)(2)(B)(ii) ................................................................................... 16, 17

Cal. Fish & Game Code § 2081(c) ................................................................................. 19

**OTHER AUTHORITIES**

50 C.F.R. § 402.02 ....................................................................................................... 20

14 Cal. Code Regs. § 898.1 .......................................................................................... 19

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

14 Cal. Code Regs. § 898.2 ........................................................................................... 19

14 Cal. Code Regs. § 895.1 ........................................................................................... 19

14 Cal. Code Regs. § 919.2 ........................................................................................... 19

14 Cal. Code Regs. § 919.11 ......................................................................................... 19

Eric Biber, *Reforming the California Endangered Species Act*, 44 Environs 127
    (2021) ..................................................................................................................... 19

**TABLE OF ACRONYMS**

| | |
|---|---|
| AHCP | Aquatic Habitat Conservation Plan |
| APA | Administrative Procedure Act |
| BaOw | Barred Owl |
| BiOp | Biological Opinion |
| CDFW | California Department of Fish and Wildlife |
| CESA | California Endangered Species Act |
| DCA | Dynamic Core Area |
| EIS | Environmental Impact Statement |
| EPIC | Environmental Protection Information Center |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FHCP | Forest Habitat Conservation Plan |
| FPRs | California Forest Practice Rules |
| FWS | U.S. Fish and Wildlife Service |
| HCP | Habitat Conservation Plan |
| ITP | Incidental Take Permit |
| MaMu | Marbled Murrelet |
| MATO | Master Agreement for Timber Operations |
| NSO | Northern Spotted Owl |
| OMU | Owl Management Unit |
| THP | Timber Harvest Plan |
| TREE | Terrestrial Retention of Ecosystem Elements |

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

EPIC thinks the Forest Habitat Conservation Plan ("FHCP") could be better. But that is true of every HCP and does not constitute a violation of the Endangered Species Act ("ESA") or Administrative Procedure Act ("APA"). For more than 30 years the Service and Green Diamond have implemented conservation plans that make Green Diamond's lands some of the best habitat for Northern Spotted Owl ("NSO") in California. *See* FWS 022-26. The FHCP builds on that legacy by providing the most robust and comprehensive suite of NSO conservation measures to date. *See* FWS 083. EPIC knows the FHCP greatly benefits NSO—that is why it asks this Court to leave the FHCP in place even if it rules in EPIC's favor. That request is telling.

EPIC's challenge to the FHCP advances an extreme interpretation of the ESA that is untethered from the law and the facts. On the law, EPIC misrepresents the legal standard for its Section 10 claims by demanding that the Court conduct an exacting analysis of the FHCP using EPIC's own stilted definition of "biological value," rather than asking whether the Service reasonably determined the FHCP fully offsets the impacts of incidental take. EPIC likewise ignores the applicable standard for its Section 7 claims by arguing that the Biological Opinion ("BiOp") is defective without identifying relevant science the Service failed to consider or explaining why it would have changed the Service's no jeopardy determination.

EPIC's treatment of the facts is, if anything, even more troubling. For example, EPIC attempts to downplay the benefits of the Dynamic Core Areas ("DCAs") by comparing the *total* amount of incidental take authorized over the FHCP's 50-year term (119 owl sites) with the *annual* number of DCAs made available for NSO (44). But that compares the wrong timeframes, relies on unrelated metrics, and ignores that the DCAs do more than protect against take—they are engines of NSO fecundity and demographic support ensuring tree and habitat growth. Similarly, EPIC argues the BiOp's baseline of NSO "active sites" (occupied in one of the last three years), was incorrect. Yet EPIC's position is based on a different metric that measures sites occupied in just a single year. *See* FWS 0233, 27660, 27654-55.

As the Ninth Circuit has cautioned time and again, decisions on technical matters such as NSO science and management, while not unreviewable, are entrusted to the Service. *See San Luis*

*& Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 996 (9th Cir. 2014).  EPIC points to nothing that commends, let alone compels, overriding the deference owed to the Service.  Green Diamond respectfully asks that the Court grant its motion for summary judgment.

## DISCUSSION

### A.  The FHCP Fully Offsets the Impacts of Incidental Take.

The FHCP is a voluntary effort that builds on Green Diamond's pioneering 1992 HCP.[1] *See* ECF No. 48 at 19:13-21:12.  The Service carefully evaluated the issues EPIC raises (and more) during the FHCP's decade-long interagency review process and determined the FHCP's measures fully offset all impacts of the authorized taking.  *See* ECF No. 48 at 17:20-19:3.  On this record, EPIC cannot show the Service made a "clear error of judgment" in so finding.  *The Lands Council v. McNair*, 537 F.3d 981, 992 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008).

### 1.  EPIC Misstates the Legal Standard.

Contending the FHCP fails to minimize and mitigate the impacts of take, EPIC mischaracterizes Green Diamond's arguments, misstates the FHCP's requirements, and mangles the applicable law.[2]  ECF No. 49 at 21:13-24:1.  EPIC argues the Service's Section 10 Handbook requires a quantitative comparison of "biological value" lost and replaced before the Service can find that impacts of take have been "fully offset."  ECF No. 49 at 21:20-23:6.  That is incorrect.  To "mitigate" means to "offset" or "rectif[y]" the impacts of take.  *Union Neighbors United, Inc.*

---

[1] Contrary to EPIC's argument, ECF No. 49 at 21:1-12, nothing in the ESA requires Green Diamond to submit an HCP and apply for an ITP, as it may simply comply with the ESA's take prohibition by "avoiding" take of NSO, like many other companies do.  *See, e.g.*, FWS 049739-50; *see also Friends of the Gualala River v. Gualala Redwood Timber, LLC*, 552 F. Supp. 3d 924, 937 (N.D. Cal. 2021) (order denying motion for preliminary injunction citing "take avoidance requirements for northern spotted owls").

[2] EPIC notes that CESA defines "take" differently than the federal ESA.  ECF No. 49 at 35:10-36:1.  While a "minimize" and "mitigate" finding under CESA is not dispositive under the ESA, CDFW's provision of a CESA Consistency Determination (pursuant to California Fish and Game Code section 2080.1) based on the FHCP reinforces the conclusion that the Service properly mitigated the impacts of take.  *See* ECF No. 46-1 (Carr Decl.), Ex. A (Consistency Determination); *see also Ctr. for Biological Diversity v. Fish & Game Comm'n,* 166 Cal.App.4th 597, 606 (2008) (CDFW spokesperson: "[s]tate standards like full mitigation are, in some instances, more restrictive than [the ESA].").

*v. Jewell*, 831 F.3d 564, 578 (D.C. Cir. 2016).  Consistent with the Handbook, the Service compared the "biological value" lost from covered activities against the "biological value" gained through the conservation measures, as reflected by fecundity.  *See, e.g.*, FWS 0134-35 (evaluating habitat value based on "contribution to NSO fecundity"), 139 (assessment of mean annual fecundity of DCAs). Based on that analysis, the Service reasonably determined the significant biological value provided every year by the FHCP would fully offset the biological value lost from the temporary disturbance of up to three NSO sites a year.  *See* FWS 0270-71, 1705-10.  EPIC does not overcome the deference owed to the Service in its expert determination of complex issues like biological value. *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004).

EPIC complains that Green Diamond argued it cannot criticize individual conservation measures.  ECF No. 49 at 21:17-19.  Not so.  What Green Diamond wrote is that because Section 10 focuses on the FHCP *as a whole*, EPIC must show any alleged deficiencies in one or more measures render the Service's comprehensive assessment of the FHCP invalid.  ECF No. 48 at 23:1-7; *see Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 984 (9th Cir. 1985) (relying on multiple mitigation measures to find compliance with Section 10(a)); *Union Neighbors*, 831 F.3d at 583 (same).  EPIC cites no authority to the contrary.[3]

Finally, EPIC improperly blurs the standards applicable to Sections 7 and 10.  ECF No. 49 at 20:23-27.  The Ninth Circuit has explained that the "best available science" standard applies *only* when the Service acts as a *consulting agency* under Section 7, and not when it makes decisions as an *action agency* (e.g., the Service's approval of the FHCP and issuance of the ITP here).  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1048 (9th Cir. 2015).  EPIC points to no contrary ESA authority and instead relies on an inapplicable NEPA case.  *See* ECF No. 49 at 21:23-25 (citing *All. for the Wild Rockies v. Gassmann*, 678 F. Supp. 3d 1249, 1278 (D. Mont. 2023) for its discussion of the NEPA "hard look" standard).

---

[3] EPIC overstates *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1053-54 (N.D. Cal. 2015).  There, the court's ruling did not rest on a finding that "a single measure [for dispersal habitat] lacked objective criteria[,]" ECF No. 49 at 23:24-25, but instead that "[t]he Fish and Wildlife Service . . . factor[ed] the conservation efforts of non-applicant Forest Service into its § 10 analysis of applicant Fruit Growers' mitigation efforts" where the applicant's lands were checker-boarded with the Forest Service's lands, 99 F. Supp. 3d at 1066.

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

### 2. The DCAs Protect High Quality Owl Habitat.

EPIC's record-based critiques of the FHCP's Dynamic Core Areas ("DCAs") fare no better than its legal contentions. EPIC claims, mistakenly, that the only purpose of the DCAs is to prevent take and, therefore, the 44 DCAs do not adequately mitigate the FHCP's total incidental take authorization over the FHCP's 50-year term. ECF No. 49 at 24:2-25:24. But the core purpose of the DCAs is not to prevent take; it is to produce and protect a "mosaic of high quality habitat" across the Plan Area where NSO are known to nest, forage, and reproduce. FWS 0134-37, 144-46. Indeed, the Service found that the DCAs would mitigate the impacts of take because they, among other things, "provide demographic support to owl populations" and support "reproductive success." FWS 01707. The data before the Service showed that the initial 44 DCA sites annually produced, on average, 16.7 NSO fledglings, or *5.7 more fledglings per year* than under the 1992 HCP's static reserves (11.0 fledglings per year). FWS 0139. The DCAs are also protected even when they are unoccupied, ensuring high-quality habitat is available as NSO populations move or expand. FWS 0134-37, 139. The 44 DCAs therefore provide an *annual* conservation benefit that dwarfs the impacts of projected incidental take under the ITP (temporary disturbance of up to 119 owl sites *over 50 years*). FWS 0233-34, 1697. EPIC also ignores the other FHCP measures that compensate for temporary impacts of take, including the TREE Program and BaOw removal. FWS 01706-08.

EPIC next argues that the DCAs' age and acreage thresholds are inconsistent with cherrypicked portions of Folliard 1993 (a study EPIC previously criticized as not reflecting the best available science). ECF No. 49 at 25:25-28:20. But EPIC's entire argument is premised on its own mistaken assumptions, as explained above, that the Service relied exclusively on the DCAs to reach its fully offset determination, and that DCAs provide only take avoidance. And EPIC misunderstands the Service's treatment of the Folliard study. As Green Diamond explained, the mean-minus-one-standard deviation threshold assumes take (triggering years of surveys and review by the Service) whenever harvesting causes habitat surrounding an owl site to drop below conditions where displacement occurred in the past. ECF No. 48 at 25:15-26:2. This approach is conservative (over-inclusive) because more than a decade of site-specific data, not just Folliard,

shows displacement of NSO often does not occur even when those thresholds are triggered.[4]  FWS 0358-67; *see also* FWS 076-88 (summarizing NSO habitat analyses).

EPIC further asserts that the DCAs' habitat thresholds are flawed because they don't account for variables that the FHCP identifies as important for nesting, such as the basal area (a measure of forest density) of older trees and hardwoods.  *See* ECF No. 49 at 29:23-24 (citing FWS 078).  As an initial matter, the argument overlooks that DCAs are selected specifically because they have a history of NSO nesting.  FWS 0135, 144-45.  EPIC never explains why the DCAs should disregard observed nesting choices of the NSO for the myriad "nesting probability" criteria EPIC believes to be important.  Furthermore, the FHCP explains that variables such as basal area are closely linked to stand age.  FWS 078 ("In other words, for nesting, NSO were selecting older more complex stands . . . ").  The FHCP's TREE Program also addresses this concern by retaining and recruiting complex habitat throughout the Plan Area, including near existing DCAs and within potential future DCAs.  *See* FWS 01707.

Beyond all that, EPIC's own cases do not support its position.  One of EPIC's core arguments is that by using the 89-acre stand age threshold, and by not separately accounting for various "structural features," the DCAs fail to accurately reflect NSO habitat.  ECF No. 49 at 29:1-30-21.  But in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1066 (9th Cir.), *amended*, 387 F.3d 968 (9th Cir. 2004), the Court upheld, under Section 7, a habitat proxy that "takes into account type of land, extent of degradation of the habitat, relationship between different habitats, the owls' distribution, and the owls' range."  *Id.*  The Folliard 1993 thresholds incorporate those same variables based on studies of NSO habitat on Green Diamond's lands.  FWS 058084-198 (Folliard study).  *Gifford Pinchot* thus reinforces that the Service's reliance on the DCAs was permissible and that the Service was not required to consider other criteria already baked into the habitat proxy.

---

[4] EPIC cites a later Folliard study to argue the DCAs must include habitat with older age classes. ECF No. 49 at 27:20-28:2 (citing FWS 035244).  But that study predicts site selection, not displacement, which is the proper focus for take.  FWS 035216.  EPIC also omits that the study found most nests in stands 35-60 years old, which is consistent with the DCAs.  FWS 035221.

EPIC's reliance on *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 972 (9th Cir. 2002), gets it no further.  There, the Ninth Circuit determined a specific habitat proxy did not meet monitoring requirements under the National Forest Management Act (NFMA) because it did not "reasonably" ensure "viable" populations. *Id.*  But this is not a NFMA case, and in any event the ESA only requires that habitat proxies be reasonably linked to impacts on a protected species. *See Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1250 (9th Cir. 2001).  Here, the extensive explanation for the DCA strategy, FWS 0134-53, including an analysis of the initial DCAs' historical fecundity rates, number of fledglings, and years occupied, FWS 0142-43, demonstrates the DCA criteria are reasonably linked to the biological needs of NSO.[5]

Turning to EPIC's argument that the DCAs "double-count[]" habitat protections under the Aquatic HCP ("AHCP"), ECF No. 49 at 32:19-35:9, EPIC provides no legal support for its position. AHCP-protected areas can provide offset value for the FHCP, especially given the biological reality that habitat often benefits multiple species.  EPIC also ignores that there is very limited geographic overlap between these areas and DCAs (34% on average), FWS 01136, 1444, and has no response to the facts that the DCAs will (i) extend habitat protections for twelve years beyond the AHCP's expiration and (ii) protect habitat independently of the AHCP.  *See* FWS 038447-39592.

### 3.    The Occupancy Surveys Avoid Unauthorized Take.

EPIC's continued attack on the FHCP's occupancy surveys confuses the issues.  EPIC essentially argues that take is undercounted because the surveys might result in false negatives. ECF No. 49 at 36:2-37:13.  But the Service made an expert judgment that three years of physical surveys adequately determine that a stand is vacant based on the survey protocol's 95% probability of detection. FWS 0227, 241-42, 751, 770-71; *see also* ECF No. 48 at 28:18-29:18.  EPIC provides no authority for insisting that an HCP is deficient unless it can prove occupancy surveys are always 100% accurate.  *See* 16 U.S.C. § 1539(a)(2)(B)(ii) (requiring that an HCP minimize and mitigate

---

[5] EPIC recycles its arguments regarding the DCAs' habitat thresholds to criticize the "dynamic" nature of the DCAs. ECF No. 49 at 30:22-32:18.  The argument fails for the same reasons discussed above.  Moreover, Green Diamond previously explained why EPIC's focus on "historical territories" is misplaced, ECF No. 48 at 27:21-28:17, and EPIC offers nothing new on reply.

take "to the maximum extent practicable"); *cf. Friends of the Gualala River*, 552 F. Supp. 3d at 937 ("the ESA requires a 'reasonable certainty' that a taking of a listed species will occur"). Nor can EPIC explain how those protocols are deficient when they go beyond the Service's current NSO survey protocol guidance, which calls for just two years of surveys even when BaOw are present.[6] FWS 013919, 13932-33.

EPIC also cites Dugger et al. 2009, ECF No. 49 at 36:16-19, to claim that an "unoccupied site" might become *reoccupied* in the future. But as Green Diamond explained, ECF No. 48 at 28:28-29:6, potential reoccupation at some future date is irrelevant to whether the FHCP undercounts take when harvesting occurs. *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995). Undeterred, EPIC merely references its comment letter, ECF No. 49 at 36:20-21 (citing FWS 028670), which references a 2008 Service survey guidance document that has been superseded, *see* ECF No. 45 at 24:6-25:1.

### 4. The FHCP Protects Owls During Post-Fire Salvage.

Contending that the FHCP inadequately constrains post-fire salvage logging in DCAs, EPIC returns to Clark 2007. ECF No. 49 at 37:14-38:8. Again, Clark provides no support for EPIC's position because it looked only at the effects of high severity fire and salvage harvesting together, rather than separately. ECF No. 48 at 30 n.23. And there is no authority for EPIC's position that the Service must prohibit salvage logging outright because it is a "joint driver" of site extinction, ECF No. 49 at 38:2-12; rather, incidental take from salvage logging, like any other covered activity, must be appropriately minimized and mitigated, as the Service found it to be here. FWS 01708-10. Moreover, EPIC ignores the supplemental prescriptions that minimize and mitigate impacts of any limited salvage harvest, by requiring, inter alia, the retention of structural features and reforestation. FWS 0192 (discussing supplemental prescriptions).[7]

---

[6] As just two examples, the FHCP commits Green Diamond to update the detection probability calculator every five years to calculate seasonal (multi-visit) detection probabilities, FWS 0725, 771, and requires ongoing annual surveys across the Plan Area, FWS 0210.

[7] EPIC also criticizes the "supplemental prescriptions" that Green Diamond may undertake in a functional post-fire DCA, ECF No. 49 at 38:13-22, but omits that the Service must "concur" with any such prescription, FWS 0192.

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

EPIC also criticizes the FHCP for allowing replacement of a non-functional, burnt DCA with a DCA providing functional habitat. ECF No. 49 at 38:8-12. But EPIC omits that the Service must agree a burnt DCA is "no longer functional" and should be replaced, and that any replacement must be "designated in the closest available NSO site that meets the necessary criteria[.]" FWS 0192. And the criticism makes little sense. The Service reasonably determined that it was better to move DCA protections to intact habitat, rather than continue to impose them on low-quality habitat that NSO would likely not use for years.

Forced to concede that the TREE Program requires that salvage harvests retain decadent features important for future NSO habitat, *see* FWS 0192, EPIC's retort is that allowing for removal of snags that constitute a "clear safety or fire hazard" renders the entire retention standard "illusory" because that exception (according to EPIC) contains no "objective" criteria. ECF No. 49 at 38:23-39:3. But not every snag will be a safety or fire hazard. And again, EPIC insists on absolute certainty, such as a mathematical definition of "hazard," where none can exist.[8] The law requires that the effects of mitigation measures be *reasonably* certain to occur. *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 987-89 (9th Cir. 2023). The TREE Program meets that standard.

### 5. Barred Owl Removal Offsets the Take of NSO.

EPIC does not dispute that invading BaOw are a primary threat to NSO, that lethal removal of BaOw alone is not a complete solution, and that lethal removal (i.e., shooting BaOw with a shotgun, FWS 092) raises ethical concerns. ECF No. 49 at 39:4-41:3. Instead, EPIC argues Phase Three of the FHCP's BaOw control program (calling for potential implementation of an "invasion" and "coexistence" approach in portions of the Plan Area) is speculative, and that the Service cannot delegate scientific decision making to a scientific review panel. *Id.* The contentions lack merit.

The Court must evaluate the BaOw control measures upon which the Service relied as a whole. *See* FWS 01707-08. The FHCP envisions that Phase Two (Plan Area-wide lethal removal of BaOw) will occur for at least the first 10 years of the FHCP term. FWS 0123. And unless and until Phase Two is proven to benefit NSO, Phase Two must continue for the 50-year duration of

---

[8] Limiting removal of trees presenting a "clear safety or fire hazard" would endanger Green Diamond personnel and risk exacerbating or reigniting a wildfire, which could further damage NSO habitat.

the FHCP. *See* FWS 0123 (requiring "statistically significant treatment effect" for Phase Two completion), 161-62 (same). Phase Three (exploring non-lethal management alternatives) is contingent on approval from the Service and permits that must be secured from the Service and CDFW. FWS 0123, 162-64. The exact details of Phase Three have not yet been ironed out, FWS 0162-63, because they will depend on lessons learned from Phase Two. But that does not mean the Service cannot rely in part on Phase Three because it is too indefinite, or that Phase Three will not "address the threats" to NSO. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020). The Ninth Circuit has already rejected EPIC's contention that "experimental studies" cannot provide mitigation value. ECF No. 49 at 40:24-25; *see Friends of Animals v. U.S. Fish & Wildlife Serv.*, 28 F.4th 19, 29-30 (9th Cir. 2022) (confirming that BaOw removal experiments provide an "informational and research benefit[,]" and explaining that whether such benefits outweigh harms from take involves an "expert judgment that we generally defer to the agency").

EPIC relies on *Bernhardt* to argue that "mitigation must be subject to agency control *and* certain to occur[.]" ECF No. 49 at 40:8-9 (emphasis added). But that misrepresents *Bernhardt*'s actual requirement that mitigation be "under agency control *or* otherwise *reasonably* certain to occur[,]" 982 F.3d at 743 (emphasis added). The BaOw control measures easily meet that bar.[9] In any event, the BaOw experimental design, and Green Diamond's related obligations, are under the Service's control because the Service must sign off on any Phase Three experiment. FWS 0123.

EPIC's critique of the FHCP's independent scientific panel, which is empowered to adjudicate any dispute between Green Diamond and the Service about whether to conclude Phase Two and proceed to Phase Three, gets it no further. ECF No. 49 at 39:26-40:12. The panel will consist of "independent experts," and "all of the science panel members must be acceptable" to the Service. FWS 0174. And the scientific panel would only decide whether it is appropriate to proceed from Phase Two to Phase Three; the Service would still need to approve the content of Phase Three and issue necessary permits. FWS 0123.

---

[9] EPIC focuses on language in the FHCP predicting Green Diamond "may" have to return to lethal removal if the Phase Three experiment is unsuccessful to suggest any such limitations would be nonbinding. ECF No. 49 at 40:13-20. Not so. The precise safeguards of a future Phase Three experiment would be approved, and enforced, by the Service. *See* FWS 0162-64.

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

**B. The Biological Opinion Reasonably Determined that Approving the FHCP Was Not Likely To Jeopardize the NSO.**

EPIC claims that the BiOp disregards the best available science, *see* ECF No. 49 at 41:4-5, yet ignores the operative legal standard, disregards the substantial deference owed the Service in its scientific judgments, and relies on misrepresentations and omissions of record evidence disproving its contentions. It falls well short of showing the BiOp violated the best available science standard, *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1067 (9th Cir. 2024), and the Court should not substitute EPIC's reinterpretations of the record for the Service's expert judgments, *Locke*, 776 F.3d at 996.

**1. EPIC Misrepresents the Record To Dispute the Demographic Baseline.**

EPIC debuts a new argument on reply that raw data from the 2019 Annual Report (required by the 1992 HCP) purportedly "breaks the mathematical foundation of FWS's jeopardy analysis." ECF No. 49 at 41:9-11. EPIC forfeited this argument. *See Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 994-95 (9th Cir. 2009). But if the Court reaches it, the argument fails because it misrepresents the record.

EPIC insists that even though the BiOp included "a 2015 baseline of 166 active spotted owl sites[,]" the 2019 Annual Report demonstrates that by 2018 "the number of occupied sites had dropped to 101." ECF No. 49 at 41:9-15 (citing FWS 01139, 27660, 27664). This compares apples to oranges. The BiOp's 2015 baseline of "active" NSO sites refers to those sites "occupied in at least one of the last three years[,]" FWS 0233 n.4, whereas the 2019 Annual Report measures sites occupied within the past year (2018 alone), *see* FWS 027660, 27654-55, 27664. EPIC's erroneous comparison of the data in no way amounts to the "actual population" of NSO dropping "nearly 40%" as it claims. ECF No. 49 at 41:15-17.

Even if the 2019 Annual Report shows a drop in NSO occupancy, the Service considered that report when it approved the FHCP and issued the ITP. ECF No. 48 at 33:10-13. The Service was not required to further explore that data as EPIC insists, especially where, as here, the Annual Report's raw data was duplicative of peer-reviewed science examined in the BiOp. *See Oregon Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 997 (D. Or. 2010) (agencies need not "cite every

potentially relevant study, especially such studies that do not constitute the best available science"). Indeed, the BiOp considered similar drops in NSO population in its jeopardy analysis, including localized population estimates on Green Diamond's lands.  *See* FWS 01111 (summarizing the Dugger et al. 2016 meta-analysis and results for "Green Diamond lands").  The Service explained that those changes in NSO population correlated with BaOw removal efforts, FWS 01111, which Green Diamond paused in 2014 pending further authorization under the FHCP, FWS 0160, 162. The Service therefore reasonably determined no jeopardy because, among other conservation measures, the FHCP would resume BaOw removal that would, in turn, lead to increasing NSO numbers.  FWS 01111, 1139-41, 1146-47.[10]

### 2. The BiOp's Acknowledgement that Green Diamond Could Use Models To Monitor Take, If the Service Approves, Was Reasonable.

EPIC argues the Service erred by acknowledging that, when Green Diamond "implement[s]" the FHCP, it may, after at least ten years and contingent on subsequent agency approval and other restrictions, assess annual incidental take based on a combination of monitoring, surveys, and statistical models.[11]  FWS 01104; *see* ECF No. 49 at 44:24-45:4.  But the precise method of monitoring incidental take is not "a critical, primary, or relatively significant factor" in the BiOp's jeopardy determination—it is tangential at best to the BiOp's assessment of the authorized level of incidental take.  *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1056 (N.D. Cal. 2015); *see Grand Canyon Trust v. U.S. Bureau of Reclamation*, 2010 WL 2643537, at *21 (D. Ariz. June 29, 2010).  The argument fails for that reason alone.

To the extent that the BiOp relied on the models at all in determining no jeopardy, it reasonably relied on the FHCP's stringent threshold requirements and safeguards to ensure that any

---

[10] EPIC also insists that the Service used a "data freeze" to shield an "obsolete baseline[,]" ECF No. 49 at 41:19, but Green Diamond already explained that the BiOp does not observe a data freeze and relies on post-2015 data, like Dugger et al. 2016, that addresses any decline in NSO population at issue here, *see* ECF No. 48 at 33:3-13.
[11] The FHCP refers to two different models:  the habitat fitness model, which identifies optimal NSO habitat, FWS 0165-66, and the site occupancy model, which identifies occupied NSO sites, FWS 0166; *see* ECF No. 48 at 18:23-19:11.

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

future use of the site occupancy model would accurately assess take. First, Green Diamond must demonstrate based on ten years of survey data, FWS 0209-10, 1104, that the site occupancy model accurately predicts the likelihood that any given site will be occupied by owls to a 95% confidence level, FWS 0167-68, 209-10, 243, 245, 773-77. Second, the Service must approve the model based on those parameters, and if it doesn't, Green Diamond must continue to monitor annual incidental take based on extensive NSO surveys and mark-recapture data. FWS 0245. Third, even if the Service approves the site occupancy model, Green Diamond must continue to annually monitor all DCAs, at least twelve additional randomly selected occupied sites, and at least 20% of potential take sites, as well as conduct annual site occupancy surveys throughout the entire Plan Area. FWS 0168. And finally, if there is any "evidence of a statistically significant . . . decline relative to the NSO population at the initiation of this FHCP" then the "full monitoring protocol for NSOs will continue throughout the Plan Area[,]" which includes intensive mark-recapture efforts. *Id.*[12]

It is not surprising that EPIC fails to cite a single case forbidding the measurement of take by using a statistical model—the Ninth Circuit has routinely approved of BiOps that rely on similar statistical models. *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 617-21 (9th Cir. 2014); *Locke*, 776 F.3d at 997. And the best available science shows that site occupancy models reliably and effectively track occupancy. *See generally* FWS 0165-66, 42370-78, 42379-86, 42387-729, 69751-65.

EPIC also revives its tired attack on the substance of the models, but it misunderstands how the models work. EPIC claims that the habitat fitness model is ineffective because it "cannot predict site-specific harvest effects[,]" ECF No. 49 at 46:7-9, but the FHCP's second model, the site occupancy model, predicts exactly that, *see* FWS 0242-44. EPIC puts forth no new science challenging the models in its reply, and instead points back to CDFW's (rescinded) critique of the

---

[12] EPIC's argument that Defendants are barred from citing to the FHCP to defend the BiOp strains credulity. *See* ECF No. 49 at 44:7-14. When the BiOp discusses the models at issue here, it necessarily cites to and incorporates by reference relevant portions of the FHCP describing the models. *See* FWS 01104 (citing FHCP at "Green Diamond 2018"); *see also* FWS 01148 (incorporating by reference conservation measures in the FHCP). That is routine and permissible within this circuit. *See, e.g.*, *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, No. 97-CV-775, 1998 WL 1988556, at *11 (W.D. Wash. May 29, 1998); *Friends of the Wild Swan v. Jewell*, No. CV 13-61-M-DWM, 2014 WL 4182702, at *9 (D. Mont. Aug. 21, 2014).

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

FHCP's models.  *See* ECF No. 49 at 45:10-18 (citing FWS 01593-94); Carr Decl., Ex. C.  But as Green Diamond and the Service explained, ECF No. 48 at 35:5-16, ECF No. 45 at 32:14-33:5, the FHCP models appropriately use data covering the entire Plan Area, FWS 0164-66, and rely on multiple covariates to accurately predict habitat fitness and occupancy, FWS 01593-94.

### 3.  The BiOp Reasonably Considered Dispersal Habitat.

The BiOp acknowledges that "dispersal habitat," described as a "mosaic of late-successional habitat interspersed with other seral conditions[,]" may benefit the NSO.  FWS 01109-10.  It then determines no jeopardy based on, *inter alia*, the FHCP's design to "[p]romote a habitat mosaic across the Plan Area[,]" *see* FWS 01104, including by using the FHCP's DCA cluster strategy and connected dispersal habitats, FWS 0136-38, as incorporated in the BiOp, FWS 01148-49.  The BiOp likewise incorporates the FHCP's analysis of the DCA cluster strategy, which is based on the best available science.  *See* FWS 0137-38 (reviewing Interagency Scientific Committee report, Goodman 1987, Shaffer 1987, Lamberson 1994, and USFWS 2008 Final NSO Recovery Plan).[13]

EPIC argues the BiOp's reliance on the cluster strategy is inadequate because the FHCP authorizes incidental take of non-DCA sites.  *See* ECF No. 49 at 47:13-16 (citing FWS 0138).  That is incorrect.  Non-DCA sites are just one supporting factor of the cluster strategy, alongside the DCAs and other reserved areas.  *See* FWS 0136-38.  Indeed, the FHCP includes "approximately 90,000 acres [over 140 square miles] of riparian and geological zones" across the Plan Area, "much of which already is or will become high quality roosting and nesting habitat[.]"  FWS 0139.[14]  Nor does take "destroy" a site—the science shows that sites retain biological functions even after timber harvest and will continue to grow.  *See* FWS 0358-59.  Incidental take has a minor effect, if any, on just one subsidiary aspect of the cluster strategy and did not bias the BiOp's analysis.

---

[13] Incorporation by reference is routine and permissible.  *See supra*, n.12.  Courts reviewing whether a BiOp adequately assessed connectivity rely on both the associated HCP and the agency's NEPA analysis.  *See Nat'l Wildlife Fed'n v. Norton*, No. CIV-S-04-0579 DFL JF, 2005 WL 2175874, at *8 (E.D. Cal. Sept. 7, 2005).

[14] EPIC's attempt to fault the BiOp because it does not require DCAs in all eleven OMUs, ECF No. 49 at 47:23-24, fails for the same reason—the FHCP already provides sufficient high-quality dispersal habitat across all OMUs, irrespective of where DCAs are located, *see* FWS 0140, 1140.  Furthermore, nothing precludes moving DCAs to other OMUs in the future.  FWS 0139.

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

**4.    The BiOp Reasonably Considered Impacts on the Adjustment Area.**

EPIC argues the BiOp "fails to analyze" impacts on adjustment area lands that may be added to the FHCP's initial plan area.  ECF No. 49 at 48:15-17.  But the BiOp obviously did this analysis, as the Service has explained, *see* ECF No. 52 at 27:19-28:17; *see also* FWS 01132, 1137, 1146 (BiOp analyzing impacts across the action area, including the initial plan area and adjustment area).

EPIC also argues that the BiOp did not sufficiently analyze adjustment area lands, ECF No. 49 at 48:9, but the record belies that argument.  EPIC takes issue with the BiOp's reference to the FHCP's statement that "all commercial timberlands" within the initial plan area and adjustment area "share similar relevant characteristics[,]" insisting that an "independent, site-specific analysis" was required of the adjustment area lands.  ECF No. 49 at 48 n.21 (citing FWS 032).  But the BiOp relied upon an analysis of habitat characteristics across the action area.  *See* FWS 070-76 (FHCP explaining that initial plan and adjustment area share relevant habitat characteristics based on site-specific research, monitoring, and the best available science), 1132-33; *see also* FWS 0812 (map of hydrographic planning areas).[15]

EPIC is confused because there is an *additional* process for Green Diamond to add adjustment area lands to the initial plan area, during which Green Diamond must present to the Service a "summary of relevant biological and physical characteristics that such [adjustment area] lands share with existing Plan Area lands."  FWS 032.  That additional safeguard does not mean the Service deferred its analysis, as held unlawful in *Conner v. Burford*, 848 F.2d 1441, 1453-54 (9th Cir. 1988), and *Southwest Center for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1139 (S.D. Cal. 2006).  The BiOp already performed the required analysis.  *See* FWS 01106, 1132.

**5.    The BiOp's Climate Change Analysis Is Lawful.**

The Service must rely on "the best scientific and commercial data available" when analyzing climate change in a BiOp.  *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 736, 739-40 (9th Cir. 2017).  It met that requirement by evaluating the FHCP's

---

[15] Contrary to EPIC's arguments, it is entirely appropriate for a BiOp to incorporate and rely on information in the FHCP.  *See supra*, n.12.

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

effects in light of climate change's effects on wildfire and forest conditions.  EPIC again flyspecks the BiOp by raising issues the Service already considered or had no obligation to consider.

*The BiOp's Analysis.*  EPIC argues that the BiOp did not address "synergistic" or "additive" impacts of climate change.  ECF No. 49 at 50:9-17.  But the BiOp did just that when it evaluated the agency action against a baseline of climate-induced wildfire and changing forest composition, explaining that climate change results in "unpredictable" changes to habitat, "due to warmer temperatures, drier fuel moistures, and prolonged dry periods[.]"  FWS 01110.  It also detailed how these climate-related changes are "likely to increase the frequency and severity of wildfires and extend the duration of fire seasons[,]" *id.*, and it quantified habitat losses from natural events including wildfires, FWS 01113.  The Service reasonably determined no jeopardy when it analyzed the expected impacts of the proposed action in light of and "on top of" these changing conditions attributable to climate change.  *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 711 (9th Cir. 2009); *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016).

The BiOp also appropriately incorporated the FHCP and FEIS (FWS 01102-03, 1148), which bolsters its climate change analysis.[16]  *See* ECF No. 48 at 37:20-38: 14.  EPIC argues the Court should ignore these documents because "the analysis must be in the BiOp[,]" ECF No. 49 at 52:16-17, but the Ninth Circuit has already rejected that argument, *see Alliance for the Wild Rockies v. Marten*, 789 F.App'x 583, 583 n.1 (9th Cir. 2020).

*EPIC's Science.*  EPIC has failed to put forward relevant climate change science that the Service failed to consider, that is better than the science the Service relied on, and that would materially affect the Service's analysis.  *See Nat. Res. Def. Council*, 102 F.4th at 1067.

*First*, EPIC argues the Service should have examined scientific research about the effects of "higher temperatures" and "longer dry periods" on forests, ECF No. 49 at 51:3-8 (citing FWS 039740), but the BiOp grappled with this very science when it examined climate change, relying

---

[16] The FHCP identifies, among other things, how climate change may affect NSO nesting success, FWS 0195, NSO site abandonment, FWS 0231, and wildfires, FWS 0319.  Its adaptive management and changed circumstances provisions also account for climate change.  *See* FWS 0174-83, 191-92.  The FEIS likewise discussed climate change effects related to drought, temperatures, and precipitation on NSO recruitment, survival, and reproduction.  FWS 01456-57.

on Skinner 2007, *see* FWS 01110 (examining "warmer temperatures" and "prolonged dry periods").[17]   And EPIC suggests that the Service should have studied heat stress on NSO, as opposed to their habitat, ECF No. 49 at 52:3-4, but the BiOp already considered the materials EPIC cites, FWS 01110.  In any event, the FEIS (incorporated into the BiOp) also studied heat stress on NSO.  FWS 01456-57.

*Second,* EPIC argues that "insect outbreaks" are a "major climate impact on forests" that the BiOp failed to consider.  ECF No. 49 at 51:8-13 (citing FWS 039736); *see also id.* at 51:10-13 (citing FWS 039740), 52:5-6.  EPIC forfeited that argument because it devoted just *two words* to the issue in its Opening Brief.  *See Dream Games of Ariz.*, 561 F.3d at 994-95.  Beyond that, the science EPIC cites on insect outbreaks across the western U.S., FWS 039736, 39740, is not applicable to the California coastal redwood forests at issue here.  *See* FWS 017, 48819-20 (NSO Recovery Plan confirming that beetle outbreaks exacerbated by climate change are primarily a threat to NSO habitat in the eastern Cascades).  EPIC accordingly has not identified "*relevant* scientific evidence that the agency ignored[.]" *Nat. Res. Def. Council*, 102 F.4th at 1067 (emphasis added).  And even if it had, the Service's FEIS did consider impacts of insect outbreaks in conjunction with climate change.  FWS 01456-57.

*Third,* the Service did not fail to assess climate change impacts on the NSO's prey.  Grasping at straws, EPIC makes a brand-new argument that the BiOp fails to analyze how climate change will affect the woodrat.[18]  *See* ECF No. 49 at 53:4-6.  Again, EPIC has forfeited this new argument.  *See Dream Games of Ariz.*, 561 F.3d at 994-95.  The claim also fails because EPIC does not cite any "better" science on climate impacts to woodrats the Service should have considered.  *See Nat. Res. Def. Council*, 102 F.4th at 1067.  The Service relied on the best available woodrat science, FWS 0419-23 and connected the dots between climate change and impacts to NSO prey,

---

[17] EPIC argues that "the BiOp's use of Skinner (2007) is incomplete" because it does not integrate certain aspects of that research, ECF No. 49 at 52:7-10, but EPIC points to research on forest management practices that Skinner does not connect to climate change and are not relevant here, *see* FWS 070541 ("Management Issues").

[18] In its opening brief, EPIC faulted the BiOp for not adequately addressing climate change impacts on red tree vole, "the spotted owl's primary prey[.]" ECF No. 38 at 40:5-6.  That was incorrect on multiple levels, as Green Diamond and the Service explained.

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

and its no jeopardy determination is fully supported by the record. *See* FWS 0195, 1110, 1456-57.

*Adaptive management.* EPIC argues the Service cannot rely on adaptive management provisions to account for uncertainty surrounding climate change, ECF No. 49 at 53:22-54:1, but the conservation measures' adaptive management and changed circumstances provisions, incorporated in the BiOp, FWS 01105, 1139-40, are just a few of the many ways in which the BiOp addresses climate change. Even setting aside those adaptive management provisions, the BiOp's jeopardy analysis more than satisfactorily addresses climate change. *See supra*, pp. 15-16.

In any event, the BiOp still properly relied on those well-defined adaptive management provisions, which entail "specific management responses, tied to [] specific triggering criteria[.]" *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011). The FHCP's adaptive management program contains formal commitments to take specific management actions based on well-defined metrics like statistically significant declines in NSO population or fecundity estimates.[19] FWS 0176, 182. Courts routinely uphold BiOps that rely on such provisions to determine no jeopardy. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1185 (E.D. Cal. 2008). *Greater Yellowstone*, which involved a BiOp that relied on undefined, generalized "management responses," 665 F.3d at 1029, has no application here.

### C. EPIC's Marbled Murrelet Claims Fail.

#### 1. EPIC Failed To Establish Standing.

The standing declarations EPIC filed with its moving papers were insufficient because the declarants either attested to only vague interests in MaMu or did not mention MaMu at all. Recognizing this failing, EPIC submitted additional declarations. *See* ECF No. 49 at 14:3-5. But those too fall short of establishing EPIC's standing to pursue its claims related to MaMu.

*First*, EPIC failed to establish any injury in fact for its original affiants Baker and DiPerna, who attested to only a vague interest in MaMu. An "injury in fact" must be "(a) concrete and

---

[19] Contrary to EPIC's arguments, the adaptive management plan does not "cap[] spotted owl habitat mitigation at 1,068 acres[.]" ECF No. 49 at 54:18-19. That limit applies to just one of the adaptive management measures. FWS 0182. In addition, EPIC's insistence that "[t]riggers requiring prolonged population declines before mandating a response fail Ninth Circuit standards[,]" ECF No. 49 at 54:12-14, is entirely unsupported by the case EPIC cites, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 876 (D. Or. 2016).

particularized and (b) actual or imminent, not conjectural or hypothetical[.]" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citations omitted). EPIC argues in its *reply brief* that Baker and DiPerna establish injury in fact based on their "close living proximity and frequent use of areas around Green Diamond lands to recreate and *look for murrelets*," ECF No. 49 at 15:11-12 (emphasis added), but neither declarant attests to having ever viewed or even "looked for" murrelets (though that alone would still be insufficient). *See* ECF No. 39 at 2:1-4:5; ECF No. 41 at 2:1-3:17. Neither show a concrete or imminent injury associated with murrelets "apart from the members' special interest" in the species. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 556 (1992).

*Second*, the declarations that EPIC submits on reply (Falxa and Burton part II) do not cure this flaw because neither declarant claims to have been a member when EPIC filed suit. Because standing is based on "the facts as they existed at the time the plaintiff filed the complaint[,]" *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (citing *Lujan*, 504 U.S. at 569 n.4), a declaration is "legally insufficient" to establish associational standing if the declarant "has not shown that he was a member of a petitioner organization *at the time the petition . . . was filed*." *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 64 (D.C. Cir. 2000) (emphasis added); *see also Env'l Prot. Info. Ctr. v. Pac. Lumber Co.*, 469 F. Supp. 2d 803, 816 (N.D. Cal. 2007); *Freedom from Religion Found., Inc. v. Weber*, 951 F. Supp. 2d 1123, 1130-31 (D. Mont. 2013).

EPIC is a repeat player in this Court (and other federal courts) and knows the rules. It bore the burden to prove its standing, *see Lujan*, 504 U.S. at 560, and had multiple bites at the apple. Yet Burton's declarations are silent as to any membership in EPIC, let alone at the time suit was filed. *See* ECF No. 40 at 2:1-3:5; ECF No. 50 at 2:1-4:4. And while Falxa claims to be a member of EPIC, he conspicuously omits whether he was a member when EPIC filed suit. ECF No. 51 at 2:4-5. Because EPIC failed to establish standing, the Court lacks jurisdiction over EPIC's MaMu claims.

### 2. The Service's No Effect Determination for MaMu Was Lawful.

The record shows the Service reasonably determined that approving the FHCP and issuing the ITP would have "no effect" on MaMu. In *State of California v. Bureau of Land Management*,

612 F. Supp. 3d 925 (N.D. Cal. 2020), the court upheld a "no effect" determination "in light of the totality of the record[,]" and particularly based on existing regulatory protections: "BLM explained that it 'already had an extensive process in place to ensure that operators conduct oil and gas operations in an environmentally sound manner.'" *Id.* at 950-51. Here too, the record shows that the Service's no effect determination for MaMu was a reasonable one based on existing regulatory mechanisms. For example, California's Forest Practice Rules ("FPRs") prohibit the approval of timber harvesting plans (THPs) that would result in "take" (under either the ESA or CESA) or "jeopardy" (under CESA) of murrelet. 14 California Code of Regulations (CCR) §§ 895.1 (defining "take" for federally and California listed species), 898.2(d), 919.11 (MaMu Protective Measures).[20] Green Diamond submits detailed on-the-ground surveys to expert state agencies before harvesting occurs to ensure those requirements are met, and the results of many of those surveys were before the Service when developing the FHCP, the ITP, and BiOp. *See* FWS 076964-77036 (recent surveys); *see also* 14 CCR §§ 898.1-898.2, 919.2. A host of other provisions under the ESA, CESA, FPRs, and MATO also protect MaMu on Green Diamond's lands. *See* ECF No. 48 at 42:6-10. On that record, the Service's "no effect" determination for MaMu was reasonable.

EPIC makes various erroneous arguments on this topic. For example, EPIC claims that the MATO "authorizes activities that constitute take" based on mainline road use. ECF No. 49 at 17:19-20. But this is controverted by the Service's expert determination that "mainline road use is not likely to result in incidental take of MAMU." FWS 077037-38. EPIC also fails to distinguish *State of California v. Bureau of Land Management*, *see* ECF No. 49 at 19:15-21, because nothing in that decision suggests action agencies must ignore state regulatory processes in making no effect determinations. Similarly, EPIC is wrong to insist that the Service improperly relied on the MATO, CESA, and California's timber harvesting regulations to "bypass its federal consultation duties."

---

[20] EPIC claims state law is only relevant to the question of take. ECF No. 49 at 18:1-5. But the FPRs specifically prohibit approval of any THP that would result in take *or jeopardy* of MaMu, 14 CCR § 919.11, and the jeopardy analysis under CESA necessarily addresses potential impacts from habitat modification, *see* Cal. Fish & Game Code § 2081(c); *Env'l Prot. Info. Ctr. v. Dep't of Fish and Wildlife*, No. A163051, 2024 WL 295704 (Cal. Ct. App., Jan, 26, 2024), at *14-16; Eric Biber, *Reforming the California Endangered Species Act*, 44 Environs 127, 167-68 (2021) (explaining jeopardy within the meaning of CESA can arise "through habitat modification").

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

ECF No. 49 at 18:11-12.  Contrary to EPIC's argument, ECF No. 49 at 18:15-17, the FHCP and BiOp repeatedly reiterate that compliance with the FPRs and associated state regulatory processes is mandatory.  *See, e.g.*, FWS 050 (noting Green Diamond "manages its lands and conducts its operations without incidental take" of "[o]ther sensitive species such as . . . marbled murrelet"), 129, 213, 1103.  Federal regulations also show that state regulatory processes and public-private agreements must be part of the BiOp's analysis.  *See* 50 C.F.R. § 402.02 (providing that the "[c]umulative effects are those effects of future State or private activities" and "environmental baseline includes the past and present impacts of all Federal, State, or private actions").

### D.  The Court Should Consider the Documents EPIC Seeks to Exclude.

EPIC's attempt to deprive the Court of relevant documents, ECF No. 49 at 11:20-13:17, should be rejected.  In APA cases, a court may "consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis," *Locke,* 776 F.3d at 993, or "to explain technical terms or complex subject matter involved in the agency action[,]" *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1209 (E.D. Cal. 1999) (citation omitted).  The documents offered by Green Diamond meet that bar.  *See* ECF No. 48 at 9 n.1, 10 n.3, 20:6-7, 23:14-17. EPIC is also incorrect to claim that certain documents should be barred as post-decisional or violative of Federal Rule of Evidence 201.  Exhibits A-D constitute proper extra-record evidence because they each rely on *pre-decisional* data and analysis, *see All. for the Wild Rockies v. Marten*, 585 F. Supp. 3d 1252, 1261-62 (D. Mont. 2021) (citing *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018)), demonstrate CDFW's close technical review of the FHCP under CESA, and explain the technical terms and complex issues the Service had to grapple with.  As for Exhibits E-H, those merely establish that EPIC intervened in litigation to defend the Service's Barred Owl Management Strategy.  *See San Luis v. Badgley*, 136 F. Supp. 2d 1136, 1146 (E.D. Cal. 2000) (courts "may take judicial notice of a document filed another court . . . to establish the fact of such litigation and related filings").

### CONCLUSION

Green Diamond asks that the Court grant its motion and deny EPIC's motion.

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

DATED:  June 25, 2026

PAUL HASTINGS LLP

By: _____
CHRISTOPHER J. CARR

Attorneys for Defendant-Intervenor
GREEN DIAMOND RESOURCE COMPANY

GREEN DIAMOND'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT